# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Natural Health USA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>United States of America, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-02989-CRC |

### Memorandum in Support of Defendants' Motion to Dismiss

OF COUNSEL:

MARK RAZA
Chief Counsel

WENDY VICENTE
Deputy Chief Counsel, Litigation

ELIZABETH BONOMO
Assistant Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD  20993-0002

BRETT A. SHUMATE
Acting Assistant Attorney General

MICHAEL D. GRANSTON
Acting Deputy Assistant Attorney
General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director, Civil Chief

HILARY K. PERKINS
Assistant Director

JAMES W. HARLOW
Senior Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    I.    FDA's regulation of over-the-counter drugs ................................................ 2

    II.   FDA's regulation of homeopathic drugs .................................................... 4

    III.  This lawsuit ................................................................................................. 7

LEGAL STANDARD ................................................................................................................ 7

ARGUMENT ............................................................................................................................ 8

    I.    Alliance for Natural Health alleges no injury whatsoever for standing ................. 8

    II.   Three of the four APA claims do not challenge final agency action ..................... 10

        A.   Count I is an impermissible programmatic attack ............................................ 10

        B.   Counts III and IV attack a guidance document that has no binding effect ....... 11

    III.  All four claims fail as a matter of law ................................................................. 14

        A.   Meditrend misinterprets the CARES Act ........................................................ 14

        B.   FDA reasonably denied AHCF's citizen petition ............................................ 17

        C.   FDA's December 2022 guidance is not arbitrary or capricious .......................... 20

        D.   Meditrend knows the legal requirements to market homeopathic drugs ........ 21

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Akpan v. Cissna,*
   288 F. Supp. 3d 155 (D.D.C. 2018) ................................................................... 18

*Apalachicola Riverkeeper v. Taylor Energy Co. LLC,*
   No. CIV.A. 12-337, 2013 WL 1897142 (E.D. La. May 4, 2013) ......................... 10

*Apter v. Dep't of Health & Hum. Servs.,*
   No. 3:22-CV-184, 2024 WL 1473737 (S.D. Tex. Feb. 5, 2024)........................... 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)................................................................................... 8, 17, 20

*AT&T Co. v. EEOC,*
   270 F.3d 973 (D.C. Cir. 2001) ........................................................................... 12

*AT&T Servs., Inc. v. FCC,*
   21 F.4th 841 (D.C. Cir. 2021) ............................................................................ 21

*\*Bennett v. Spear,*
   520 U.S. 154 (1997)............................................................................................ 11

*Blanchett v. DeVos,*
   490 F. Supp. 3d 26 (D.D.C. 2020) ............................................................... 14, 17

*Blue v. Dist. of Columbia,*
   811 F.3d 14 (D.C. Cir. 2015)................................................................................ 8

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020)............................................................................................ 16

*Brownback v. King,*
   592 U.S. 209 (2021).............................................................................................. 7

*Bruesewitz v. Wyeth LLC,*
   562 U.S. 223 (2011)............................................................................................ 16

*Catawba Cnty. v. EPA,*
   571 F.3d 20 (D.C. Cir. 2009)............................................................................. 13

*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001).......................................................................... 11

*Ctr. for Biological Diversity v. Trump,*
   453 F. Supp. 3d 11 (D.D.C. 2020)................................................................... 9, 10

*Cutler v. Hayes,*
   818 F.2d 879 (D.C. Cir. 1987).............................................................................. 3

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................................. 7

*Elk Run Coal Co. v. U.S. Dep't of Lab.*,
   804 F. Supp. 2d 8 (D.D.C. 2011) ..................................................... 11, 18

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ....................................................... 14, 17, 19

*\*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................... 9, 10

*\*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ....................................................... 22

*ForUsAll, Inc. v. U.S. Dep't of Lab.*,
   691 F. Supp. 3d 14 (D.D.C. 2023) ..................................... 13, 19, 20

*Friends of Animals v. Ashe*,
   174 F. Supp. 3d 20 (D.D.C. 2016) ............................................... 11

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ....................................................... 10

*Hancock v. Urban Outfitters, Inc.*,
   830 F.3d 511 (D.C. Cir. 2016) ....................................................... 9

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ....................................................................... 8

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012) ............................................... 11, 13

*\*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) ............................................... 12, 13

*Iowaska Church of Healing v. Werfel*,
   105 F.4th 402 (D.C. Cir. 2024) ..................................................... 9

*Kansas v. Biden*,
   No. 24-1057-DDC-ADM, 2024 WL 2880404 (D. Kan. June 7, 2024) ........... 9

*\*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................... 10, 11

*M.M.V. v. Garland*,
   1 F.4th 1100 (D.C. Cir. 2021) ..................................................... 9

*McAfee v. FDA*,
   36 F.4th 272 (D.C. Cir. 2022) ..................................................... 17

*\*MediNatura, Inc. v. FDA*,
   496 F. Supp. 3d 416 (D.D.C. 2020) ............................................. 3

*MediNatura, Inc. v. FDA,
  998 F.3d 931 (D.C. Cir. 2021) ............................................................................ 3, 4, 5, 6

Milner v. Dep't of Navy,
  562 U.S. 562 (2011) ........................................................................................................ 16

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) .......................................................................................................... 21

N.C. Fisheries Ass'n, Inc. v. Gutierrez,
  518 F. Supp. 2d 62 (D.D.C. 2007) ................................................................................ 19

Nat'l Mining Ass'n v. McCarthy,
  758 F.3d 243 (D.C. Cir. 2014) ...................................................................................... 12

Neitzke v. Williams,
  490 U.S. 319 (1989) .......................................................................................................... 8

Norton v. S. Utah Wilderness All.,
  542 U.S. 55 (2004) .......................................................................................................... 10

Perry Cap. LLC v. Mnuchin,
  864 F.3d 591 (D.C. Cir. 2017) ...................................................................................... 17

Regan v. Spicer HB, LLC,
  134 F. Supp. 3d 21 (D.D.C. 2015) ..................................................................... 18, 19, 20

Rempfer v. Sharfstein,
  583 F.3d 860 (D.C. Cir. 2009) ...................................................................................... 21

Ross v. Blake,
  578 U.S. 632 (2016) ........................................................................................................ 14

Spokeo, Inc. v. Robins,
  578 U.S. 330 (2016) .......................................................................................................... 9

Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.,
  422 F. Supp. 3d 35 (D.D.C. 2019) ................................................................................ 14

Steel Co. v. Citizens for a Better Env't,
  523 U.S. 83 (1998) ............................................................................................................ 7

Sw. Airlines Co. v. U.S. Dep't of Transp.,
  832 F.3d 270 (D.C. Cir. 2016) ...................................................................................... 11

TransUnion LLC v. Ramirez,
  594 U.S. 413 (2021) .......................................................................................................... 8

Trudeau v. FTC,
  456 F.3d 178 (D.C. Cir. 2006) ........................................................................................ 6

United States v. Bronstein,
  849 F.3d 1101 (D.C. Cir. 2017) .................................................................................... 22

*Valero Energy Corp. v. EPA,
  927 F.3d 532 (D.C. Cir. 2019) .................................................... 11, 12, 13

Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,
  454 U.S. 464 (1982) ........................................................................ 9

Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.,
  106 F.4th 1195 (D.C. Cir. 2024) ...................................................... 13

Weinberger v. Hynson, Westcott & Dunning, Inc.,
  412 U.S. 609 (1973) ................................................................ 2, 21

Ysleta Del Sur Pueblo v. Texas,
  596 U.S. 685 (2022) ...................................................................... 16

**Statutes**

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. No. 116-136, 134 Stat. 281 (2020) ................................... passim

5 U.S.C. §
  551(13) .................................................................................... 10
  702 ........................................................................................ 10
  704 ........................................................................................ 10
  706(2) ...................................................................................... 7

21 U.S.C. §
  301 ................................................................................... 14, 15
  321(g) ..................................................................................... 18
  321(g)(1) .................................................................................. 4
  321(p) ............................................................................... 2, 3, 15
  321(p)(1) ................................................................................. 19
  355 ................................................................................... passim
  355h ................................................................................. 3, 6, 15
  355h(a) ..................................................................................... 3

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................... 7

Fed. R. Civ. P. 12(h)(3) ....................................................................... 7

**Other Authorities**

37 Fed. Reg. 9464 (May 11, 1972) ................................................... 3, 16

84 Fed. Reg. 57,439 (Oct. 25, 2019) ................................................. 5, 13

INTRODUCTION

Homeopathic drugs—like all other drugs—are subject to the terms of the Federal Food, Drug, and Cosmetic Act (FFDCA). Those include the requirement of premarket approval for new drugs and the prohibition on distributing unapproved new drugs. The Food and Drug Administration has never approved a marketing application for a homeopathic drug nor determined a homeopathic drug was exempt from the new drug approval requirement. Though for several decades the agency extended enforcement discretion to unapproved homeopathic drugs under certain conditions, this policy ended in 2019. Since then, FDA has reiterated publicly that homeopathic drugs are subject to the FFDCA—the same as they always have been and the same as other drugs.

The interest group Alliance for Natural Health USA and the homeopathic drug manufacturer Meditrend, Inc., disagree with FDA's regulatory approach to the homeopathic drug industry. They filed this Administrative Procedure Act (APA) suit, challenging FDA's position about the FFDCA's applicability to homeopathic drugs and decision not to promulgate a rule creating a special carveout for such drugs. But this suit should be dismissed for several reasons.

*First*, Alliance for Natural Health lacks standing. The interest group alleges no injury whatsoever to satisfy Article III's requirements. It thus is no more than an interested bystander, unentitled to litigate as a plaintiff in federal court.

*Second*, three of the complaint's four claims do not challenge any agency action, much less a final agency action, as the APA requires. Count I is the sort of broad programmatic attack, divorced from any specific FDA action, that Supreme Court and circuit precedent prohibits. Counts III and IV target an FDA guidance document issued in December 2022, which merely informs the public about the law applicable to homeopathic drugs and the agency's risk-based enforcement strategy. With no binding effect, the guidance is not final agency action challengeable under the APA.

*Third*, none of the four counts alleged in the complaint plausibly states a claim for relief. Count I misinterprets the 2020 amendment of the FFDCA by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). Far from lessening the regulatory standards for homeopathic drugs, as Meditrend contends, the CARES Act expressly reaffirmed the applicability of the FFDCA's general requirements. Count II, contesting FDA's denial of a citizen petition seeking a rulemaking in favor of homeopathic drugs, fares no better. Each purportedly arbitrary or capricious ground cited by Meditrend is belied by the governing law and the four corners of the agency's decision. The same is true for Count III's challenge to the December 2022 guidance document. Finally, the argument in Count IV that Meditrend lacks fair notice of the legal requirements for marketing homeopathic drugs is inconsistent with the complaint's own allegations. Without any viable claims, the Court should dismiss this suit.

**BACKGROUND**

This case involves the regulation, under the FFDCA, of both over-the-counter (OTC) monograph drugs and homeopathic drugs. Each product category has a distinct regulatory history. We first discuss the legal framework for OTC drugs, then turn to FDA's regulation of homeopathic drugs, and conclude with the background of this case.

## I.   FDA's regulation of over-the-counter drugs

In 1938, the FFDCA "established a system of premarketing clearance for drugs," which "prohibit[s] the introduction into commerce of any 'new drug' unless a new drug application" was both "filed with" FDA and "effective with respect to that drug." *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 612 (1973); *see* 21 U.S.C. § 321(p) (defining "new drug"). Although premarket review originally focused on safety, in 1962 Congress "gave FDA power to scrutinize and evaluate drugs for effectiveness as well." *Hynson, Westcott & Dunning*, 412 U.S. at 630. Congress also "amended the definition of 'new drugs' to include all drugs 'not generally recognized

2

among experts . . . as *safe* and *effective* for use [GRAS/E] under the conditions prescribed, recommended, or suggested in the labeling thereof." *Cutler v. Hayes*, 818 F.2d 879, 883 (D.C. Cir. 1987) (quoting 21 U.S.C. § 321(p)(1) (1982)).[1] In other words, a drug that was not GRAS/E was a "new drug" subject to pre-market approval.[2]

The "GRAS/E exemption" became the primary marketing pathway for nonprescription, OTC drugs. *Hayes*, 818 F.2d at 883-84. As a result, in 1972, FDA launched "a comprehensive review of all OTC drugs to determine whether they were properly marketable under the GRAS/E exemption." *Id.* at 884; *see* 37 Fed. Reg. 9464 (May 11, 1972) (promulgating regulations to determine the safety and effectiveness of OTC drugs). Through this review process, which included notice-and-comment rulemaking, FDA "established monographs recognizing classes of OTC drugs as GRAS/E." *MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 423 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021).

In 2020, "Congress reformed the OTC process" through the CARES Act. *Id.*; *see* Pub. L. No. 116-136, §§ 3851-56, 134 Stat. 281, 435-58 (2020*)*. Specifically, Congress "replac[ed] the notice-and-comment procedure for recognizing OTC drugs as GRAS/E with a more expedient administrative order process." *MediNatura*, 496 F. Supp. 3d at 423; *see* CARES Act, § 3851(a), 134 Stat. at 435 (codified at 21 U.S.C. § 355h). The CARES Act amendments to the FFDCA constitute the governing framework for all "[n]onprescription drugs marketed without an approved drug application under" 21 U.S.C. § 355, on or after "the date of the enactment of this section," i.e., March 27, 2020. CARES Act, § 3851(a), 134 Stat. at 435 (adding FFDCA, § 505G(a), 21 U.S.C. § 355h(a)).

---

[1] The definition of a new drug in 21 U.S.C. § 321(p) has changed slightly since 1962, but the differences are immaterial to this case.

[2] "To be excluded from 'new drug' status, a medication must also be used to a 'material extent or for a material time' for purposes other than simply evaluating safety and effectiveness." *Hayes*, 818 F.2d at 883 n.7 (quoting 21 U.S.C. § 321(p)(2) (1982)).

3

With one important exception:[3] "Nothing in" the CARES Act, Congress said, "shall apply to any nonprescription drug . . . which was excluded . . . from the Over-the-Counter Drug Review in accordance with the paragraph numbered 25 on page 9466 of volume 37 of the Federal Register, published on May 11, 1972." CARES Act, § 3853(a), 134 Stat. at 454. Put more simply, Congress excluded "homeopathic drugs," 37 Fed. Reg. at 9466, from the CARES Act's framework for nonprescription drugs. This carveout thus is the segue to the relevant regulatory history for homeopathic drugs.

## II.  FDA's regulation of homeopathic drugs

"Homeopathy is an alternative medical practice based on two unconventional theories: (1) like cures like—the notion that a disease can be cured by a substance that produces similar symptoms in healthy people; and (2) the law of minimum dose—the notion that the lower the dose of the medication, the greater its effectiveness." *MediNatura*, 998 F.3d at 935 (cleaned up). Conventionality aside, the FFDCA equally covers all drugs, whether they are homeopathic or not. *See* 21 U.S.C. § 321(g)(1) (defining "drug," in part, to include "articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them"). Thus, homeopathic drugs are "subject to the [FFDCA's] requirement that any 'new drug' must be approved." *MediNatura*, 998 F.3d at 935 (citing 21 U.S.C. §§ 321(g), 321(p), 331(d), 355(a)).

Also like other drugs, homeopathic drugs that qualified for the GRAS/E exemption would not be "new drugs" under the FFDCA. However, in 1972, the "American Institute of Homeopathy requested that homeopathic medicines be excluded from the OTC review," which would have been one way to determine their GRAS/E eligibility. 37 Fed. Reg. at 9466. FDA acquiesced. In volume 37, page 9466, paragraph 25 of the Federal Register, published on May 11, 1972, the agency announced it would "exclude

---

[3] There are also a few minor exceptions, which are not relevant here.

homeopathic drugs from this OTC drug review and . . . review them as a separate category at a later time after the present OTC drug review is complete." *Id.* That later date never arrived.

Instead, beginning in 1988, FDA "exercised its enforcement discretion regarding the sale of homeopathic drugs through" Compliance Policy Guide § 400.400 (CPG 400.400). *MediNatura*, 998 F.3d at 935. Though not "exempt[ing] homeopathic drugs from approval requirements," CPG 400.400 outlined certain conditions under which homeopathic drugs might be marketed without triggering an enforcement action. *Id.*

By 2015, FDA had concerns with the continued wisdom of CPG 400.400 due to the expansion of the homeopathic drug industry and the agency's receipt of adverse event reports involving homeopathic drugs. *See id.* at 936. While the agency evaluated its enforcement policies, concerns about the safety of homeopathic drugs mounted. In 2016, for example, adverse events related to "belladonna toxicity" included "reports of infant deaths and seizures." *Id.* at 943 (quoting Withdrawal of Guidance, 84 Fed. Reg. 57,439, 57,440 (Oct. 25, 2019)). After public comment, FDA announced in December 2017 its intent "to replace CPG 400.400 with a risk-based enforcement approach." *Id.* at 936 (quotation omitted).

Withdrawal of CPG 400.400 officially took place in October 2019. *See* 84 Fed. Reg. 57,439 (Oct. 25, 2019). Yet as FDA noted at the time, "withdrawing the CPG [did] not represent a change in the legal obligations that apply to homeopathic drugs under the statutes FDA administers." *Id.* at 57,440. "CPG 400.400 did not, and legally could not, provide a path for legal marketing of unapproved new drugs, including those that are homeopathic." *Id.* at 57,441. And "nothing in the [FFDCA] exempts homeopathic drug products from any of the requirements in the [FFDCA], including those related to approval, adulteration, and misbranding." *Id.* at 57,440.

"FDA has never approved" a marketing application "for a homeopathic drug nor found a homeopathic drug to be GRAS/E and thus not a 'new drug' requiring"

approval. *MediNatura*, 998 F.3d at 935. Furthermore, Congress declared that "[n]othing in" the CARES Act—including the new procedure by which a nonprescription drug without an approved application can be legally marketed after March 2020—"shall apply to any nonprescription drug . . . which was excluded . . . from the Over-the-Counter Drug Review in accordance with the paragraph numbered 25 on page 9466 of volume 37 of the Federal Register, published on May 11, 1972." § 3853(a), 134 Stat. at 454. So "no GRAS/E determinations will be made for homeopathic drug products under [21 U.S.C. § 355h] because [21 U.S.C. § 355h] does not apply to homeopathic drug products." Harlow Decl. Ex. A, FDA, *Homeopathic Drug Products: Guidance for FDA Staff & Industry* 3 (Dec. 2022) [hereinafter Final Guidance].[4]

A few months after passage of the CARES Act, Americans for Homeopathy Choice Foundation (AHCF) submitted a citizen petition to FDA. Compl., ECF No. 1, at ¶ 39. The petition contained numerous requests, including that the agency adopt AHCF's proposed regulations for the manufacture and sale of homeopathic drugs. *See id.* ¶¶ 40-41. Essentially, the petition sought to stop FDA from "applying new drug approval . . . requirements to OTC homeopathic drugs" and cause "most" homeopathic drugs to be recognized as GRAS/E. *Id.* ¶ 41.

In December 2022, FDA simultaneously denied AHCF's petition and issued a final guidance about homeopathic drugs. *See* Compl. ¶¶ 44, 50. The citizen petition response analyzed each of the petition's requests and explained why FDA disagreed with them. *See generally* Harlow Decl. Ex. B, Pet. Resp. For instance, AHCF's proposal to establish "a separate standard for GRAS/E determinations" for homeopathic drugs was

---

[4] Plaintiffs apparently intended to make this guidance document and FDA's citizen petition response exhibits to the complaint, *see* Compl. ¶¶ 44, 50, but forgot to do so. Regardless, the Court may consider them for this motion to dismiss. *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (permitting consideration of "any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice" when "determining whether a complaint fails to state a claim").

"inconsistent with FDA's longstanding interpretation of [its] statutory authority," under which "the 'new drug' determination is the same for all drugs." Pet. Resp. 12. In the guidance document, FDA described for the regulated community its "risk-based approach" for "prioritiz[ing] enforcement and regulatory actions involving certain categories" of homeopathic drugs. Final Guidance 1.

### III.  This lawsuit

Nearly two years later, on October 21, 2024, the healthcare advocacy organization Alliance for Natural Health USA and the homeopathic drug manufacturer Meditrend, Inc., filed this suit under the APA. *See* Compl. ¶¶ 10, 14, 57-111. They challenge FDA's denial of AHCF's citizen petition, "the agency's regulation of OTC homeopathic drugs under" 21 U.S.C. § 355, and the final guidance. *Id.* ¶ 10. The complaint's four APA claims variously allege this conduct was arbitrary and capricious, contrary to constitutional due process, and exceeded FDA's statutory jurisdiction. *See id.* ¶¶ 57-111; 5 U.S.C. § 706(2)(A)-(C).

FDA now moves to dismiss this case under Federal Rule of Civil Procedure 12(b)(1) and (6) for lack of subject-matter jurisdiction and failure to state a claim.

LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges subject-matter jurisdiction, which must "be established as a threshold matter." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The Court "presume[s]" to "lack jurisdiction" unless the plaintiff meets their "burden of establishing it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quotations omitted)); *see Brownback v. King*, 592 U.S. 209, 217 (2021) (plaintiff "must plausibly allege all jurisdictional elements"). If that burden is not met, the Court "must dismiss the action" or the affected claim. Fed. R. Civ. P. 12(h)(3).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The "court must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. Dist. of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 675, 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. And "if as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

ARGUMENT

At the outset, Alliance for Natural Health should be dismissed for lack of standing. Alleging no injury at all, this bystander organization is not a proper federal plaintiff. The complaint then should be dismissed in its entirety for failure to state a claim. Three of the four counts do not satisfy the APA's prerequisite for a final agency action. And all counts suffer from legal and factual deficiencies, which render implausible any theory for relief under the APA.

## I.   Alliance for Natural Health alleges no injury whatsoever for standing

Like any "party invoking federal jurisdiction," Alliance for Natural Health "bear[s] the burden of demonstrating . . . standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021). Specifically, "(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423. "[A]t the pleading stage," it "must clearly allege facts demonstrating each

element," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), to the level of plausibility, *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016). But the complaint in this case entirely fails to show any injury to Alliance for Natural Health.

"To allege an injury-in-fact," Alliance for Natural Health "must show such concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constituting more than simply a setback to the organization's abstract social interests." *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 412–13 (D.C. Cir. 2024) (cleaned up). The complaint doesn't make that showing; instead, it asserts no cognizable injury to the organization from FDA's challenged conduct. An assertion of standing based on a general interest in "healthcare" policy, Compl. ¶ 16, does not suffice. "[A]n organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982)). With no injury in fact, Alliance for Natural Health "may not litigate as [a] suitor[] in the courts of the United States." *Valley Forge Christian Coll.*, 454 U.S. at 475–76.

Though Alliance for Natural Health may hope to remain in this case by piggybacking on Meditrend's standing, the Court need not "give all Plaintiffs an automatic 'pass' when one meets the standing requirements." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 29 (D.D.C. 2020). Supreme Court and D.C. Circuit precedent "do[] not *prohibit* the court from paring down a case by eliminating plaintiffs who lack standing." *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021) (quotation omitted). Indeed, district courts around the country regularly exercise this authority to maintain the integrity of their Article III jurisdiction. *See, e.g., Kansas v. Biden*, No. 24-1057-DDC-ADM, 2024 WL 2880404, at *14, 23 (D. Kan. June 7, 2024) (dismissing eight of eleven state-plaintiffs because they "haven't shouldered their burden to show that they

have standing" (quotation omitted)); *Apter v. Dep't of Health & Hum. Servs.*, No. 3:22-CV-184, 2024 WL 1473737, at *1 (S.D. Tex. Feb. 5, 2024) (dismissing two of three plaintiffs suing FDA for lack of standing); *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 29 (dismissing two entities which "completely failed to establish organizational standing"); *Apalachicola Riverkeeper v. Taylor Energy Co. LLC*, No. CIV.A. 12-337, 2013 WL 1897142, at *4 n.26 (E.D. La. May 4, 2013) (dismissing three organizational plaintiffs which "fail[ed] to submit any proof" of standing). This Court should follow their example, dismiss Alliance for Natural Health, and "prevent[] the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." *All. for Hippocratic Med.*, 602 U.S. at 381-82 (quotation omitted).

## II.    Three of the four APA claims do not challenge final agency action

Two "threshold questions" for every APA claim are "[w]hether there has been 'agency action'" and then "'final agency action' within the meaning" of 5 U.S.C. §§ 702 and 704.  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). "[I]f these requirements are not met," the APA claim "is not reviewable." *Id.* That's the case for Counts I, III, and IV.

### A.    Count I is an impermissible programmatic attack

An APA claim must target "circumscribed, discrete agency actions," as defined by 5 U.S.C. § 551(13). *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Yet Count I "does not refer to a single [FDA] order or regulation." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). Rather, it objects to how FDA is "[r]egulating OTC homeopathic drugs" writ large. Compl. ¶ 59; *see id.* ¶ 71 (attacking "FDA's policy regarding homeopathic OTC drugs").

By generally challenging FDA's "continuing" regulatory "operations" involving homeopathic drugs, Count I does not satisfy the APA prerequisites of "an identifiable 'agency action'—much less a 'final agency action.'" *Nat'l Wildlife Fed'n*, 497 U.S. at 890;

*see, e.g., Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("an on-going program or policy is not, in itself, a 'final agency action' under the APA"). On the contrary, it presents the sort of wholesale "programmatic" challenge that is beyond "the terms of the APA." *Nat'l Wildlife Fed'n*, 497 U.S. at 891. Accordingly, the Court should dismiss Count I for failure to challenge a discrete agency action. *See, e.g., Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 37-38 (D.D.C. 2016) (dismissing APA count against "alleged 'policy' to grant import permits in the future" as "the type of broad challenge that the Supreme Court rejected in *National Wildlife Federation*"); *Elk Run Coal Co. v. U.S. Dep't of Lab.*, 804 F. Supp. 2d 8, 30-31 (D.D.C. 2011) (dismissing APA claim about "'programmatic' deficiencies with MSHA's ventilation-plan review-and-approval process" because claim did not "identify any discrete, final agency actions").

## B. Counts III and IV attack a guidance document that has no binding effect

Counts III and IV challenge FDA's December 2022 guidance document about homeopathic drugs. *See* Compl. ¶¶ 84-85, 98, 100, 105. To review the issuance of a guidance document under the APA, it must constitute "*final* agency action for which there is no other adequate remedy in a court." *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (quoting 5 U.S.C. § 704). That is, the guidance both "must mark the 'consummation' of the agency's decision-making process" *and* "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted). Because FDA's December 2022 guidance does not satisfy the second *Bennett* condition, Counts III and IV do not state proper APA claims. *See Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (agency action "must satisfy *both* prongs of the *Bennett* test to be considered final") (emphasis added).

The second *Bennett* "prong looks to the 'actual legal effect (or lack thereof) of the agency action in question on regulated entities.'" *Valero Energy Corp. v. EPA*, 927 F.3d

532, 536 (D.C. Cir. 2019) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 242 (D.C. Cir. 2014)). An "agency works no legal effect 'merely by expressing its view of the law.'" *Id.* (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001)). Nor by "merely explain[ing] how [it] will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Nat'l Min. Ass'n*, 758 F.3d at 252. FDA's guidance does no more than that.

The guidance first explains why, under the FFDCA, "homeopathic drugs are subject to the same statutory requirements as other drugs," including those "related to approval, adulteration, or misbranding." Final Guidance 2; *see id.* 2-3 (discussing the impact of the CARES Act on homeopathic drug products). Then, it conveys FDA's "risk-based approach" to future "enforcement and regulatory actions" for "homeopathic drug products marketed in the United States without the required FDA approval." *Id.* 4; *see id.* 4-5 (identifying "certain categories of homeopathic drug products marketed without the required FDA approval as potentially posing higher risks to public health"). The guidance is "purely informational in nature; it imposed no obligations and denied no relief." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

None of Meditrend's attempts to make the guidance into something more survive scrutiny.[5] According to the company, the guidance "increased the regulatory burdens on" homeopathic drugs by stating they were "subject to [21 U.S.C. §] 355 pre-market drug approval." Compl. ¶ 46; *see id.* ¶ 104. But FDA's observation about premarket approval requirements simply reflected its "position on what the law is," *i.e.*, what the FFDCA already requires. *Valero Energy Corp.*, 927 F.3d at 537; *see* Final Guidance 2-3

---

[5] This section refers solely to Meditrend because Alliance for Natural Health should be dismissed on jurisdictional grounds. All these Rule 12(b)(6) arguments, however, apply equally to Alliance for Natural Health.

(interpreting the effect of FFDCA provisions). Otherwise, the guidance "does not impose" (and could not impose) any additional "binding duties" on homeopathic drug manufacturers; it just "clarifies" their "existing duties under the" FFDCA. *Catawba Cnty. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009); *see, e.g.*, *Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1204–05 (D.C. Cir. 2024) (agency statements that are "[c]onsistent with what is plainly contemplated by the" statute "do not impose any new concrete consequences" and "do not constitute final agency action") (internal quotations omitted).

Furthermore, contrary to Meditrend's characterization, the 2022 guidance did not "remove[] the clear standards that existed under CPG 400.400." Compl. ¶ 49. FDA withdrew CPG 400.400 *three years prior*, in 2019. *See* 84 Fed. Reg. at 57,440. And when FDA withdrew the CPG, it noted how "absent a determination that a homeopathic drug product is not a 'new drug' under section 201(p) of the FD&C Act (21 U.S.C. 321(p)), all homeopathic drug products are subject to the premarket approval requirements in section 505 of the FD&C Act or section 351 of the PHS Act." *Id.* Thus, the guidance "neither announced a new interpretation of the" FFDCA "nor effected a change in the" status of homeopathic drugs. *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427; *see, e.g.*, *ForUsAll, Inc. v. U.S. Dep't of Lab.*, 691 F. Supp. 3d 14, 29-30 (D.D.C. 2023) (no "legal consequences flow" from agency compliance release that "did not seek to change" or "diverge from" the prevailing "standard").

At bottom, FDA's 2022 guidance "imposes no obligations, prohibitions, or restrictions; it 'compels action by neither the recipient nor the agency.'" *Valero Energy*, 927 F.3d at 536 (quoting *Holistic Candlers & Consumers Ass'n*, 664 F.3d at 944). It thus does not satisfy *Bennett*'s second prong—a failure which dooms Counts III and IV.

13

### III.  All four claims fail as a matter of law

Even if Counts I, III, and IV challenged a final agency action, they and Count II rest upon invalid legal theories and accusations belied by the face of the relevant agency documents. As a result, no claim alleged in the complaint contains sufficient "facts that, if true, plausibly establish that" FDA's challenged conduct was "arbitrary and capricious," *Blanchett v. DeVos*, 490 F. Supp. 3d 26, 32 (D.D.C. 2020), outside the "zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), or otherwise contrary to law. Accordingly, "as a matter of law," the complaint "fail[s] to state an APA claim upon which relief can be granted" and should be dismissed. *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 422 F. Supp. 3d 35, 40 (D.D.C. 2019).

#### A.  Meditrend misinterprets the CARES Act

In Count I, Meditrend alleges that the CARES Act "exempt[s] OTC homeopathic drugs from premarket approval requirements" in 21 U.S.C. § 355 and permits their "continued marketing and sale . . . subject to the conditions defined in CPG 400.400." Compl. ¶¶ 61-62. The CARES Act does no such thing; indeed, it requires the opposite.

Beginning as usual "with the text," *Ross v. Blake*, 578 U.S. 632, 638 (2016), section 3853(a) of the CARES Act reads in full:

> Nothing in this Act (or the amendments made by this Act)
> shall apply to any nonprescription drug (as defined in
> section 505G(q) of the Federal Food, Drug, and Cosmetic Act,
> as added by section 3851 of this subtitle) which was excluded
> by the Food and Drug Administration from the Over-the-
> Counter Drug Review in accordance with the paragraph
> numbered 25 on page 9466 of volume 37 of the Federal
> Register, published on May 11, 1972.

134 Stat. at 454. The following subsection, titled "Rule of Construction," further states:

> Nothing in this section shall be construed to preclude or
> limit the applicability of any other provision of the Federal
> Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.).

§ 3853(b), 134 Stat. at 454.

This text invites a few questions, all of which have ready answers. Which nonprescription drugs were excluded from FDA's OTC review by that paragraph of the Federal Register? "[H]omeopathic drugs." 37 Fed. Reg. at 9466. And what does not apply to homeopathic drugs? The amendment of the FFDCA by the CARES Act with the new governing framework for "[n]onprescription drugs marketed without an approved drug application under" 21 U.S.C. § 355, on or after March 27, 2020. § 3851(a), 134 Stat. at 435. That means homeopathic drugs are excluded from the legal marketing pathway available to nonprescription drugs under 21 U.S.C. § 355h and from the statutory process by which an OTC drug may be recognized as GRAS/E by administrative order under that section. *See* § 3851(a), 134 Stat. at 437 (codified at 21 U.S.C. § 355h).

If the new framework from the CARES Act does not apply to homeopathic drugs, which legal requirements do? "Nothing in" section 3853, Congress said, "shall be construed to preclude or limit the applicability of any other provision of the [FFDCA] (21 U.S.C. 301 et seq.)." § 3853(b), 134 Stat. at 454. So homeopathic drugs remain subject to all FFDCA requirements, including premarket authorization, like other new drugs.

Despite the plain statutory text, Meditrend argues that "[r]egulating OTC homeopathic drugs under the same standards as conventional 'new' drugs violates the CARES Act." Compl. ¶ 59. This argument entirely ignores the "Rule of Construction" in the CARES Act, by which Congress affirmed the continued "applicability of any other provision of the [FFDCA]." § 3853(b), 134 Stat. at 454. These provisions necessarily include the definition of a "new drug," 21 U.S.C. § 321(p), and the requirements for premarket approval of new drugs in 21 U.S.C. § 355.

Struggling for a statutory foothold, Meditrend grasps at the cross-reference in section 3853(a) of the CARES Act to the Federal Register paragraph in which FDA excluded homeopathic drugs from the OTC review process. *See* Compl. ¶ 63. But the

notion that, through this cross-reference, "Congress intended to permit the continued marketing and sale of OTC homeopathic drugs subject to the conditions defined in CPG 400.400," Compl. ¶ 62, is wholly without support. For one thing, CPG 400.400 did not exist when that paragraph appeared in the Federal Register; CPG 400.400 was issued sixteen years later. For another, had Congress wanted to make CPG 400.400 the new statutory standard, "it could have easily said so." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 705 (2022). Yet Congress said nothing about CPG 400.400. Instead, the plain text simply identified "homeopathic drugs" as a subcategory of drugs excluded from the CARES Act, *see* § 3853(a), 134 Stat. at 454 (citing 37 Fed. Reg. 9466), and for which "the applicability" of the FFDCA's general provisions remained unaffected, § 3853(b), 134 Stat. at 454.

Meditrend next tries to rewrite the CARES Act by referencing a post-enactment letter by some Members of Congress. *See* Compl. ¶ 67. However, this sort of "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Nor can it "muddy clear statutory language," *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011), like that in section 3853.

As a fallback, Meditrend alleges that "[r]equiring all homeopathic drugs to secure approval under Section 355 will destroy the OTC homeopathic market." Compl. ¶ 69. Such "naked policy appeals" are "the last line of defense for all failing statutory interpretation arguments." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 680 (2020). "The place to . . . address unwanted consequences of" the FFDCA on the homeopathic drug market "lies in Congress," not the federal courts. *Id.* at 680-81.

By the plain terms of section 3853(a) *and* (b), homeopathic drugs, like other new drugs, remain subject to the premarket approval requirements in 21 U.S.C. § 355. Because "[t]hat is how Congress wrote the law," "that is the law" both FDA and this

Court "must apply." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 608 (D.C. Cir. 2017). Accordingly, the Court should dismiss Count I for failure to state a claim.

### B.    FDA reasonably denied AHCF's citizen petition

To state the APA claim in Count II, Meditrend "must allege facts that, if true, plausibly establish that" FDA's denial of AHCF's citizen petition was "arbitrary and capricious," *Blanchett*, 490 F. Supp. 3d at 32, and outside the "zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423; *see* Compl. ¶ 74. Further, as a challenge to FDA's denial of a petition for rulemaking, APA review is "extremely limited and highly deferential." *McAfee v. FDA*, 36 F.4th 272, 274 (D.C. Cir. 2022) (quotations omitted). Count II thus must contain sufficient "well-pleaded facts" to "permit the court to infer more than the mere possibility," *Iqbal*, 556 U.S. at 679, that there is "compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency," to "reverse the agency's choice," *McAfee*, 36 F.4th at 274.

Count II identifies four purported "errors of law and fact," Compl. ¶ 79; none gives rise to a plausible APA claim. First, echoing Count I, Meditrend says "FDA erroneously concluded that Congress pursuant to the CARES Act intended all homeopathics (including OTC homeopathic drugs) to be regulated under 21 U.S.C. § 355." Compl. ¶ 79. But repetition cannot ameliorate the fundamental flaws with this statutory argument. As described above and in the response to AHCF's citizen petition, "homeopathic drugs" have always been "subject to the same statutory requirements as other drugs," including "the requirements related to approval, adulteration, or misbranding." Pet. Resp. 2. Because the CARES Act's amendment of the FFDCA expressly "does not apply to homeopathic drug products," "no GRAS/E determinations will be made for homeopathic drug products" under the new statutory framework. *Id.* 3 & n.9 (citing CARES Act, § 3853, 134 Stat. at 454). Instead, "all homeopathic drug products remain subject to the premarket approval requirements" in

21 U.S.C. § 355. *Id.* 3. FDA plainly "adher[ed] to the relevant statutes"—the CARES Act and the FFDCA—so its "decision is neither arbitrary nor capricious." *Akpan v. Cissna*, 288 F. Supp. 3d 155, 164 (D.D.C. 2018) (cleaned up).

Second, Meditrend alleges that, when "reject[ing] AHCF's proposal to permit evaluation of homeopathic drugs under homeopathic—rather than conventional—standards of review," FDA "erroneously concluded that [it] lacks a statutory basis to regulate homeopathics differently." Compl. ¶¶ 54, 79. Yet again, this position is contrary to the plain statutory text, as FDA explained in the petition response.

"Homeopathic drug products are 'drugs' under the" FFDCA's definition in 21 U.S.C. § 321(g). Pet. Resp. 11. And the FFDCA's standards for "determining safety and efficacy . . . apply to all drug products, regardless of whether they are homeopathic" or not. *Id.*; *see id.* 8-9. Making "GRAS/E determinations based on expertise specifically in homeopathy," as AHCF proposed, "would deviate from the statutory GRAS/E standard," which "treats homeopathic drug products the same as any other drug product." *Id.* 12; *see id.* ("The GRAS/E standard does not transform based on the medical specialty the drug product is intended for . . . or whether it is considered part of the practice of homeopathy or any alternative medical practice[.]"). FDA declined to adopt a proposed rule "inconsistent" with its "statutory authority," in complete compliance with the APA. *Id.*; *see Apkan*, 288 F. Supp. 3d at 164.

Third, according to Meditrend, FDA "erroneously concluded that increased regulatory oversight was necessitated by safety risks not proven endemic to homeopathics but based entirely on isolated instances of manufacturer error." Compl. ¶ 79. Meditrend misstates both what AHCF's petition requested and how FDA responded. *See, e.g.*, *Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 26 (D.D.C. 2015) ("when a written instrument is attached to a complaint and it contradicts the allegations in the complaint, the written instrument controls").

AHCF asked FDA to evaluate homeopathic drugs "in relation to the risks presented by other regulated products" such that homeopathic products would "fall into the lowest area of safety concern for all FDA regulated products." Pet. Resp. 17. But FDA declined to adopt "a single statement of enforcement policy that covers all product areas." *Id.* 18. "[S]uch a broad statement of policy" was inappropriate, the agency explained, because "it would not take into account the numerous specific considerations for each product area." *Id.* For example, "the safety of homeopathic drugs (as with all drug products) depends upon many factors, including the manufacturing quality and the identity and amount of the 'active' ingredients." *Id.* 17-18; *see also id.* 4. Furthermore, without any homeopathic drugs "reviewed and approved by FDA for safety and efficacy," there was "no basis to conclude that, as a class, [homeopathic drugs] belong in a lower category of risk than other products." *Id.*

The petition response itself thus makes plain that FDA "reasonably considered the relevant issue[] and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. And Meditrend's "mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful." *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007).

Fourth, Meditrend claims that FDA "erred in deeming all OTC homeopathic drugs marketed subject to [Homeopathic Pharmacopeia of the United States] monographs predating 1938 to be 'new drugs' under Section 321(p)." Compl. ¶ 80. FDA made no such ruling. On the contrary, it recognized that, under 21 U.S.C. § 321(p)(1), "if a drug was marketed under the Federal Food and Drugs Act of 1906 . . . prior to the enactment of the [FFDCA] in 1938, and the drug's labeling contained the same representations concerning the conditions of its use as before . . . 1938, the drug is not a new drug." Pet. Resp. 14. FDA simply declined to determine the eligibility (or ineligibility) of homeopathic drugs for this grandfather clause categorically. *See id.* Rather, "the determination of whether a drug product is or is not a new drug under the 1938

grandfather clause of the [FFDCA] is a fact-intensive determination of whether a specific drug product is the same drug product as was marketed between January 1, 1907, and June 25, 1938." *Id.* 15. Thus, contrary to the allegations in the complaint, FDA expressly left open the door for an OTC homeopathic drug to show eligibility for the 1938 grandfather clause. *See, e.g.*, *Regan*, 134 F. Supp. 3d at 26.

With all four theories debunked, the APA claim in Count II does not "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

### C.    FDA's December 2022 guidance is not arbitrary or capricious

Even if the December 2022 guidance were final agency action, the allegations in Count III do not amount to a plausible APA claim. Meditrend contends that "FDA acted arbitrarily and capriciously" by "predicat[ing]" the guidance "on flawed, misleading, exaggerated, and unsupported safety concerns." Compl. ¶ 98. But, once again, this allegation is belied by the face of the challenged document.

In the "Background" section of the December 2022 guidance, FDA explained that "[s]ince the issuance of CPG 400.400," the agency had "encountered multiple situations in which homeopathic drug products posed a significant risk to patients." Final Guidance 3. A footnote described "two examples among many." *Id.* 3 n.12. The first involved "99 cases of adverse events consistent with belladonna toxicity, including reports of infant deaths and seizures"; the second, 130 reports of adverse events "associated with the use of Zicam homeopathic intranasal zinc products." *Id.*; *see also id.* 4 n.13 (describing an incident when four companies manufactured "multi-dose, preservative-free, homeopathic ophthalmic drug products . . . without any attempt to render them sterile").

Meditrend alleges these examples "hav[e] nothing to do with endemic or intrinsic [safety] characteristics of homeopathic products." Compl. ¶ 86. Yet at least one of the examples in the December 2022 guidance is related to such safety characteristics. Take

Zicam, where "FDA determined that if the products were used as labeled, a user would receive significant daily exposure to intranasal zinc, raising a serious safety concern." Final Guidance 3 n.12. That safety concern was not attributable to manufacturing error; rather, it arose from a product manufactured as intended and used as labeled.

In any event, Meditrend's "disagreement by itself is insufficient to demonstrate that [FDA] failed to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 851 (D.C. Cir. 2021) (quotations omitted).[6] FDA cited these "two examples among many," as support for "a new guidance that applies a risk-based enforcement approach to homeopathic drug products marketed without the required FDA approval, consistent with FDA's risk-based regulatory approaches generally." Final Guidance 3 n.12, 4. This position therefore was not "counter to the evidence" or "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, FDA permissibly "exercise[d] its judgment in moving from the facts and probabilities . . . to a policy conclusion," *id.* at 52, a judgment within "its area of expertise" afforded a "high level of deference," *Rempfer v. Sharfstein*, 583 F.3d 860, 867 (D.C. Cir. 2009) (quotations omitted). Count III does not plausibly establish the December 2022 guidance was arbitrary or capricious.

**D.   Meditrend knows the legal requirements to market homeopathic drugs**

Finally, the premise of Count IV—that FDA's guidance "fails to give the regulated class . . . any . . . notice of the applicable legal standards governing lawful versus unlawful sales of homeopathic products, Compl. ¶ 105—does not withstand scrutiny.

---

[6] Also, to the extent Meditrend's disagreement is based on practitioners' anecdotal reports, *see* Compl. ¶ 87, the law is clear that "clinical impressions of practicing physicians and poorly controlled experiments do not constitute an adequate basis for establishing efficacy," *Hynson, Westcott & Dunning*, 412 U.S. at 630.

For constitutional and administrative law purposes, the "fair notice requirement generally requires only that the government make the requirements of the law public 'and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 773 (D.C. Cir. 2022) (quoting *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017)). Here, as the guidance explains, "homeopathic drugs are subject to the same statutory requirements as other drugs," in effect for over 60 years, and correspondingly may avail themselves of the same approval pathways in 21 U.S.C. § 355 as other drugs. Final Guidance 2.

Meditrend is aware of the governing statutes and how a drug manufacturer can comply with them. *See, e.g.*, Compl. ¶¶ 104-05. It just doesn't want to. *See id.* ¶ 105 (looking for some way, "*other* than through" 21 U.S.C. § 355, to lawfully market new homeopathic drugs) (emphasis added). But fair notice is concerned with whether the law "provides a discernable standard when legally construed," *Fed. Express Corp.*, 39 F.4th at 773, not with its soundness as a policy matter. Because the FFDCA's requirements for lawful marketing of homeopathic drugs are readily discernible, the due process claim in Count IV fails.

### Conclusion

For the foregoing reasons, this Court should grant FDA's motion, dismiss Alliance for Natural Health USA for lack of standing, and dismiss the entire complaint for failure to state a claim.

January 21, 2025                               Respectfully submitted,

                                              /s/ James W. Harlow
                                              JAMES W. HARLOW
                                              Senior Trial Attorney
                                              Consumer Protection Branch
                                              Civil Division
                                              U.S. Department of Justice

PO Box 386
Washington, DC  20044-0386
(202) 514-6786
(202) 514-8742 (fax)
james.w.harlow@usdoj.gov