## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Alliance for Natural Health USA, *et al.*,

                   Plaintiffs,

   v.

United States of America, *et al.*,

                  Defendants.

Case No. 1:24-cv-02989-CRC

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jonathan W. Emord
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124

Counsel for Plaintiffs Alliance for Natural Health-USA
and Meditrend, Inc.

# TABLE OF CONTENTS

*MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS* ........................ *1*

*INTRODUCTION* ................................................................................................................... *1*

*ISSUES PRESENTED IN DEFENDANTS' MOTION TO DISMISS* ............................................... *6*

*LEGAL STANDARDS* .............................................................................................................. *6*

*ARGUMENT* ........................................................................................................................... *9*

    I.    THE PLAINTIFFS HAVE STANDING TO SUE ............................................................... 9

    II.    THIS COURT HAS SUBJECT-MATTER JURISDICTION TO ADDRESS EACH OF

    PLAINTIFFS' FOUR COUNTS ...................................................................................... 13

        A.    Count II Is Not a Broad Programmatic Attack but Identifies Three Discrete Agency

        Actions That Violate the Administrative Procedure Act ......................................... 13

        B.    Counts III And IV Address the FDA's Final Agency Action Revoking The CPG, Not A

        "Guidance Document with No Binding Effect" ...................................................... 16

        C.    Counts I-IV Are Based on A Proper Interpretation of The Cares Act, Consistent with

        The Canons of Statutory Construction ................................................................. 21

*CONCLUSION* ...................................................................................................................... *24*

## TABLE OF AUTHORITIES

**Cases**

*Am. Legal Found. v. F.C.C.*, 808 F.2d (D.C. Cir. 1987) ........................................................11

*Appalachian Power Co. v. E.P.A.*, 208 F.3d (D.C. Cir. 2000) .......................................19, 20

*Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559 (D.C. 2002) ....................................8

*Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C.Cir.2000) .............................16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 549, 555 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ..8

*Bennett v. Spear*, 520 U.S. 154, (1997) .............................................................................15

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d (2020) .................23

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 & n. 7 (D.C.Cir.1986) ....................................16

*Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.2d 798 (D.C. Cir. 2006) .............17

*Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29 (D.D.C. 2018) ...............................10

*Ctr. For Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020) ....................................10

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ......................13

*Department of Commerce v. New York*, 588 U.S. 752, 766 (2019) ........................................2

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 195 L. Ed. 2d (2016) .................13

*Env't Health Tr. v. Fed. Commc'ns Comm'n*, 9 F.4th (D.C. Cir. 2021) ....................................5

*FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 144 S. Ct. 1540, 219 L. Ed. 2d (2024)* ........7

*FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 144 S. Ct. 1540, 219 L. Ed. 2d 121, (2024)* 7

*Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d (D.C. 1999) ............................................8

*Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 864 F.3d (D.C. Cir. 2017)................................14

*Franklin v. Massachusetts Supreme Court of the United States June 26, 505 U.S. (1992)*..................14

*Gen. Elec. Co. v. E.P.A.*, 290 F.3d 377 (D.C. Cir. 2002) ....................................................15

*Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333 (1977)* ...............................11

*Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n,* 67 F.Supp.3d 373, (D.D.C. 2014)........................................................................................................................................17

*Jackson v. Atrium Cos., No. 3:04-CV-0679-G, 2004 U.S. Dist. LEXIS 15486 (N.D. Tex. Aug. 9, 2004)* ......................................................................................................................................................9

*MediNatura, Inc. v. FDA,* 496 F.Supp.3d 416, (D.D.C. 2020)................................................16

*MediNatura, Inc. v. FDA,* 496 F.Supp.3d 416, 327-38 (D.D.C. 2020), *aff'd* 998 F.3d 931 (D.C. Cir. 2021).............................................................................................................................2, 14, 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) .........13

*Murthy v. Missouri, 603 U.S. 43, 144 S. Ct. 1972, 219 L. Ed. 2d (2024)*..........................................2, 12

*Murthy v. Missouri, 603 U.S. 43, 144 S. Ct. 1972, 219 L. Ed. 2d 604, (2024* ..........................................2

*Nat'l Min. Ass'n v. McCarthy, 758 F.3d (D.C. Cir. 2014)* ........................................................17

*New York State Club Ass'n, Inc. v. City of New York, 487 U.S. (1988)*...................................12

*Ohio v. Env't Prot. Agency,* 603 U.S. 279, 144 S. Ct. 2040, 219 L. Ed. (2024) .....................................13

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d (D.C. Cir. 2015)*.........10

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087) (D.C. Cir. 2015)* ......................................................................................................................................................10

*Raines v. Byrd, 521 U.S. 811, 117 S. Ct. 2312, 138 L. Ed. 2d 849, (1997)*...............................................2

*Scott v. Fedchoice Fed. Credit Union, 274 A.3d 318 (D.C. 2022).* .........................................................8

*Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229 (11th Cir. 2008)..................8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d (2023)...............................................................................................................11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023). ........................................................................................12

*Tosco Corp. v. Communities for a Better Environment*, 236 F.3d 495 (9th Cir. 2001)...........................8

*Town of Chester v. Laroe Estates, Inc*, 581 U.S. 433, 137 S. Ct. 1645, 198 L. Ed. 2d 64, (2017).........2

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. (2016) ............................................................15

*v.* 2

*W. Virginia v. Env't Prot. Agency,* 597 U.S. 697, 142 S. Ct. 2587, 213 L. Ed. 2d (2022).....................23

## Statutes

§ 351 of the Public Health Service Act (PHS Act) ...................................................................................17

§ 3853(a)...........................................................................................................................................24, 26

§ 3853(a), CARES Act ............................................................................................................................24

§ 3853(b) .................................................................................................................................................25

§ 505 of the Federal Food, Drug, and Cosmetic Act (FD&CA)...............................................................17

21 U.S.C. § 321(g)......................................................................................................................................6

21 U.S.C. § 355 ...................................................................................................................................22, 25

28 U.S.C. § 1331, 1332(a))......................................................................................................................10

5 U.S.C.A. §  704 .....................................................................................................................................18

U.S. Const. art. 3, § 2, cl. 1......................................................................................................................12

## Rules

*§ 3531.9.5,13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.)* ...............................................................15

## Other Authorities

37 Fed. Reg. 9466....................................................................................................................................26

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Natural Health USA, *et al.*,<br><br>     Plaintiffs,<br><br> v.<br><br>United States of America, *et al.*,<br><br>     Defendants. | Case No. 1:24-cv-02989-CRC |

## <u>MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

Plaintiffs Alliance for Natural Health-USA ("ANH") and Meditrend, Inc. ("Meditrend") hereby oppose Defendants' Motion to Dismiss. The Defendants challenge one Plaintiff's standing to sue, that of ANH, and three of Plaintiffs' causes of action under FRCP 12 (b)(1) (lack of subject matter jurisdiction) on the conclusory allegation that Count I is a broad programmatic attack not predicated on any specific agency action, and Counts II, III and IV do not address a final agency action because the document in issue is a guidance with no binding effect. For the reasons that follow, Defendants arguments fail under the relevant standards and precedent.

### INTRODUCTION

The Defendants challenge Plaintiff ANH's standing to sue, but not Plaintiff Meditrend's. At the outset, that limited challenge omits reference to, does not distinguish, and fails under the "one plaintiff rule." Under that rule, as recently reaffirmed by the Supreme Court, standing is satisfied for

1

all plaintiffs when "at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri, 603 U.S. 43, 144 S. Ct. 1972, 219 L. Ed. 2d 604, (2024)*. Even if Defendants could show ANH lacked standing in and of itself, because both plaintiffs share in every cause of action brought, and Plaintiff Meditrend has unquestioned standing to sue, standing exists for the causes of action. See also, *Town of Chester v. Laroe Estates, Inc*, 581 U.S. 433, 137 S. Ct. 1645, 198 L. Ed. 2d 64, (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint"); *Raines v. Byrd, 521 U.S. 811, 117 S. Ct. 2312, 138 L. Ed. 2d 849, (1997)* ("A proper case or controversy exists . . . when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue"); *Department of Commerce v. New York*, 588 U.S. 752, 766 (2019). Nevertheless, we hereby submit as Exhibits the Declarations of principals of both ANH and Meditrend supplying further evidence supporting each entity's standing.

For the reasons stated below, Defendants have likewise presented no sound challenge based on subject matter jurisdiction with each of the four causes of action in the complaint properly stating a claim for which resolution is achieved through the requested declaratory and injunctive relief. One of the primary arguments presented by Defendants is foreclosed by precedent (which the Defendants fail to cite on the proposition directly in issue). In 2020, this Court ruled (and the D.C. Circuit affirmed) that the agency action at the heart of Plaintiffs' present challenge, "Conditions Under Which Homeopathic Drugs May Be Marketed," Compliance Policy Guideline 400.400 (hereinafter "CPG"), was in fact a legislative rule, not a mere exercise of enforcement discretion, constituting a final agency action within the meaning of the Administrative Procedure Act. See *MediNatura, Inc. v. FDA,* 496 F.Supp.3d 416, 327-38 (D.D.C. 2020), *aff'd* 998 F.3d 931 (D.C. Cir. 2021) ("By its own terms, the [CPG] thus pertains to the affirmative 'regulation' of homeopathic drugs and not just . . . to

2

the exercise of enforcement discretion").[1]  The Court there rejected the same challenge the Defendants reassert here.  In the advent of *MediNatura, Inc.*, it strains credulity to contend anew as Defendants do that the CPG is merely advisory, not establishing binding norms, or that FDA enforced 21 USC 355 against homeopathic drugs throughout the over three decades the CPG remained in place (when in fact not a single homeopathic drug manufacturer ever filed an application for new drug approval pursuant to Section 355 or was ever granted new drug pre-market approval by FDA). See FDA, https://www.fda.gov/drugs/information-drug-class/homeopathic-products ("There are no FDA-approved products labeled as homeopathic"); see also *MediNatural, Inc.*, 496 F.Supp., at 424-("Although homeopathic drugs are included in the FFDCA's definition of 'drug' and are therefore subject to regulation by the FDA, *see* 21 U.S.C. § 321(g), the agency has never approved an NDA for a homeopathic drug, nor has it determined that any homeopathic drugs are exempt from the NDA process because they are GRAS/E, *see* Dkt. 11-1 at 15").  Contrary to Defendants' conclusory, and previously rejected, assertion, the CPG establishes a new binding legislative rule, defining a detailed "safe harbor" regulatory pathway for homeopathic over-the-counter drug (OTC) market entry without need for separate satisfaction of the new drug pre-market approval requirements in 21 USC 355. That pathway was used by homeopathic drug manufacturers for over thirty years.  Compliance with the conditions prescribed for invocation of that regulatory pathway in the CPG determined the rights of homeopathic drug companies to enter the market in the United States, including the rights of

---

[1] On substantive grounds, *MediNatura, Inc.* concerned a different challenge to the CPG, not based on the CARES Act exception Plaintiffs present here.  Inexplicably, Defendants omitted reference to *MediNatura, Inc.*'s holding concerning the legal status of the CPG, which directly refutes their legal position in their motion.  Defendants neither drew to the Court's attention nor distinguished the *MediNatura, Inc.* holding that the CPG was "an affirmative regulation" and not a mere exercise of "enforcement discretion."  The omission is even more glaring when one considers that Defendants cited the case on other grounds on page 3 of their motion (and Plaintiffs cited the case in support of final agency action on page 11 of their complaint).

Plaintiff Meditrend, for three decades until FDA revoked the CPG in a final action in December of 2022. That revocation was announced in a document styled "Guidance," but the "guidance" is belied not only by its content but by its title, poignantly addressed not just to the industry but also to "FDA Staff." FDA alerted its own Staff by name because the contents of the "guidance" defined the end of a regulatory pathway that the staff had used for three decades to allow homeopathic drugs to enter the market, establishing an effective exception to strict adherence to the premarket approval criteria in 21 USC 355. A change that removes legal protection, a "safe harbor," previously afforded an entire industry, changing the status of that prior "safe harbor" from legal to illegal, is not a mere interpretive guide having no legal force or effect but is a legislative rule, replacing accepted norms that affected the rights and interests of the regulated class with new governing norms that alter those same rights and interests. In one fell swoop, on December 6, 2022, the FDA imposed on Plaintiff Meditrend and all other homoeopathic companies in the U.S. final, binding obligations to comply with costly, extensive FDA drug pre-market approval requirements, at the whim of the agency and based on an undefined notion of enforcement triggered by the agency's own perception of relative risk, leaving every homeopathic drug company to guess against whom FDA would elect to shut down for selling what had suddenly become "unapproved new drugs." The CPG pathway had created for thirty-five and a half years a "safe harbor" for homeopathic drugs to enter the market predicated on the extraordinary safety of homeopathics when compared to non-homeopathic drugs. See, e.g., Iris Bell and Nancy M. Boyer, "Homeopathic Medications as Clinical Alternatives for Systematic Care of Acute Otitis and Upper Respiratory Infections in Children," Glob Adv Health Med. 2013 Jan 1;2(1):32–43, Pub.Med., https://pmc.ncbi.nlm.nih.gov/articles/PMC3833578/#R5 (Homeopathic

medications are a "demonstrably safe and effective 200 year old whole system of complementary and alternative medicine used worldwide").[2]

Indeed, the fact that the CPG defined that pathway with detailed criteria[3] that had to be satisfied to permit exception from 21 USC 355 reveals the "guideline" not to be advisory but to be a rule, governing when the regulated class could enter a homeopathic drug into the market. The new final rule ended decades of consistent application whereby homeopathic drug companies like Meditrend that satisfied CPG requirements were able to enter the market without need for FDA pre-market drug approval under Section 355. By so acting in December 2022, FDA fundamentally modified the legal and economic rights and interests of homeopathic drug manufacturers like

---

[2] The Defendants' attempt to justify the FDA's actions by citing newfound safety concerns is richly flawed. The agency has provided no evidence demonstrating that homeopathic drugs, as a category, pose risks greater than other over-the-counter (OTC) drugs that remain subject to less restrictive enforcement. AHCF's petition, endorsed by the Plaintiffs in the proceedings before the FDA, reasonably asked the FDA to evaluate homeopathic drugs "in relation to the risks presented by other regulated products," a process that would have aligned regulatory scrutiny with actual risk, yet the FDA dismissed that request out of hand without a meaningful analysis. "'An agency cannot simply ignore evidence suggesting that a major factual predicate of its position may' not 'be accurate'." *Env't Health Tr. v. Fed. Commc'ns Comm'n*, 9 F.4th 893 (D.C. Cir. 2021). The arbitrary nature of this decision demonstrates that the agency's actions were not based on a rational, evidence-based assessment but rather on an unreasoned shift in regulatory philosophy. The FDA's denial of the petition, therefore, fails to meet the standards of reasoned decision-making required under the APA.

[3] Defendants' contention that all drugs must comply with the pre-market approval requirements of 21 USC 355 conflicts with the reality of agency regulation. Over-the-counter drugs historically entered the market based on a drug manufacturers self-determination that the OTC drug satisfied the conditions of an FDA authorized drug monograph. There is in that no requirement for FDA drug pre-market approval under Section 355. Under the CPG, homeopathic medication labeling is regulated under the same provisions as over-the-counter drugs, but with key differences. Under the CPG, homeopathic medications need not be tested for effectiveness before a drug treatment claim may be placed on the label, so long as the claim complies with the Homeopathic Pharmacopeia of the United States and select traditional treatises on homeopathy. Further, only homeopathic medications for "self-limiting" conditions are allowed to enter the market under the CPG. A self-limiting condition is one "which runs its course in a specific period of time limited by its own peculiarities and not by outside influences." In other words, the disease or condition treatable with a homeopathic medication must be able to resolve itself without aid of medication.

Meditrend.  Both Plaintiffs were adversely affected by FDA's action and, for the reasons explained below, have standing to sue.  Both were participants in agency notice and comment proceedings that preceded FDA revocation of the CPG.  See Comment from Alliance for Natural Health USA, Posted by the Food and Drug Administration on Jan 23, 2018 (Docket No. FDA-2017-D6580-0001), March 30, 2018 (Docket No. FDA-2017-D6580-0001), and June 26, 2020 (Docket No. FDA-2017-D-6580-4828) and Meditrend Comments on December 7, 2022 (Docket No. FDA-2020-P-1510-0002).  The agency rejected their comments.

Each of the Defendants' arguments supportive of dismissal is assessed below, following an explanation of the issues and relevant legal standards.

## ISSUES PRESENTED IN DEFENDANTS' MOTION TO DISMISS

The Defendants raise the following issues in their Motion to Dismiss:

(1) Whether Plaintiff ANH has standing to sue;

(2) Whether this Court has subject matter jurisdiction over Plaintiffs' claims under FRCP 12(b)(1);

(3) Whether Plaintiffs state claims for which relief can be granted under FRCP 12(b)(6); and

(4) Whether the CARES Act retained the CPG exception to 21 USC 355 for over-the-counter homeopathic drugs.[4]

## LEGAL STANDARDS

---

[4] This third issue is not appropriately brought within the context of a Rule 12 motion because it pierces the pleadings and addresses substantive argument on the merits.  Accordingly, Plaintiffs respectfully request that this issue be left for decision on cross-motions to enable the parties to present full briefing under the summary judgment rule with full provision of the uncontested material facts and the law relevant to them.

**Standing.** As the Supreme Court explained in *FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 144 S. Ct. 1540, 219 L. Ed. 2d 121, (2024),* "[t]o establish standing . . . a plaintiff must 'demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the Defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." Standing disputes raise two questions that the Plaintiff is obliged to answer to invoke Article III standing: Is there an injury in fact, and did the action of the Defendant cause the injury? An "injury in fact must be 'concrete,' meaning that it must be real and not abstract . . . The injury must also be 'particularized;' [meaning that] the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance. . ." *Id., at, 1556.* The "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." In instances, such as the present, where the Plaintiffs seek injunctive relief, "the plaintiff must establish a sufficient likelihood of future injury." *Id. at 1552.* The Court has ruled that "[g]overnment regulations that require or forbid some action by the Plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Id. at 1552.* That is the case here, because the revocation of the CPG forbad Plaintiff from relying on that legal predicate for entering homeopathic drugs into the market.

A motion to dismiss for lack of standing will be dismissed if one of the Plaintiffs has standing. "For all relief sought there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, co-plaintiff, or an intervenor of right." *Town of Chester v. Leroe Estate, Inc., 581 U.S. 433, 137 S. Ct. 1645, 198 L. Ed. 2d 64, (2017).*

**Subject-Matter Jurisdiction.** A federal court has "subject matter jurisdiction over an action that either arises under federal law, or when there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000." *Tosco Corp. v. Communities for a Better*

*Environment, 236 F.3d 495, 499 (9th Cir. 2001)* (citing 28 U.S.C. §§ 1331, 1332(a)). "When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." Id.

As the Eleventh Circuit explained in *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008):

> A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack. "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony.

Id. (internal citations and quotations omitted). Evidence supplied to the Court by way of affidavit does not transform a motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment. See *Scott v. Fedchoice Fed. Credit Union, 274 A.3d 318, 320 (D.C. 2022)*.

***Failure to State a Claim.*** An FRCP 12(b)(6) motion asks the Court to test the legal sufficiency of the complaint's factual and legal allegations. Motions to dismiss for failure to state a claim are disfavored at the trial level. See *Atraqchi v. GUMC Unified Billing Servs., 788 A.2d 559, 562 (D.C. 2002)* and *Fingerhut v. Children's Nat'l Med. Ctr., 738 A.2d 799 (D.C. 1999)*. In construing a 12(b)(6) motion, the court accepts all well pled facts in the complaint as true. See, e.g., *Bell Atlantic Corp. v. Twombly,* 550 U.S. 549, 555 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-1950 (2009). Factual allegations "must be enough to raise the right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." See *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Moreover, if a motion appears meritorious, and a more carefully drafted complaint might cure any deficiencies, the court must first "give the plaintiff an opportunity to amend his complaint, rather than dismiss it"

outright. See *Jackson v. Atrium Cos., No. 3:04-CV-0679-G, 2004 U.S. Dist. LEXIS 15486, at *1 (N.D. Tex. Aug. 9, 2004)*.

## ARGUMENT

### I.      THE PLAINTIFFS HAVE STANDING TO SUE

*Plaintiff Meditrend, Inc.*  As confirmed by the attached Declaration of Richard D. Savage, CEO of Meditrend, Inc., Meditrend has been a homeopathic drug company since 1984.  See Exhibit: B- Declaration of Meditrend, Inc. CEO Richard Savage.  Savage and his formulators relied on the CPG for over thirty years to introduce OTC homeopathic products into the market without need to file an application for new drug approval and undergo the high costs of proving safety and efficacy pursuant to 21 USC 355.  See Exhibit: B.  The homeopathic formulations made by Meditrend are not patented and are unpatentable, making it impossible for Meditrend to satisfy the requirements for drug pre-market approval in light of the estimated $1 billion in cost to attain approval for each one. See Exhibit: B.  Meditrend had over 53 homeopathic formulations that it markets, all of which entered the market under the CPG without resort to an application for new drug approval under 21 USC 355.  See Exhibit: B. However, in light of the unavailability of the CPG to enter new homeopathic products on the market, Meditrend has not introduced any new formulations since the FDA decision to revoke the CPG became final in December of 2022.  See Exhibit B.  Due to the FDA's revocation of the CPG, Meditrend has not been able to secure financing from lenders who have viewed compliance with drug pre-market approval requirements under 21 USC 355 as impossible for Meditrend to satisfy due to the lack of patentability for its products.  See Exhibit: B.

In response to the notice-and-comment proceeding employed by FDA prior to its issuance of the December 2022 guidance revoking the CPG, Meditrend participated actively in this, submitting a comment filed through Emord & Associates P.C., acting on behalf of Meditrend, documented under Docket No. FDA- 2020-P-1510-0002, now recorded as FDA-2020-P-1510-29462 in the FDA's docket files.

*Plaintiff ANH.*  Non-profit advocacy organizations, like ANH, can sue on their own behalf (organizational standing) or on behalf of their members (representational standing). U.S. Const. art. 3, § 2, cl. 1. See also *Ctr. for Responsible Sci. v. Gottlieb, 346 F. Supp. 3d 29 (D.D.C. 2018), aff'd sub nom* and *Ctr. For Responsible Sci. v. Hahn, 809 F. App'x 10 (D.C. Cir. 2020)*. ANH satisfies the requirements of organizational and representational standing, as it has suffered an injury to its organizational interests and represents the interest of its members, including Meditrend, Inc., and other homeopathic manufacturers, who have likewise suffered injury.  See Exhibit A: Declaration of Robert Verkerk, Ph.D., Executive Director, ANH.  As recognized in *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087 (D.C. Cir. 2015)*, an organization can assert standing in either capacity or both.

ANH's mission to "promote sustainable approaches to healthcare and defend freedom of choice in healthcare" intimately involves ensuring that consumers have access to affordable and effective OTC homeopathic drugs. See Exhibit A. The FDA's new requirement for premarket approval for homeopathic drugs frustrates ANH's mission by making it more difficult to access and more costly to obtain homeopathic products, reducing availability, accessibility, and affordability of alternative homeopathic healthcare options.  This constitutes an injury-in-fact and courts have consistently held that for standing purposes, the key inquiry is whether the agency's action or

omission injures the organization's interest.  See *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087) (D.C. Cir. 2015).*

Furthermore, ANH participated actively in the notice-and-comment proceeding employed by FDA prior to its issuance of the December 2022 guidance revoking the CPG, submitting several action alerts[5] and comments, including those on January 23, 2018,[6] March 30th, 2018,[7] and June 26, 2020[8]. ANH's position (and Meditrend's) that FDA retain the CPG was ultimately rejected by the FDA, causing an organizational injury that further supports its standing in this case.  ANH, as a named party, sues based on this injury, solidifying its organizational standing as articulated in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023).

Even if ANH had not suffered injury itself, it could nevertheless assert representational standing on behalf of its members. As established in *Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 342 (1977)*, an organization can base its standing on injury to one of its members if (1) its member would otherwise have standing to sue in his or her own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. ANH meets all three criteria, as it

---

[5] **Tell congress and FDA: Stop the attack on homeopathy**, Posted by Alliance for Natural Health- https://anh-usa.org/action-center/?vvsrc=%2fCampaigns%2f88403%2fRespond
[6] **Comment from Alliance for Natural Health USA,** Posted by the **Food and Drug Administration** on Jan 23, 2018- https://www.regulations.gov/comment/FDA-2017-D-6580-0383. Accessed 05/02/2025
[7] **Comment from Alliance for Natural Health – USA,** Posted by the **Food and Drug Administration** on Mar 30, 2018- https://www.regulations.gov/comment/FDA-2017-D-6580-4148. Accessed 05/02/2025
[8] **Comment from Alliance for Natural Health USA,** Posted by the **Food and Drug Administration** on Jun 26, 2020- https://www.regulations.gov/comment/FDA-2017-D-6580-35448. Accessed 05/02/2025

represents Meditrend, Inc., and other homeopaths and homeopathic manufacturers and the interests it seeks to protect are germane to its organizational purpose, satisfying the standing requirements outlined in *Hunt* and *Re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 110 F.4th 295, 329 (1st Cir. 2024)*. See also *Am. Legal Found. v. F.C.C., 808 F.2d 84 (D.C. Cir. 1987). Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023).*

Meditrend, a member of ANH-USA, represented by ANH has a direct and substantial interest in this litigation.  See Exhibit A. ANH's representational standing arises from its responsibility to protect those members' interests, particularly regarding regulatory changes that affect their ability to manufacture and sell homeopathic products. This principle is well-settled as the law recognizes that organizations "can assert standing to protect against injury to their own organizational interests" and may "borrow freely the standing that could be established by individual members."  See *§ 3531.9.5 Rights of Others—Organization Standing,13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.)*. ANH's representational standing is further supported by the fact that each of its homeopathic manufacturer and seller members would have standing to bring this suit individually, and the interests at stake are central to ANH's purpose of defending access to affordable homeopathic remedies.

The Supreme Court has consistently held that "an association has standing to sue on behalf of its members when those members would have standing to bring the same suit." *New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1 (1988)*. Here, ANH's members, including Meditrend, Inc., face direct injury from the FDA's December 2022 action revoking the CPG, and ANH's advocacy for homeopathic remedies is germane to its mission. Therefore, ANH has standing to sue on its own behalf and that of its members, and the defendant's argument to the contrary ignores well-established precedent and the clear facts of this case.

Finally, because Meditrend, Inc. has standing to sue, under the "one plaintiff rule," even if

ANH were to lack standing as a sole plaintiff, standing nevertheless exists because its co-plaintiff

Meditrend, Inc. has standing to sue and is plaintiff in each of the four counts of the Complaint with

ANH.  See *Murthy v. Missouri*, *603 U.S. 43, 144 S. Ct. 1972, 219 L. Ed. 2d 604, (2024)*.

## II.    THIS COURT HAS SUBJECT-MATTER JURISDICTION TO ADDRESS EACH OF PLAINTIFFS' FOUR COUNTS

### A.  **Count II Is Not a Broad Programmatic Attack but Identifies Three Discrete Agency Actions that Violate the Administrative Procedure Act**[9]

---

[9] The Defendants' assertion that the FDA's December 2022 guidance is not arbitrary and capricious fails under the standard provided by the Administrative Procedure Act (APA). An agency must "examine the relevant data and articulate a satisfactory explanation for its action" including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)*.* The FDA's decision to revoke the CPG and impose premarket approval requirements on all homeopathic OTC drugs based on a handful of incidents—many involving manufacturing errors rather than intrinsic safety risks—lacks a rational connection to the evidence concerning the industry as a whole. The FDA's own data shows homeopathic drugs are significantly safer than conventional drugs, with adverse event reports for homeopathic products representing less than 0.26% of those for a single conventional drug like acetaminophen- (Available at https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (last accessed Feb. 17, 2025)). By ignoring that overwhelming evidence of safety in favor of isolated and non-representative instances of malmanufacture, the FDA failed to engage in the reasoned decision-making required by the APA and violated 5 U.S.C. § 706(2)(A). Moreover, Defendants' Zicam example misleads. The biologically active ingredients in Zicam, which are zincum aceticum and zincum gluconicum, are well-documented for their efficacy in treating the severity or duration of cold symptoms (available at https://www.zicam.com/our-products/cold-shortening/rapid-melts-citrus (last accessed Feb. 17, 2025)). Any safety issues arising from Zicam's use may therefore be linked to improper dilution, dosage or mislabeling. Those are issues of manufacturer error not inherent product defects. Homeopathic drugs have been marketed and safely used for over two centuries, leading the WHO to conclude that adverse events linked to homeopathy are generally related to manufacturing errors rather than intrinsic safety risks (WHO's- Safety Issues in the preparation of Homeopathic Medicines, World Health Organization, 2009. Available at https://iris.who.int/bitstream/handle/10665/44238/9789241598842_eng.pdf (last accessed Feb. 17, 2025). The Supreme Court has emphasized in *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891, 1913 (2020*)* that when an agency changes longstanding regulatory policy, it must account for "serious reliance interests that must be taken into account," and "it would be arbitrary and capricious to ignore such matters." The FDA's failure to take into account relevant

Count I of the plaintiffs' complaint is not a broad programmatic attack, but clearly challenges three discrete FDA final actions[10]. It challenges FDA's revocation of the Compliance Policy Guide 7132.15, § 400.400 (1988) (CPG 400.400) under the APA as arbitrary and capricious agency action, not in accordance with law. This Court, as affirmed by the D.C. Circuit, has already ruled the CPG is a legislative rule, the revocation of which is actionable under the APA. See *MediNatura, Inc. v. FDA,* 496 F.Supp.3d 416, 327-38 (D.D.C. 2020), *aff'd* 998 F.3d 931 (D.C. Cir. 2021) ("By its own terms,

_____

evidence of safety and to exaggerate the significant of isolated instances of injury constitutes arbitrary and capricious agency action. See also *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 136 S. Ct. 2117, 195 L. Ed. 2d 382 (2016*).* Under *Ohio v. Env't Prot. Agency,* 603 U.S. 279, 144 S. Ct. 2040, 219 L. Ed. 2d 772 (2024), an agency cannot "ignore an important aspect of the problem," yet the FDA has precisely done that by treating homeopathic drugs identically to conventional drugs, despite differences in their risk profiles. Pre-market approval requirements do not address the root causes of safety issues cited by the FDA, such as manufacturing errors or current Good Manufacturing Practice (cGMP) violations. As the plaintiffs explained, FDA's previous regulatory framework (the CPG) already required compliance with GMP standards, making heightened regulatory scrutiny for homeopathic drugs unjustified.

Furthermore, agency decisions must be evaluated on the "basis of the reasons the agency gave, not on the basis of those it *might have* given." *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 563 (2009). The FDA's reliance on a handful of isolated cases, while disregarding substantial evidence supporting the safety of homeopathic products, renders its decision-making process fundamentally flawed. Court have held that they will not defer to an agency's declaration of fact "that is capable of exact proof but is unsupported by any evidence." *Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.,* 864 F.3d 738 (D.C. Cir. 2017)*.* The FDA failed to provide substantial evidence demonstrating that homeopathic drugs are intrinsically unsafe for the general public, but instead relied on isolated manufacturing failures, rendering its decision arbitrary and capricious under 5 U.S.C. § 706(2)(A).

[10] Agency action is considered "final" and reviewable under Administrative Procedure Act (APA) when an agency completes its decision-making process and the result of that process is one that will directly affect parties. See *Franklin v. Massachusetts Supreme Court of the United States June 26, 505 U.S. 788 (1992).* Regarding completing its decision-making process, the FDA's final guidance document expressly states that on March 27, 2015, the agency began "'evaluating its regulatory framework for homeopathic drug products' followed by public hearings with stakeholders and request for public input. This evaluation and decision-making process culminated in the issuance of 'a new guidance that applies a risk-based enforcement approach to homeopathic drug products.'" The culmination that resulted in this final rule is thus express within the document itself. Revocation of the CPG is itself a final action that determines the rights of homeopathic manufacturers, distributors, and sellers, and affects their interests both financial and legal.

the [CPG] thus pertains to the affirmative 'regulation' of homeopathic drugs and not just . . . to the exercise of enforcement discretion").  Count I also challenges FDA's denial of AHCF's request for a rulemaking regarding homeopathic drugs, to which Meditrend, Inc. and ANH joined, and the issuance of the December 2022 guidance, which not only revoked the CPG but imposed premarket approval requirements on homeopathic drugs.

As acknowledged by the Defendants, this completed decision-making process which led to the issuance of the guidance satisfies the first prong of *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). A comprehensive reading of the guidance also demonstrates satisfaction of the second prong, which requires that the guidance "must be one by which rights or obligations have been determined," or from which "<u>legal consequences will flow</u>."  The guidance unequivocally denies homeopathic drugs the "safe harbor" pathway to market entry that previously existed under the now revoked CPG and obligates homeopathic drug manufacturers to comply with the full premarket approval requirements under § 505 of the Federal Food, Drug, and Cosmetic Act (FD&CA) or § 351 of the Public Health Service Act (PHS Act).  Failure to comply now classifies homeopathic products as "illegally marketed" and subjects them to potential enforcement action by the FDA at any time. This clearly meets both prongs under which agency action is considered final.  *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016); *Gen. Elec. Co. v. E.P.A.*, 290 F.3d 377, 380 (D.C. Cir. 2002). 5 U.S.C.A. §  704.

The Defendants somewhat whimsically assert, without reference to and yet directly contrary to this Court's holding in *MediNatura, Inc. v. FDA,* 496 F.Supp.3d 416, 327-38 (D.D.C. 2020), *aff'd* 998 F.3d 931 (D.C. Cir. 2021), that the guidance is "purely informational in nature" and "imposed no obligations." That characterization is flatly contradicted by the last sentence in Paragraph III of the guidance (FDA's Enforcement Policy), which states: "...any homeopathic drug product that is being

marketed illegally is subject to FDA enforcement action at any time." This clear warning demonstrates that the December 2022 final guidance carries with it profound civil and criminal law consequences for any who deviate from its requirements. Such agency attempts at misrepresentation have been dealt with in cases like *Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 435 & n. 7, 436 (D.C.Cir.1986)*, where the court held that a letter from an agency official stating the agency's position and threatening enforcement action unless the company complied, constituted final agency action. Likewise, in *Barrick Goldstrike Mines Inc. v. Browner, 215 F.3d 45, 48 (D.C.Cir.2000)*, an enforcement letter from the guidance-issuing agency, relying on the guidance document as the basis for enforcement, was found to create legal consequences, confirming the document's finality.

## B. Counts III And IV Address the FDA's Final Agency Action Revoking The CPG, Not A "Guidance Document with No Binding Effect"

Contrary to Defendants' argument, Counts III and IV of the plaintiffs' complaint do not challenge an FDA guidance document with no binding effect. For nearly 80 years, the FDA has recognized homeopathic drugs not as "new drugs," but as "unique" to be regulated "as a separate category" of drugs subject to the precise conditions set forth in the CPG but not to the full new drug approval requirements under 21 USC 355. The final action taken by FDA in December of 2022 not only reversed that recognition, but also reclassified homeopathic drugs as unapproved new drugs under 21 USC 355, making them liable to be removed from the market by FDA at any time. The court undoubtedly has authority to declare to be "legislative rules" "agency actions that purport to impose legally binding obligations or prohibitions on regulated parties" and which serve as the "basis for an enforcement action for violations of those obligations or requirements." Indeed, in *MediNatura, Inc. v. FDA,* 496 F.Supp.3d 416, 327-38 (D.D.C. 2020), *aff'd* 998 F.3d 931 (D.C. Cir. 2021), this Court did precisely that, holding the CPG not a mere guidance but a legislative rule.

16

Plaintiff Meditrend, Inc. and similarly situated homeopathic drug manufacturers represented by ANH must now obtain pre-market approval (i.e., licensing authority) from FDA pursuant to 21 USC 355, which prior to the revocation of the CPG, they did not need to obtain. This agency action sets forth legally binding requirements for a private party to obtain a permit or license which qualifies as a "legislative rule." *Nat'l Min. Ass'n v. McCarthy, 758 F.3d 243 (D.C. Cir. 2014)*. Moreover, this action eliminated a "safe harbor" pathway to market entry, which in and of itself affects the rights and obligations of Plaintiffs and solidifies the December 2022 final action as a final rule subject to review under the APA. When an agency statement creates a "safe harbor" compliance method through which a regulated entity can avoid enforcement, that is "binding as a practical matter" and thus gives rise to a legislative rule. See, e.g., *Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n,* 67 F.Supp.3d 373, 419 (D.D.C. 2014) (quoting *Gen. Elect.*, 290 F.3d, at 382); *Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.2d 798, 809 (D.C. Cir. 2006).

While labeled a guidance, the document affects and largely determines Plaintiffs' rights and obligations, negatively impacting both legally and economically Plaintiff Meditrend and every homeopathic company in the industry. Meditrend CEO Richard Savage explains the impact revocation of the CPG has had on his homeopathic drug business in Exhibit B. There he explains that following the December 2022 final order revoking the CPG and replacing it with a demand for new drug approval under 21 USC 355, Meditrend encountered severe difficulties in keeping its flagship product line of homeopathic Allergy Relief formulations on the market, difficulties that persist and threaten his company's demise. See Exhibits B2 and B3. Meditrend has produced and distributed the Allergy Relief formulations for over forty years without issue, including during the full pendency of the CPG. Those formulations rely on minute quantities of antigenic ingredients. However, due to the FDA's revocation of the CPG and reclassification of homeopathics as unapproved "new drugs," that

manufacturer has no sound legal basis on which to supply Meditrend with the antigens unless and until Meditrend's receives new drug approval from FDA for the Allergy Relief formulations, an impossibility given the absence of patentability for those formulations and the need for upwards of $1 billion to finance the substantial evidence standard required to support approval of the product. The FDA now requires formal drug facility inspections of antigen suppliers, a demand which suppliers, operating under a grandfathered set of FDA regulations, refuse to satisfy. This situation has nearly exhausted Meditrend's supply of antigens, bringing production of its Allergy Relief formulations to a halt and threatening the company's closure after decades of safely providing a natural health solution to millions of Americans suffering from seasonal allergies. See Exhibits B2, B3 and B4.

Furthermore, Meditrend has suffered significant lost sales as a direct result of the FDA's revocation of the CPG. Meditrend had developed a promising homeopathic natural immunotherapeutic, discovered by university researchers, that showed potential in treating cancer and other immune-related illnesses, including COVID-19. Published in "Cancer Research," this substance demonstrated lifetime cure rates for melanoma and myeloma in animal models. Meditrend manufactured over six million injectable doses at a cost-effective rate of $100 per dose, while pharmaceutical knockoffs were sold for up to $10,000 per dose. However, the FDA's regulatory changes have cut off Americans' access to this economically viable treatment. See Exhibit B.

In 2023, Meditrend was invited to participate in Whole Foods' "global store" initiative, a national retail health food chain with over 500 stores. Previously, Meditrend had averaged $165,000 in annual sales in select regional stores. Due to the FDA's revocation of the CPG and demand for full satisfaction of the new drug approval requirements in 21 USC 355, Whole Foods canceled Meditrend's involvement in the initiative and removed all of Meditrend's products from Whole Foods stores, resulting in a significant loss of current and future revenues. Additionally, Meditrend is now

18

actively engaged as a co-litigant in legal proceedings involving Sprouts Health Food Store Chain, which operates over 440 stores, due to similar adverse impacts stemming from the FDA's revised regulatory approach. See Exhibits B1, B2, B3, B15.

In 2024, the uncertainty surrounding the availability of antigenic ingredients forced Meditrend to turn down several significant orders, including one exceeding $400,000 from online distributors. See Exhibits B4, B5, B6, B7, B8, B9, B19, B11, B12, B13 and B14. The company also incurred over $85,000 in litigation costs related to the regulatory challenges. Meditrend's reluctance to expand distribution continues, as the supply of essential ingredients remains uncertain. These combined challenges, including the withdrawal of Meditrend products by major retailers like Whole Foods and Sprouts, have severely hindered the company's growth trajectory. Despite previously experiencing a growth rate of 15-25% annually, Meditrend is now projected to lose over $3.5 million in current allergy product sales once they are unable to obtain necessary ingredients for their homeopathic line of product offerings. See Exhibit B.

Moreover, the FDA's decision to declare homeopathy subject to premarket drug approval has a chilling effect on research, investment, and new product development within the industry. The in terrorem effect of case-by-case enforcement by the FDA creates uncertainty and risk, discouraging manufacturers from introducing new homeopathic products, as in the case of Meditrend as described above. The looming threat of enforcement not only hinders current operations but also stifles the introduction of new homeopathic products, thereby undermining the growth of natural healthcare solutions.  See Exhibit B and B1.

The court found a comparable EPA action to be a legislative rule and binding for all practical purposes because the agency based its "enforcement actions on the policies or interpretations formulated in the document" and led "private parties" "to believe that it will declare permits invalid

unless they comply with the terms of the document," *Appalachian Power Co. v. E.P.A.,* 208 F.3d 1015 (D.C. Cir. 2000). Courts have not been tricked into believing substantively legislative acts mere non-obligatory guidance but have instead consistently recognized such "guidance" documents to be legislative rules, even when the "guidance document bears a caveat denying its compulsory and mandatory nature." *Appalachian Power Co. v. E.P.A.,* 208 F.3d 1015 (D.C. Cir. 2000).

The "guidance," therefore, does far more than merely "clarify" existing obligations; it introduces a fundamentally new regulatory framework that erases the longstanding distinction between homeopathic and conventional drugs, despite homeopathy's unique characteristics and unparalleled record of safety.

The plaintiffs also dispute the Defendants' assertion that the December 2022 guidance did not remove the clear standards established under the CPG. The revocation of CPG in the final December 2022 action eliminated the well-defined regulatory framework that had governed the manufacture, labeling and sale of OTC homeopathic drugs for decades. The CPG provided specific conditions under which homeopathic drugs could be marketed without premarket approval, including compliance with HPUS standards and current good manufacturing practices (cGMP). By revoking the CPG and replacing it with a vague, risk-based enforcement approach, the FDA effectively removed clear standards, leaving homeopathic drug manufacturers without any standard to discern what would and would not be the subject of FDA "risk" enforcement. That is particularly so given that FDA characterized the entire industry, despite a few discrete instances of mismanufacture of homeopathic drugs, as inherently risky (See page 3 of the Guidance).

The defendant's claim that the guidance "neither announced a new interpretation of the" FFDCA "nor effected a change in the" status of homeopathic drugs, is a clear misrepresentation. If no new interpretation of the FFDCA was necessary, why did the FDA revoke the CPG, a long-standing

"safe harbor" policy that had provided a regulatory pathway for homeopathic drugs to enter the market for decades? And if the FDA did not intend to effect any change, why did it issue entirely new requirements that imposed additional obligations and legal consequences on homeopathic drug manufacturers? The withdrawal of the CPG was not an isolated administrative action but a deliberate move to dismantle the prior regulatory framework and replace it with a new one that treated homeopathic drug market entry indistinguishably from conventional drug market entry under 21 USC 355. The FDA's actions clearly constitute a legal *volte face*, fundamentally altering the regulatory landscape for homeopathic drugs. Those changes have had immediate and profound consequences on the rights and obligations of Plaintiff Meditrend, contradicting the Defendant's superficial claim that no substantive change occurred.

### C. Counts I-IV Are Based on A Proper Interpretation of The Cares Act, Consistent with the Canons of Statutory Construction

The CARES Act, specifically § 3853(a), states:

Nothing in this Act (or the amendments made by this Act) shall apply to any nonprescription drug...which was excluded by the Food and Drug Administration from the Over-the-Counter Drug Review in accordance with the paragraph numbered 25 on page 9466 of volume 37 of the Federal Register, published on May 11, 1972.

Both parties agree that this exclusion applies exclusively to homeopathic drugs, as they were the only drug category excluded from the OTC Drug Review in 1972. (See Compl. ¶ 34 and Pg 15 of Defendant's memorandum). Congress's deliberate decision to exclude homeopathic drugs from the new OTC framework demonstrates its intent to treat homeopathic drugs differently from conventional drugs. Had Congress intended for homeopathic drugs to be subject to the same premarket approval requirements as conventional drugs, it would not have expressly excluded them from the OTC monograph system. This exclusion reveals that Congress intended to leave in place the unique regulatory status of homeopathic drugs, which at the time was regulated under FDA's

enforcement discretion policy, CPG 400.400.  This interpretation is consistent with the canons of statutory construction, namely, the "rule of non-interference," or the "presumption against change in existing regulations."  Under that canon, the legislature is assumed to intend to leave existing regulations in place unless they expressly state to the contrary in the statutory language.  Here, the CPG was promulgated in May of 1988.  The CARES Act became law in March of 2020, and the FDA order revoking the CPG was proposed in 2019 but became final in December of 2022.  Had Congress not intended to retain the CPG, it would have been incumbent upon it in the CARES Act to state that expressly.  Since it reviewed the matter, as revealed in § 3853(a), and did not codify the FDA's proposed revocation of the CPG then extant in 2019, the rule of non-interference dictates that it meant for the operative CPG to remain in place.

The Defendants argue that § 3853(b), the "Rule of Construction," reaffirms the applicability of the FDCA's general provisions, including premarket approval requirements under 21 U.S.C. § 355. However, that interpretation ignores the plain language of the statute. § 3853(b) states that *"nothing in this section shall be construed to <u>preclude or limit the applicability</u> of any other provision of the [FDCA]."* This language does not affirmatively impose premarket approval requirements; rather, it preserves the *status quo ante*. Before December 2020, homeopathic drugs were marketed without a New Drug Application (NDA) under FDA's enforcement discretion policy, the CPG. If Congress had intended to impose new, burdensome approval requirements on homeopathic drugs, it would have done so expressly within the context of the enabling act amendments of the CARES Act. The absence of such language supports the conclusion that Congress intended to maintain the historical regulatory treatment of homeopathic drugs.

The Defendants misrepresent Plaintiffs' argument by suggesting that the plaintiffs' reliance on Congress's cross-reference to 37 Fed. Reg. 9466 implies an intent to preserve the marketing

conditions of CPG 400.400.  That is not the Plaintiffs' position. The Plaintiffs maintain that

Congress's reference to the FDA's 1972 exclusion—which was based on the "uniqueness of

homeopathic medicine"—reflects a legislative intent to continue treating homeopathic drugs

differently from conventional nonprescription drugs, precisely the aim of the CPG. The FDA's

subsequent revocation of the CPG and issuance of the December 2022 requirement to treat

homeopathic drugs the same as conventional nonprescription drugs thus reverses this long-standing

distinction, imposing a more stringent regulatory framework on homeopathic products than Congress

intended.

Furthermore, the Defendants miss the relevance of a post-enactment letter from Members of

Congress who voted in favor of the CARES Act.  As the Supreme Court reminds us,

"legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."

*Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020*)*. The

letter from leading Members of Congress who voted for the CARES Act expressly states that the Act

"exempts homeopathic drugs from review under its provisions regarding pharmaceutical drugs" and

reaffirms the historical distinction between homeopathic and conventional drugs reflected in the

CPG. This direct evidence of congressional intent contradicts the Defendants rewrite of history and

reinterpretation of the statutory language.

The Defendants' novel and unsupported interpretation of the CARES Act would impose

significant regulatory burdens on the homeopathic industry, effectively destroying a $6.2 billion

market. Under the major questions doctrine, FDA lacks clear statutory authority to impose such

burdensome requirements without express congressional authorization. *W. Virginia v. Env't Prot.*

*Agency,* 597 U.S. 697, 142 S. Ct. 2587, 213 L. Ed. 2d 896 (2022). The CARES Act not only fails to

give FDA that express authorization, it excludes homeopathic drugs from the new OTC framework,

preserving the unique regulatory status of homeopathic drugs consistent with the CPG. The Defendants' interpretation would require homeopathic drugs to undergo the same costly and time-consuming NDA process as conventional drugs, despite Congress's clear intent to have them treated differently consistent with the CPG. The Defendants' novel reinterpretation is inconsistent with the text and articulated congressional purpose of the CARES Act and should be rejected.

## CONCLUSION

For the foregoing reasons, the Plaintiffs have standing to sue, have proven the existence of subject matter jurisdiction by this Court and have established that their claims are cognizable under the Administrative Procedure Act to have declared arbitrary and capricious agency actions not in accordance with law. Accordingly, the Defendants' motion to dismiss should be denied.

Respectfully submitted,

ALLIANCE FOR NATURAL HEALTH-USA;
MEDITREND, INC.,

By: __/s/ Jonathan Emord
        Jonathan W. Emord, Counsel
        DC Bar No. 407414
        Emord & Associares, P.C.
        11808 Wolf Run Lane
        Clifton, VA 20124
        Email: jemord@emord.com
        Phone: 703-239-8968

Dated: February 21, 2025