# EXHIBIT B

## DECLARATION OF RICHARD D. SAVAGE

**DECLARATION OF RICHARD SAVAGE**

I, Richard D. Savage, declare under penalty of perjury of the laws of the United States that the following is true and correct:

1. I am over 18 years of age and am competent to testify to the facts and circumstances set forth in this declaration.

2. I am the Founder and Executive Director of Meditrend, Inc., a homeopathic drug company based in Albuquerque, New Mexico, which is a plaintiff in this proceeding. Meditrend, for over four decades, has engaged in the development and distribution of innovative health solutions, including over-the-counter (OTC) products marketed as homeopathic drugs in the United States, introduced under the CPG 00.400. Our products are manufactured through contract manufacturers. The listing is attached hereto as Exhibit B1.

3. On October 25, 2019, the FDA withdrew Compliance Policy Guidance (CPG) 400.400, which for over thirty years had provided comprehensive guidelines for homeopathic manufacturers on how to manufacture, label, and sell homeopathic drugs. CPG 400.400 included key provisions related to directions for use, ingredient statements, documentation for recognition in the Homeopathic Pharmacopoeia of the United States (HPUS), product names, labeling exemptions for small containers, language requirements, and more. It covered both prescription and over-the-counter (OTC) homeopathic drugs and established standards for compliance with current good manufacturing practices.

4. In response to this withdrawal, Alliance for Natural Health (ANH), on behalf of Meditrend, Inc., caused several comments to be filed with the FDA. On December 7, 2022, in response to the FDA's solicitation for public comments, I also caused an additional comment to be filed through Emord & Associates P.C., acting on behalf of Meditrend, documented under Docket No. FDA-2020-P-1510-0002. This comment, now recorded as

FDA-2020-P-1510-29462 in the FDA's docket files.

5.  In our comment, Meditrend, Inc. urged the FDA to regulate OTC homeopathic drugs separately from conventional drugs and restore a regulatory framework similar to CPG 400.400, which did not require premarket approval for homeopathic products. The FDA, however, denied the ANH's and Meditrend's comments.

6.  The agency rejected our position and on December 6, 2022, the FDA issued its final guidance document which replaced CPG 400.400. This guidance imposed a premarket approval requirement on homeopathic drugs and introduced new enforcement measures for manufacturers failing to comply. This shift in regulatory perspective has had significant adverse effects on Meditrend, the industry and the consumers we serve.

7.  Due to this guidance, Meditrend has lost access to critical antigenic ingredients needed to produce our homeopathic allergy formulations. These ingredients, derived from antigenic tree, weed, and grass substances, are the same materials supplied to physicians for injectable administration. For over 40 years, Meditrend has safely and effectively provided sublingual formulations of these substances, highly diluted in 6x, 12x, and 30x potencies.

8.  Physicians, however, are not subject to FDA facility inspections for the antigenic substances they use in their injectable treatments. By contrast, the FDA's recent regulatory changes now mandate that our homeopathic product manufacturers conduct "facility inspections" of antigenic ingredient providers. Unfortunately, the two main U.S. suppliers of these antigenic substances operate under a unique set of grandfathered FDA regulations, which exempt them from facility inspections. Both suppliers have refused to permit these inspections, leading to a disruption in Meditrend's supply chain. It is attached hereto as Exhibit B2 and B3.

9.  Our homeopathic product manufacturer has determined that failing to conduct facility inspections would violate the FDA's interpretations of current Good Manufacturing Practice (cGMP) guidance. Although these inspections are technically voluntary, recent FDA actions have pressured

manufacturers into compliance. As a result, our manufacturer is unable to procure these essential ingredients, and once our current stock is depleted, we will no longer be able to offer these formulations to our customers. See Exhibit B2 and B3.

10. These FDA actions are stifling innovation. Meditrend had developed a homeopathic natural immunotherapeutic, discovered by university researchers, which showed promise for treating cancer and other immune-related illnesses, including COVID-19. This substance, which demonstrated lifetime cure rates for melanoma and myeloma in animal models and was published in "Cancer Research," was manufactured by Meditrend in a cost-effective manner. We produced over six million doses for injectable administration at a cost of $100 per dose, while pharmaceutical industry knockoffs are sold for up to $10,000 per dose. Due to the FDA's changes, Americans have lost access to this economically viable cancer and immune-related immunotherapeutic.

11. In 2023, Meditrend was invited to join Whole Foods' "global store" initiative, which was set to expand to 500 stores across the United States. Meditrend had previously averaged $165,000 annually in just a portion of their regional stores. However, due to the FDA's revocation of the CPG and actions against the homeopathic industry, Whole Foods cancelled our involvement in the global initiative and removed all Meditrend products from its stores, resulting in a significant loss of existing and future business. See Exhibit B1 hereto.

12. Moreover, Meditrend has become a co-litigant in a lawsuit with Sprouts, a health food store chain with over 440 locations, due to predatory lawsuits triggered by the FDA's revocation of the CPG and treatment of homeopathic products as new drugs. Sprouts, which yielded $335,000 annually for Meditrend, is expanding to 1,000 stores, and there is a real possibility that they will follow Whole Foods in abandoning homeopathic products altogether. It is attached hereto as Exhibit B4. See also Exhibit B1 hereto.

13. In 2024, Meditrend turned down numerous orders, including one worth over $400,000 from online distributors, due to the uncertainty surrounding the availability of antigenic ingredients. Additionally, Meditrend has incurred over $68,000 in litigation expenses related to these regulatory issues, and our reluctance to expand distribution channels persists, as we cannot guarantee the supply of necessary ingredients. It is attached hereto as Exhibit B1, B5, B6, B7, B8, B9, B10, B11, B12, B13 and B14.

14. Alongside the loss of our homeopathic product manufacturer, the withdrawal of homeopathic products by major retailers like Whole Foods has severely impacted Meditrend's growth trajectory. Over recent years, Meditrend has experienced a growth rate of 15-25%. However, due to the FDA's changes, we are projected to lose over $3.5 million in current allergy product sales once our stock of antigenic ingredients is depleted. See Exhibit B1 hereto.

15. Meditrend has been in business since 1984, providing homeopathic and dietary supplement formulations safely and effectively to the public. For over 40 years, we have procured antigenic substances for these products without issue. Meditrend had over 53 homeopathic formulations that it marketed under the CPG without resort to an application for new drug approval under 21 USC 355. However, following the FDA's decision to revoke the CPG, which became final in December 2022, we have been unable to introduce any new formulations, disrupting our ability to continue our long-standing practice of bringing new homeopathic products to market. It is attached hereto as Exhibit B15. See also Exhibit B1, B2, B3 and B4 hereto.

16. Meditrend's long-standing business, which has safely supplied innovative health solutions for over four decades, now faces severe harm due to the FDA's abrupt regulatory changes. The FDA's actions, including the imposition of premarket approval requirements and new enforcement mechanisms, have adversely impacted our access to essential ingredients, stifled innovation, and led to significant financial losses. The FDA's failure to recognize the unique nature of homeopathic

products and its aggressive regulatory approach have deprived Meditrend and other similar businesses of the ability to continue providing these important health solutions to the public.

17. Meditrend's homeopathic formulations are not patented, and without the ability to patent them, the company cannot realistically pursue drug pre-market approval. The process is prohibitively expensive, with estimates suggesting it would cost around $1 billion for each formulation to be approved. We therefore respectfully request the court to address these issues and provide relief for the harm caused.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on: _____2/19_____, 2025


Richard D. Savage

Founder and Executive Director,
 Meditrend, Inc.

# EXHIBIT B1

Manufacturer and Brand Owner Survey

**Manufacturer and Brand Owner**

**Survey**



<u>**Purpose**</u>

To provide Congress with information about how the FDA's new regulatory and enforcement stance on homeopathic medicines is affecting the industry. This type of information has been very valuable in getting the attention of Congress and will be important as we move forward with a bill to protect homeopathic medicines in the new Congress. **Above all, members of Congress tell us they want to know the economic impact of the FDA's actions on the homeopathy industry.**

In order to provide evidence of the FDA's misdirected policies to share with members of Congress, we are asking you for the following information. Share as much as you feel comfortable sharing, and feel free to share additional information that may be useful not asked for below.

<u>**Survey**</u>

1. **Basic information about your company**

   a. **Approximate annual sales**

      ___Under $1 million   _x_ $1 million to $5 million   ___Over $5 million

   b. **Number of employees: 9 employees**

   c. **Number and location of offices and/or facilities:**

      1. **Specify location (4820 Eubank Blvd NE Albuquerque, NM 87111) and location type (main office and, warehouse, etc.):**

   d. **Where do you sell your products (for example, mostly in the Western United States, nationwide, nationwide and internationally)? Products are sold nationwide, minor international sales.**

2. **Anecdotes that illustrate how the new regulatory and enforcement stance is affecting your business. See attached Narrative**

3.      Describe if any current regulations or guidance document "recommendations" are becoming more burdensome and inappropriate for homeopathic medicines and if the community would be better served by standards unique to the industry. Please be as specific as possible. See attached narrative.

4.      Quantitative information that shows the effects of the agency's actions. Examples include:

a.  Additional expenses incurred to comply with FDA requirements: Legal expenses in excess of $75,000 and continuing.

b.  Lost sales (percent of total): We had just been approved as a global provider for Whole Foods before the FDA began to harass Homeopathics manufacturers and marketers.  Whole Foods retail health food store chain (500 stores) has now not only cancelled their global initiative with our Company, but has also removed our product from their domestic retail stores.  In addition, we are now actively a co-litigant involving Sprouts Health Food Store Chain. Directly related to FDA actions in the homeopathic industry. (in excess of 440 stores.)

c.  Lost production (percent of total): We will likely lose our main manufacturer soon when his supply of antigens is exhausted.

d.  Employee layoffs (number of layoffs and over what period AND percent of total workforce): none currently, 100% if antigen availability issue is not resolved in near future.

e.  Any other losses and/or expenses related to FDA actions: As the attached narrative points out, we will likely lose our entire allergy business soon if matters explained in the narrative are not resolved.  Excess of $3.5 Million annually.

5.  Legal consequences

a.  Number of demand letters you have received from plaintiff law firms since 2015: None so far.  Our main manufacturer, however, has been subjected to very onerous and abusive inspections.

b.  Number of federal lawsuits involving the legality of homeopathic medicines in which your company is a defendant since 2015: One lawsuit pending in which we are a colitigant.

    c.  **Number of state lawsuits involving state unfair and deceptive trade practice laws in which your company has been a defendant since 2015: One lawsuit in the State of California as a co-litigant.**

6.     Point of contact at your company to coordinate a tour of your office/facilities for federal legislators/staff if you'd like to sponsor a tour. Richard D Savage and/or Seneca Savage.

7.    Your data

  x    **I'm okay with members of Congress and their staffs seeing the name of my company attached to the data above. I understand that that will make more of an impact than anonymous data. OK to use our name, however, please do not leave information in Congressional staff or government offices unless needed by HHS under Robert Kennedy Jr.**

    **Please keep my data anonymous.**

# EXHIBIT B2

**Correspondence between Richard Savage and Supplier**

 Outlook

RE: TELECONFERENCE Materials -ALLERGENA -"Bulk Antigens" Message to Our Vendor

From 

Date Wed 5/3/2023 6:04 PM

To       Richard     D.       Savage      <        rdsavage@meditrend.com>       cc

Seneca R. Savage<srsavage@meditrend.com>

Rick,

Am happy to talk it over. The advice from the attorney goes against everything we understand from the FDA. Really just need one of the suppliers to fill out our questionnaire and then sell to us. We are required to qualify the supplier, even if it is a food, supplement or drug. We need to know that they follow a quality and GMP process for safety and for your benefit. Is should be a concern that none of them want to do that. And some will hot sell to us no matter what as we are not a medical practice.

Also, we are shooting for the minimum FDA requirement, not more, in order to make your products, so indeed, we are on the same page. We understand the minimum to be that we need to qualify the antigen supplier.

You said: You can also rely on a certificate of analysis (COA) from a supplier of a component if you have established reliability of the supplier's analyses. ....we cannot find a label who can test their material for identity (and we have asked them who can test them and they do not know) to validate their COA. So we wanted to visit to see their facility to not have to do this, but they al said no. And they will not fill out our paper questionnaire. This is the stalemate. We and you have no idea what is in their bottles or if they follow any quality processes.

To:

We would love to get back into production of your products.

Set up a call for all of us. Will be interesting. Thanks,



---

From: Richard D. Savage <rdsavage@meditrend.com> Sent:

Wednesday, May 3, 2023 3:47 PM

cc: ███████████████Seneca R. Savage <srsavage@meditrend.com>

Subject: FW: TELECONFERENCE Materials -ALLERGENA -"Bulk Antigens" Message to Our Vendor

I have been conferring with our FDA lawyers to better understand regulations for qualifying

"bulk antigen" purchases in a manner that works for and the antigen manufacturers.

There is a basis for asserting that the production of bulk antigens is not subject to drug cGMP

requirements, at least at the early stages (e.g., when the plants/herbs are grown, collected,

cut, or undergo initial extractions). Rather, the bulk antigens would begin to fall under

GMP control of manufacturing once they are used as the starting material in the first
homeopathic attenuation, similar to how GMPs apply when API starting material is introduced

into the manufacturing process.

Regardless, even if the bulk antigens constitute "components" for purposes of FDA's drug

cGMP regulations, an audit of the bulk antigen suppliers is not required under 21 C.F.R.

Part 211. Under 21 C.F.R. 5 211.84 (d)(2), you merely need to test components for conformity with written specifications. You can also rely on a certificate of analysis (COA) from a supplier of a component if you have established reliability of the supplier's analyses. This means obstacles to purchase of "bulk antigens" on terms satisfactory to 2 of the remaining 3 antigen suppliers in America could be removed insuring a long term supply of the vital components of ALLERGENA Homeopathic remedies.

We understand that some companies go above and beyond what FDA's drug cGMP regulations require and follow the recommendations contained in, for example, ICH Q7 and QIO, including recommendations to audit suppliers, but those recommendations are voluntary, not mandatory.

Can we arrange a teleconference with our attorneys and your team next week to address questions?

Inventory levels are low, we need to get over this hurdle ASAP.

Let me know available time slots so I can assemble our legal team.

Thanks again for your continued patience in this matter, your continued interest and support in getting a solution to these issues is very much appreciated.

Richard D. Savage
Managing Director

5)                    ]



(505) 559-4169 [office]
-9356

# EXHIBIT B3

**Correspondence Between Seneca Savage and Supplier**

 Outlook

---

**RE: Antigen for pets**

| From | ██████████████████████████ |
|------|-----|
| Date | Wed 12/11/2024 4:43 PM |
| To | Seneca R. Savage <srsavage@meditrend.com> |
| Cc | ████████████████████████████; Ashlee R. Collier <arcollier@progena.com> |

Seneca,

As you know, there are no suppliers of antigens that we can find that will work with us. None will fill out the paper work required for us to qualify them or they will not work with us. I have no idea where to look anymore. I thought that project was with you and your team. Once we run out of antigens, we cannot make any of you items anymore. That is the same message for some time now. It is an existential business issue that needs to be addressed. We are out of ideas, so it is all with you.

We do have the base antigen homeopathic mix for the zone items, all with same formula. This will last quite some time. Before they expire, we go form a 1X, to a 2X which buys another 5 years. Eventually, we will run out. This is the same message for some time now.

We can make mother tinctures of herbs here (drainage items), which is keeping you going on that part. Just want to be sure we are remembering the same thing.

Thanks,



**From:** Seneca R. Savage <srsavage@meditrend.com>
**Sent:** Wednesday, December 11, 2024 4:16 PM
**To:** ████████████████████████████
**Cc:** ████████████████████████████; Ashlee R. Collier <arcollier@progena.com>
**Subject:** Re: Antigen for pets

Hi ██████

Doing well, hope you guys are, too!

Are you going to check to make sure that these antigens are unattainable, or are you already certain?

If so, we can definitely have the labels corrected and reprinted and adjust down to 2300 bottles.  Just want to make sure.

Thanks,

Seneca

**From:** ███████████████████████
**Sent:** Wednesday, December 11, 2024 12:36 PM
**To:** Seneca R. Savage <srsavage@meditrend.com>
**Cc:** ██████████████████████████████████
**Subject:** Antigen for pets

Hi Seneca,
Hope all is well.
You guys ordered Antigen for pets.
We need more of these antigens, but I assume they will not be possible to get:
Mugwort
Pigweed
Russian thistle
Pet antigen blend

We can do about 2300 bottles (you ordered 7500), but that means it will be like last time were we were unable to do some of the 6X items.
See attached for label.

If this works, I will have to buy Rhus Tox 6x and redo pricing.

Then, this item is done forever as is. Will need reformulation to the actives that we can get.

What would you like to do?

Thanks,



# EXHIBIT B4

**Demand Letter**



Feinstein
Doyle
Payne &
Kravec LLC

429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
T: 412.281.8400
F: 412.281.1007

29 Broadway, 24ᵗʰ Floor
New York, NY 10006-3205
T: 212.952.0014
www.fdpklaw.com

*Writer's Extension: 128*
*wlison@fdpklaw.com*

October 13, 2023

*via Certified Mail/Return Receipt Requested*

Jack Sinclair
Chief Executive Officer
Sprouts Farmers Market, Inc.
5455 East High Street, Ste. 111
Phoenix, AZ 85054

Re:    **Sprouts Farmers Market Violates Federal and California Law for Unlawfully
Possessing and Selling Misbranded, Unapproved Homeopathic Drugs**

Dear Mr. Sinclair:

We represent Emi Bruemmer (hereinafter our "Client"), as well as potentially a class of
California consumers who purchased homeopathic drug products ("Homeopathic Products") at
Sprouts Farmers Market, Inc. stores in California ("Sprouts"). The Homeopathic Products Sprouts
is selling to unwitting consumers are unapproved, misbranded drugs that mislead consumers to
believe they are effective treatments for their various conditions when they are nothing more than
a placebo. Sprouts' sale of these Homeopathic Products is a massive Health Fraud that violates the
Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), 21 U.S.C. §§ 301–399f, U.S. Food and
Drug Administration ("FDA") regulations and California law.

Homeopathic Products made pursuant to traditional homeopathic theories are so highly
diluted there is none of the purported "active" ingredients for their purported benefits. The U.S.
Federal Trade Commission ("FTC") released a Staff Report concluding that there is no competent
or reliable scientific evidence that supports the efficacy claims of Homeopathic Products.[2]

---

[1] Homeopathic Products as used throughout this letter refers to homeopathic drug products labeled
as being intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, or
to affect the structure or function of the body, including being labeled with drug facts with an
active ingredient and/or indication of the drug's purpose and uses. Homeopathic substances or
products not labeled as being intended for such use, and which do not have active ingredients or
drug fact labeling with a purpose and use, are not included as part of this demand.

[2] Staff Report on the Homeopathic Medicine & Advertising Workshop, Federal Trade Commission
(2016) ("Staff Report"), available at https://www.ftc.gov/system/files/documents/reports/federal-
trade-commission-staff-report-homeopathic-medicine-advertising-
workshop/p114505_otc_homeopathic_medicine_and_advertising_workshop_report.pdf.

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 2

Moreover, focus groups and survey results show that consumers do not understand the theories behind homeopathy, cannot differentiate homeopathic products from natural, herbal, or home remedies, and mistakenly believe they are efficacious based on human trials. Much like other consumers, our Client each mistakenly believed the homeopathic products they purchased were natural remedies for a variety of conditions, with scientifically proven efficacy, despite the fact the products they purchased contained none of the purported "active ingredients" because of how dilute they have become, and have no scientifically proven efficacy.

In addition to being a Health Fraud, Sprouts' sale of Homeopathic Products is illegal. Under the FDCA, homeopathic products labeled as drugs are subject to the same requirements related to approval as other drugs. *See* 21 U.S.C. § 355. To date there have been no homeopathic products approved by the FDA because none have been shown to meet modern scientific standards for safety, effectiveness and/or quality. Nor have any Homeopathic Products been approved by California for sale as drugs within the state. Cal. Health & Safety Code § 111550(b). The FDCA prohibits the introduction or delivery for introduction into interstate commerce any new drug without prior FDA approval. 21 U.S.C. § 355(a). By selling these unapproved products, Sprouts is in violation of the FDCA and California's Sherman Law that prohibit the sale of any unapproved new drug. Cal. Health & Safety Code § 110110(a); Cal. Health & Safety Code § 111550.

Additionally, Homeopathic Products sold as nonprescription, over the counter ("OTC") drugs are not made pursuant to any FDA-approved OTC monograph, or have been determined to be generally recognized as safe and effective ("GRAS/E"). OTC drugs that have not been approved as a new drug pursuant to § 355 or made in accordance with a final monograph pursuant to 21 U.S.C. § 355(h), such as the Homeopathic Products sold in Sprouts stores, are misbranded. 21 U.S.C. § 352(ee). By receiving and selling misbranded drugs, Sprouts is also in violation of the FDCA, 21 U.S.C. § 331(c), and Sherman Law, Cal. Health & Safety Code § 111440.

This letter shall serve as our Client' pre-litigation notice and demand in accordance with the requirements of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750–85. This letter is to demand that, in California, Sprouts immediately cease the unlawful sale of Homeopathic Products that are labeled as drugs and being sold in violation of California and federal law; and pay damages and restitution to consumers who purchased the Homeopathic Products from Sprouts stores in California. If Sprouts does not do so within thirty (30) days of receipt of this letter, our Client may bring claims under the CLRA, Cal. Civ. Code §§ 1750–85, among other claims. All further communications intended for our Client must be directed through this office.

Ms. Bruemmer purchased Hyland's Bioplasma Cell Salts from a Sprouts store near her home within the past three years based on being marketed as effective to treat cold symptoms, nervous tension, fatigue and headaches. Had the Bioplasma Cell Salts not been labeled, advertised and promoted as drugs intended to treat these conditions on the product's labeling, this would have affected Ms. Bruemmer's purchasing decision.

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 3

**I.    FEDERAL AND CALIFORNIA LAW PROHIBIT THE POSSESSION OR SALE OF MISBRANDED, UNAPPROVED NEW DRUGS**

      **A.  Under the FDCA and Parallel California Law, All Products Intended for Use in the Diagnosis, Cure, Mitigation, Treatment, or Prevention of Disease Must be Approved by FDA to be Lawfully Sold**

The purpose of the FDCA, FDA regulations, and FDA oversight is consumer protection. In 1938, Congress enacted the FDCA after 107 deaths were caused by a new "wonder drug" called Elixir Sulfanilamide that, despite the catastrophic results of its use, the company could not be prosecuted under then-existing laws for anything other than "misbranding" it. Among other things, the newly enacted FDCA required drug manufacturers to prove to the FDA that a new drug was safe before it could be marketed, which was the birth of the "new drug application" or NDA. In enacting the FDCA, Congress sought to strike a balance between consumers' desire to pursue new remedies for ailments, and the introduction of effective drugs into the marketplace. It was this interplay between consumers' interest in effective cures and evolving science that all new drugs have to bear adequate directions for safe use and warnings whenever necessary. Within 2 months of the FDCA's enactment, the FDA determined that some drugs could not be labeled for safe self-use but required supervision for individualized use by a physician or dentist which gave rise to the first prescription regulations. The requirement that certain drugs only be provided pursuant to a prescription was later codified in an amendment to the FDCA in 1951.

The FDCA defines a "drug" as, among other things, articles recognized in the official United States Pharmacopœia, official Homeopathic Pharmacopœia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals. *See* 21 U.S.C. § 321(g). A "new drug" is defined as one "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p). The FDCA provides that no person shall introduce or deliver for introduction into interstate commerce any new drug without prior FDA approval. 21 U.S.C. § 355(a). Additionally, OTC drugs that have not been approved as a new drug or labeled in accordance with a final monograph are misbranded. 21 U.S.C. § 352(ee). The FDCA prohibits receiving and selling misbranded drugs. 21 U.S.C. § 331(c).

California's Sherman Law incorporates the FDA's new drug application requirements promulgated pursuant to the FDCA. Cal. Health & Safety Code § 110110(a). It also defines a "drug" as, among other things, "an article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal." Cal. Health & Safety Code § 109925(2). It defines "new drug" as any drug the composition of which is such that "(a)... is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof." Cal.

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 4

Health & Safety Code § 109980(a)-(b). Similarly, the Sherman Law provides, "[n]o person shall sell, deliver, or give away any new drug or new device" unless approved by FDA, or approved by California's Department of Health Services. Cal. Health & Safety Code §§ 111550(a) and (b). Also parallel to the FDCA, the Sherman Law makes it unlawful to sell, deliver, hold, or offer for sale any misbranded drug. Cal. Health & Safety Code § 111440.

**B. Homeopathic Products Have No Scientifically Proven Efficacy, and Must be Pre-Approved by FDA to be Labeled and Sold as Drugs**

Homeopathy is an alternative medical practice that has a historical basis in theory and practice first established in the late 1700s. Homeopathy is based mainly on two general principles: (1) that a substance that causes symptoms in a healthy person can be used in diluted form to treat symptoms and illness (known as "like-cures-like"); and (2) the more diluted the substance, the more potent it is (known as the "law of infinitesimals"). Proponents of homeopathy claim that a significantly diluted aqueous solution, consisting mainly of water molecules, retains therapeutic properties due to a "memory" of the substance diluted in it. However, there is no scientific explanation how such "memory" might lead to therapeutic value, when the vast majority of the water never touched any of the purported active ingredient.

Historically, homeopathic drugs have been identified through "provings," in which substances are administered to healthy volunteers in concentrations that provoke overt symptoms. Symptoms experienced by volunteers are recorded to indicate possible therapeutic uses for the substances. In other words, if a substance elicits a particular symptom, individuals experiencing that symptom would be treated with a diluted solution made from that substance. However, these "provings" are not valid clinical trials which could show that the diluted substance treats any condition or symptoms of the condition that the un-diluted substance caused.

Understanding the principals of homeopathic dilutions is the key to understanding why homeopathic products do not and cannot have a drug-like physiological effect. The standard homeopathic preparation is labeled by the "centesimal," or "C." For every 1C, the substance is diluted by a factor of 100. For a 2C preparation, the substance would, for example, first be diluted in 100 liters of water, and 1 liter of that sample would be placed in another 99 liters of water to make the second dilution. In other words, a 2C preparation is a 1/10,000 dilution of the purportedly "active" substance. Because of the logarithmic nature of the dilution of homeopathic "active" ingredients, homeopathic products act, at best, as a placebo[3] because none of the original "active" ingredient is detectable in the final drug preparation.[4]

---

[3] A placebo is as a substance that has no therapeutic effect used as a control in testing new drugs. A placebo is sometimes given for a psychological benefit (*i.e.*, to calm someone), but has no true physiological effect. *See* https://www.verywellmind.com/what-is-the-placebo-effect-2795466.

[4] *See* Subash Vijayakumar, Alternative Medicine: Homeopathy A Review. Inter. J. of Pharmacotherapy; 2(2), 2012, 57-69.

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 5

Even though homeopathic products are specially defined as drugs in the FDCA,[5] they are still subject to the same regulatory requirements as allopathic (*i.e.*, science-based) drugs.[6] Nothing in the FDCA exempts homeopathic drugs from any of the requirements related to approval, adulteration, or misbranding, including labeling requirements.[7] Accordingly, all homeopathic products labeled as drugs are subject to the same premarket approval requirements as non-homeopathic drugs.[8] Despite the requirement for homeopathic products to go through the pre-approval process to be labeled as drugs, i.e., intended to treat any health condition, according to FDA, "[t]here are currently no homeopathic products approved by FDA" as a drug. *See* FDA Guidance. Thus, any product labeled "homeopathic" that is also labeled as being intended to cure, treat, mitigate, or prevent any disease – including the use of "Drug Facts" that identify a purpose or use of a homeopathic ingredient to treat disease – is a "new drug" which may not be possessed or sold prior to FDA approval.

FDA previously exercised its enforcement discretion concerning over-the-counter homeopathic products labeled as drugs intended solely for self-limiting, non-chronic conditions amenable to self-diagnosis and treatment. *See* former Compliance Guide 400.400 ("Withdrawn Enforcement Discretion"). The Withdrawn Enforcement Discretion limited FDA enforcement actions to homeopathic products that were harmful, improperly labeled or manufactured in violation of good manufacturing practices. While the Withdrawn Enforcement Discretion did not make homeopathic drugs "legal" because any product labeled as a drug that has not been approved by FDA or made pursuant to an OTC monograph violates the FDCA, it gave homeopathic manufacturers reassurance that they would not be prosecuted by the FDA so long as their products did not create a risk of direct personal injury or claim to treat serious conditions.

On October 25, 2019, the FDA withdrew the Withdrawn Enforcement Discretion. *See* 84 Fed. Reg. 57439. With the FDA withdrawing the Withdrawn Enforcement Direction, federal regulators have made it clear that homeopathic drugs – i.e., those labeled as being intended to cure,

---

[5] When the FDCA was passed in 1938, the primary focus was on drug safety and not efficacy. By recognizing homeopathic products as drugs at the time, Congress was recognizing their safety and that they met certain quality standards, not that they were effective. *See* https://www.fda.gov/consumers/consumer-updates/kefauver-harris-amendments-revolutionized-drug-development (the 1962 amendment to the FDCA required FDA to conduct a retrospective evaluation of effectiveness of drugs approved for safety between 1938 and 1962).

[6] A homeopathic product not labeled as a drug would not require prior FDA approval to be sold, and this demand does not put at issue any homeopathic products not labeled as drugs sold by Sprouts.

[7] *See* FDA guidance on Homeopathic Products, ("FDA Guidance"), available online at https://www.fda.gov/drugs/information-drug-class/homeopathic-products.

[8] *See* 21 C.F.R. § 314.1, *et seq.*

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 6

mitigate, treat, or prevent even self-limiting diseases – may not be lawfully sold without prior FDA approval.[9] The withdrawal of the Withdrawn Enforcement Direction and recognition that homeopathic products must comply with the FDCA – including its requirement that any product labeled as a drug be approved by the FDA – has been upheld in court. *See MediNatura, Inc. v. Food & Drug Admin.,* 496 F.Supp.3d 416 (D.D.C. 2020) (granting in part the FDA's motion to dismiss and denying the homeopathic manufacturer's motion for preliminary injunction seeking to stop the FDA from withdrawing CPG 400.00, holding the FDA could properly withdraw CPG 400.400 based, in part, on the FDA's strong interest in ensuring unapproved, ineffective drugs are not marketed to people who might take them instead of an effective alternative). On appeal, MediNatura argued that the FDA did not appropriately withdraw the Withdrawn Enforcement Discretion, and it should be able to continue importing and selling the products in the United States due to the hardship it would cause to its business. In rejecting this, the D.C. Circuit Court of Appeals upheld the District Court's ruling because of the public health concerns of allowing Homeopathic Products to continue to be sold, and finding that FDA properly withdrew the Withdrawn Compliance Guide even without giving homeopathic companies their own NDA or GRAS/E process because this would have been outside the FDA's discretion because Homeopathic Products must comply with the FDCA. *MediNatura, Inc. v. FDA,* 998 F.3d 931, 940 (D.C. Cir. 2021).

On December 7, 2022, FDA issued its final Guidance for FDA Staff and Industry for Homeopathic Drug Products.[10] In doing so, FDA reiterated that Homeopathic Products are subject to the same statutory requirements as other drugs; nothing in the FDCA exempts Homeopathic Products from any requirements related to approval, adulteration or misbranding, including labeling requirements. *See* Final Guidance, p. 2. Absent a determination that any Homeopathic Products is not a "new drug" under the FDCA, it is subject to premarket approval requirements and there are no Homeopathic Products that are FDA approved. *Id.*

To be lawfully sold in California, Homeopathic Products intended to cure, treat, mitigate, or prevent disease, or affect the structure or any function of the body, must be pre-approved by FDA or California's Department of Health Services. To date, no homeopathic products labeled as drugs that are being sold by Sprouts (or otherwise) have been proven as safe and effective for use under the conditions their labels proclaim, recommend, or suggest, and are therefore misbranded, unapproved new drugs under the FDCA and California's Sherman Law. 21 U.S.C. § 321(p); Cal. Health & Safety Code § 110110(a). Sprouts' sale of these misbranded, new drugs violates federal and California law. 21 U.S.C. §§ 355(a) and 331(c); Cal. Health & Safety Code §§ 111440 and 111550.

---

[9] Sprouts has admitted as much in its 2022 Annual Report under Regulatory Compliance, stating, "The FDA has the authority to regulate homeopathic products. Under the FDCA, homeopathic products are subject to the same requirements related to approval, adulteration and misbranding as other drug products. There are no FDA-approved products labeled as homeopathic." *See* https://s28.q4cdn.com/791277983/files/doc_financials/2022/AR/sfm_2022_10-k.pdf, page 16.

[10] Available online at https://www.fda.gov/media/163755/download.

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 7

### C. California Law Prohibits the Unapproved Advertisement of Products for the Treatment of Certain Conditions

In addition to prohibiting the sale or possession of any New Drug, the Sherman Law prohibits advertising any drug represented to have an effect in certain conditions, disorders or diseases unless approved by FDA through a new drug application or by virtue of following an established OTC monograph.[11] Cal. Health & Safety Code §§ 110403; 110505(b). This prohibition is not limited to just serious diseases such as cancer, diabetes and AIDS, it also includes common conditions affecting the ears, eyes and skin. *Id.*

"Advertisement" under the Sherman Law is broad, encompassing print ads, and radio ads, and a product's packaging. *Id.*, § 10988. Critically, the prohibition from unapproved advertising of drugs for certain conditions applies equally to sellers, manufacturers, and distributors of the drugs. Cal. Health & Safety Code §, 110413. This prohibition in § 110403 is specific for certain conditions and includes no exception for articles listed in the pharmacopeia. Cal. Health & Safety Code § 110405.

OTC Homeopathic Products – none of which have been approved by FDA or California's Department of Health Services to treat any disease or formulated pursuant to any approved monograph – are often labeled to treat many of the conditions, disorders, and diseases subject to the Sherman Law's advertising prohibition in § 110403. This includes homeopathic drugs purporting to treat arthritis (i.e., joint disease); conditions of the eye (e.g., stye); diseases or disorders of the ear (e.g., earaches); sinus infections; and tumors. Sprouts sells Homeopathic Products specifically labeled to treat many of the very conditions prohibited by § 110403.

Because no homeopathic product has been approved by FDA or California's Department of Health Services, or formulated pursuant to an approved monograph as explained above, Sprouts' sale is not only in violation of the FDCA's and Sherman Law's general prohibitions of the sale of misbranded, unapproved new drugs, but also the Sherman Law's prohibition from advertising drugs to treat certain conditions, disorders, and diseases. Cal. Health & Safety Code § 110403. Critically, Sprouts' sale of Homeopathic Products is not some technical violation of obscure federal and state laws; rather, it is a health fraud and a major economic cheat to many thousands of unsuspecting consumers who purchase the Homeopathic Products believing they are getting some form of natural remedy as opposed to the placebo homeopathic products are.

## II.  SPROUTS IS PERPETRATING A HEALTH FRAUD BY UNLAWFULLY SELLING MISBRANDED UNAPPROVED HOMEOPATHIC DRUGS

---

[11] Because the Sherman Law's prohibition from advertising products for certain conditions and diseases is conditioned on the failure to get approval from FDA, it does not require any more than the FDCA requires and would not be preempted by federal law.

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 8

### A. Homeopathic Health Fraud is a Public Concern and Major Economic Cheat

Even though homeopathic products labeled as drugs are misbranded, illegal new drugs, Sprouts sells them to many unsuspecting consumers as potentially effective remedies for many different conditions, which an unlawful health fraud. Health Fraud is the deceptive promotion, advertisement, distribution, or sale of substances represented as being effective to diagnose, prevent, cure, treat, or mitigate disease (or other conditions), or provide a beneficial effect on health, but which have not been scientifically proven safe and effective for such purpose.[12] Such scientific proof of safety and efficacy must be submitted to, accepted by, and approved by the FDA before the product can be marketed with drug claims. 21 U.S.C. § 355; *see also* Cal. Health & Safety Code 110550(b) (requiring scientific proof of safety and efficacy for approval by the Department of Health Services). Health Fraud is one of the FDA's highest enforcement priorities when it involves a direct risk of health and is a major economic cheat even when a person's health is not at risk. *See* FDA Compliance Policy Guide 120.500 Health Fraud. Moreover, even if the Health Fraud does not pose a direct risk to a person's health, it is still an indirect health risk when a consumer relies on a Health Fraud in delaying or discontinuing appropriate medical treatment. *Id.*

Consumers, generally, do not understand what homeopathy is, or what "homeopathic" means when it is stamped on a product's label. The FTC issued a report demonstrating that consumers poorly understand the principles underlying homeopathy.[13] People in two focus groups were asked generally what they thought homeopathic products were, and they thought they were the same as natural, herbal or home remedies. Accordingly, most people unfamiliar with the principles behind homeopathy believe it to be akin to naturopathy – medical treatment using natural remedies to help the body heal itself using therapies such as herbs, acupuncture, and exercise. A separate survey commissioned by the FTC showed that a significant portion of consumers mistakenly believed that homeopathic manufacturers tested their products on people to show their effectiveness. This confusion exists even for people who have purchased homeopathic products in the past, including our Client who believed the homeopathic products she purchased was a natural remedy with scientifically proven efficacy, and not a highly diluted substance equivalent to a placebo. By purchasing and using Homeopathic Products rather than allopathic drugs or naturopathic remedies, consumers are putting their health at risk by not getting a treatment with scientifically proven physiological efficacy. This is particularly troublesome given the recent COVID-19 pandemic the world faced, and is still facing.

The FTC's Staff Report concluded that Homeopathic Products should be held to the same truth-in-advertising standards as other products claiming health benefits, but the efficacy claims for Homeopathic Products lack competent and reliable scientific evidence that they have the

---

[12] *See* FDA Compliance Policy Guide 120.500 Health Fraud (available online at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-120500-health-fraud-factors-considering-regulatory-action).

[13] Staff Report, fn 2, *supra.*

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 9

claimed treatment effects. Yet, despite homeopathic drugs being nothing more than a Health Fraud and a major economic cheat, Sprouts advertises and sells Homeopathic Products labeled to cure, prevent, mitigate, or treat various conditions in contravention to its own corporate purpose, and its pharmacists' ethical obligations.

### B. Sprouts' Health Fraud Selling Homeopathic Products is Antithetical to Its Code of Ethics

Sprouts touts itself as being one of the country's leading natural and organic retailers, crediting its success to "high standards in everything [it does], everywhere [it does] business." In its Code of Ethics, Sprouts says "acting ethically and with honesty is essential to maintaining [its] reputation." Sprouts' Code of Ethics, which says applies to all team members at all levels and vendors and suppliers, says you must act with integrity and honesty, and comply with all applicable laws and regulations wherever Sprouts does business.[14]

Sprouts' promise of integrity and honesty rings hollow given that Sprouts stocks its stores with unapproved, misbranded Homeopathic Products which are not proven effective to treat anything. Selling Homeopathic Products undermines Sprouts purported "honesty" and promise to comply with all applicable laws and regulations. Instead of having integrity and honesty, Sprouts misleadingly and unlawfully sells Homeopathic Products in its stores and online that neither promotes health nor provides treatment, putting sales and profits over the wellbeing of its customers. If Sprouts is truly dedicated to integrity, honesty and compliance with all laws and regulations, it will remove misbranded, illegally labeled homeopathic products from its stores' shelves, and stop selling them immediately.

### C. Selling Homeopathic Products in Sprouts Stores is Materially Misleading and Harmful to Consumers

It should go without saying that selling products intended to cure, treat, prevent or mitigate diseases when they have not been proven to and have not been approved by the FDA as safe and effective to do so, is materially misleading and harmful to consumers. *See* 21 U.S.C. § 352(a)(1). As explained above, no homeopathic product has ever been approved by the FDA as safe or effective to be labeled as a drug for any purpose, and there are no valid studies using current scientific methods showing that homeopathic products are effective to treat any condition.

The FTC has also concluded that homeopathic products are misleading to consumers. "The case for efficacy [for the vast majority of OTC homeopathic drugs] is based solely on traditional homeopathic theories and there are no valid studies using current scientific methods showing the products' efficacy."[15] *See* 81 Fed. Reg 90122-01, *90123. Based on this, the FTC has concluded

---

[14] See https://s28.q4cdn.com/791277983/files/doc_downloads/governance_docs/2022/Sprouts-Code-Of-Conduct-Rebrand.pdf.
[15] The conclusion was based on the FTC's workshop on homeopathic products, found at https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-staff-report-

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 10

that homeopathic products advertised as having therapeutic effects should explain to consumers that (1) there is no scientific evidence that the products work, and (2) the products' therapeutic claims are based only on theories of homeopathy from the 1700s that are not accepted by most modern medical experts.[16] *Id.* FTC concluded that a significant percentage of consumers simply do not understand what homeopathy means, how these products are regulated, or how much evidence there is to support the products' claims.[17] Many consumers simply associate homeopathy as synonymous with an herbal or natural remedy, which is not true. Indeed, given the theory of homeopathy, it belies today's medical science that products containing an "active" substance so diluted as to be undetectable could have any therapeutic effect on a disease. Critically, consumers may be misled to forgo otherwise effective, available treatment and opt instead for the homeopathic products sold in Sprouts stores that have no proven value, further exacerbating their illnesses or, in the case of contagious diseases, spreading it to others.

### III.  VIOLATIONS OF CALIFORNIA AND FEDERAL LAW

Sprouts' sale of Homeopathic Products labeled as drugs which have not been approved by FDA, or made pursuant to an approved OTC monograph, is illegal under federal and California law.  *See* 21 U.S.C. §§ 331 (it is illegal to introduce or deliver for introduction into interstate commerce and misbranded drug, to receive or deliver in interstate commerce any misbranded drug, or introduce or deliver in interstate commerce any unapproved drug); Sherman Law §§ 111440 (it is unlawful to hold, offer to sell or sell any misbranded drug), 111550 (it is unlawful to sell any drug not approved by the FDA or California's Department of Health Services).

In addition to the violations of the FDCA and California laws above, Sprouts' sale of the homeopathic Products also violates California consumer laws, including the California's Unfair Competition Law (Cal Bus. & Prof Code 17200, *et seq.*), False Advertising Law (Cal Bus. & Prof Code 17500, et seq), and CLRA.  Specifically, Sprouts' sale of Homeopathic Products violates the CLRA in at least three ways.  First, the Homeopathic Products misrepresent that they have characteristics and benefits they do not have -- i.e., are effective to treat various diseases and conditions when they have not been proven to do so -- in violation of Cal. Civ. Code § 1770(a)(5).

---

homeopathic-medicine-advertising-
workshop/p114505_otc_homeopathic_medicine_and_advertising_workshop_report.pdf.

[16] While it is true that homeopathy is based on theories from the 1700s that are not accepted by most modern medical experts, this statement alone does not clearly explain that one of the basic tenants of homeopathy is that there is no trace of any active ingredient due to the nature of the dilutions, which is why there is no scientific evidence that homeopathic products work.

[17] FTC Staff Report at 11.  *See also* Lake Research Partners study, "Findings from a nationwide online survey of adults on attitudes toward homeopathic products, including an oversample of Washington, D.C. residents," August 2019 (a plurality of adults tend to see homeopathic and non-homeopathic OTC drugs about equally effective).

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 11

Second, the Homeopathic Products misrepresent as being of a particular standard, quality, or grade – i.e., effective to treat the labeled conditions – when they are not in violation of Cal. Civ. Code § 1770(a)(7). Third, the Homeopathic Products are advertised as being effective to treat their labeled conditions when Sprouts did not intent to sell them as effective treatments for those labeled treatments in violation of Cal. Civ. Code § 1770(a)(9). Sprouts also violates the CLRA by failing to inform consumers purchasing Homeopathic Products that they are nothing but placebos when they are labeled as being effective drugs. *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 835, 51 Cal. Rptr. 3d 118, 126 (2006), as modified (Nov. 8, 2006) (a claim under the CLRA is actionable based on an omission of fact the defendant is obliged to disclose). Sprouts' conduct also gives rise for claims under California's warranty laws, under common law for unjust enrichment, fraudulent concealment and nondisclosure, and other statutory and common law claims.

   Critically, the United States Court of Appeals for the Ninth Circuit, has confirmed that the "reasonable consumer test" is not an element of an "unlawful" claim under California's UCL when consumer confusion it is not an element of the predicate violation, and many of our Client' potential claims for violation of the FDCA, FDA regulations and California's Sherman Law for unlawfully selling unapproved new drugs do not require consumer confusion. *Bruton v. Gerber Products Company*, 703 Fed. Appx. 468, 472, 2017 WL 3016740, *2 (9th Cir. July 17, 2017). *See also Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *23 (N.D. Cal. Aug. 13, 2019), reconsideration denied, 2020 WL 3246335 (N.D. Cal. May 28, 2020) (granting summary judgement to a plaintiff for violation of the FDCA and Sherman Law despite no evidence presented that the challenged labeling was likely to deceive a reasonable consumer). The Ninth Circuit has also held that the purchaser of goods that a defendant "is legally not allowed to sell in the form being offered" alone may constitute both an unlawful practice and a loss for purposes of UCL standing. *Franz v. Beiersdorf, Inc.*, 2018 WL 6519527, 745 Fed. Appx. 47, *48 (9th Cir. Dec. 11, 2018) ("Plaintiff need not plead reliance because neither the alleged FDCA violation nor the alleged Sherman Law violation requires allegations of fraud or deception"); *see also Sanchez v. Nurture, Inc.*, No. 5:21-cv-08566-EJD, 2023 U.S. Dist. LEXIS 176548, at *12 (N.D. Cal. Sep. 29, 2023) (sustaining claim for violation of the "unlawful" prong of the UCL for products that violate FDA regulations on nutrient content claims, while dismissing fraud-based claims where reasonable consumers could not be misled by the labeling). And for any claims that the "reasonable consumer" test must be met, courts have granted summary judgment to certified classes of consumers, finding that materiality and deception of alleged mislabeling can be presumed where the mislabeling violates California law. *See, e.g., Brown v. Hain Celestial Grp., Inc.*, 2015 WL 3398415 at *5-*12 (N.D. Cal. May 26, 2015).

   As a result of this unlawful and sale of Homeopathic Products labeled as drugs, Sprouts has sold the Homeopathic Products to many thousands of consumers in California, generating substantial profits for itself in turn.

**IV.    DEMAND FOR RELIEF**

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 12

In accord with Cal. Civ. Code § 1782 and any other laws requiring pre-suit demand and notice, our Client demands that within thirty (30) days of receipt of this letter, Sprouts take the following steps to cure the issues complained of herein:

1. Provide our Client with an accounting of its sales and profits (both gross and net profits) for all homeopathic products labeled as drugs sold within the past four (4) years in California that were sold in violation of applicable laws and regulations in any of the ways described above;

2. Refrain from selling homeopathic products labeled as drugs in California, in violation of applicable laws and regulations;

3. To provide corrective advertising in California, including advising consumers that there is no scientific evidence that homeopathic drugs are effective, and that the Homeopathic Products' therapeutic claims are based only on theories of homeopathy from the 1700s that are not accepted by most modern medical experts; and

4. Pay damages to our Client and to all other putative class members in California, including restitutionary disgorgement of profits earned over the past four (4) years as a result of the sale of homeopathic products labeled as drugs in California, as well as attorneys' fees and expenses.

If we do not receive a response from you within thirty (30) days of receipt of this letter, we will assume that Sprouts has no interest in curing the matters complained of herein, our Client may file an action seeking damages and/or injunctive[18] or equitable[19] relief for these, and potentially other, violations of state law.

---

[18] Our Client can seek an injunction individually under California law without the need to certify a class. *See, e.g., McGill v. Citibank, N.A.*, 393 P.3d 85, 2 Cal. 5th 945 (2017). Such action for injunctive relief would necessarily proceed in the Superior Court of California, and not in federal court. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018) (establishing requirement for Article III standing for injunctive relief in consumer labeling actions); *Benton v. CVS Pharm., Inc.*, 604 F. Supp. 3d 889 (N.D.Cal. 2022) (remanding claim for illegal sale of homeopathic products seeking injunctive relief for lack of federal subject matter jurisdiction).

[19] Any claim for equitable relief would necessarily proceed in the Superior Court of California, and not in federal court. *See Guzman v. Polaris Indus.*, 49 F.4th 1308 (9th Cir. 2022) (holding federal court lacks equitable jurisdiction to hear claims under the UCL, and such claim must be dismissed without prejudice to proceed in state court); *Guthrie v. Transamerica Life Ins. Co.*, 2021 WL 4314909 (N.D. Cal. Sep. 23, 2021) (remanding class action to state court for lack of equitable jurisdiction).

Jack Sinclair
Sprouts Farmers Market, Inc.
October 13, 2023
Page 13

Thank you for your attention to this matter.

Sincerely

Wyatt A. Lison
Admitted in CA and PA

cc:    Ms. Emi Bruemmer (via Electronic Mail)

# EXHIBIT B5

**Cancellation Email 1**

 Outlook

---

**Re: Reselling Allergena & Progena Products**

---

**From** Chris Sutton <chris@holistic4all.com>

**Date** Wed 11/23/2022 8:14 AM

**To**    Seneca R. Savage <srsavage@meditrend.com>

Seneca,

We completely understand and please keep us in mind if you need any help with Amazon or Walmart. We appreciate the prayers. Thank you

*Chris Sutton*

*Chief Executive officer*

Holistic 4 All
625 S Palm St.
La Habra, CA 90631
**P: 562-448-3135**
**Direct: 817-805-6291**
**Holistic4all.com**

On Tue, Nov 22, 2022 at 5:17 PM Seneca R. Savage <srsavage@meditrend.com> wrote:

Hello Chris,

I'm very sorry to learn about your father.

It is with a heavy heart that we deliver this news to customers like you and your father, who have successfully promoted and supported our brand in many different ways, for many years.  I do want to stress that we are simply restricting sales via 3rd party seller platforms.  You are still permitted to sell our products via your own website.

Unfortunately, this is a business decision.  We have alerted our resellers and will be monitoring 3rd party platforms for unauthorized sellers who do not heed the message.  That said, it would be inappropriate to offer some sellers an exception while others have been restricted.

We will notify you should we decide to again allow resellers to sell on 3rd party platforms in the future.  But for reasons mentioned below, we have decided to change our business model in this particular area for the time being.  I trust you understand.

Please indicate whether you'd like to cancel the pending order or fulfill it as is.

I wish you the best and again thank you and your father for your many years of patronage.  My thoughts and prayers are for Dr. Sutton's full recovery.

Best,

Seneca

---

**From:** Chris Sutton <chris@holistic4all.com>
**Sent:** Tuesday, November 22, 2022 9:49 AM
**To:** Seneca R. Savage <srsavage@meditrend.com>
**Subject:** Reselling Allergena & Progena Products

Hello Seneca,

My father Mark and business partner, who you emailed earlier, is not able to respond to emails at this time due to a major stroke he is currently suffering from.

We have been selling Progrena for many years and my family currently takes many of your products.  Is there a way that Progrena could have a few select sellers on Amazon? We have been using the proceeds to help my father's long recovery and it has been an integral part of our business.

Let us know how Holistic 4 All can help Progena grow on Amazon and take advantage of the tools which helped us grow into a top 1000 Amazon company.  Please take a look at our profile here.

Please consider us!

Sincerely,

*Chris Sutton*
*Chief Executive officer*

Holistic 4 All
625 S Palm St.
La Habra, CA 90631
**P: 562-448-3135**
**Direct: 817-805-6291**
**Holistic4all.com**

–

Outlook

**Reselling Allergena & Progena Products**

**From** Seneca R. Savage <srsavage@meditrend.com>

**Date** Mon 11/21/2022 6:21 PM

**To** markmsutton58@gmail.com <markmsutton58@gmail.com>

**Cc** orders <orders@meditrend.com>

📎 1 attachment (119 KB)

MEDITREND MAP Policy - rev 11.16.22.pdf;

Hello Dr. Sutton,

We are in receipt of your order and want to give you the opportunity to proceed or cancel, based on the following.

The notice below is being delivered to all Online Resellers selling Meditrend Brands (Allergena & Progena) via 3rd Party Marketplaces, such as Amazon. Since your order was just submitted, we are willing to fill it, and allow you to resell this and remaining stock via 3rd party marketplace channels you currently have in place. Future purchases meant for resale via 3rd party marketplaces, however, will be declined for the reasons stated below:

   Progena is reorganizing due to supply chain issues and other market forces outside our control. Accordingly, sales to online resellers selling via third-party marketplaces, including Amazon, are being halted. Sellers WILL be permitted to sell their remaining stock via these marketplaces, pursuant to the attached MAP policy.

   Online Reseller Accounts designated internally as selling via third party marketplace(s) have been closed and will no longer receive discounted pricing. If your account has been closed as a result of this change, yet you intend to sell product through a brick and mortar store or via your own website, please re-apply for a reseller account at Meditrend.com.

We apologize for this sudden, unfortunate change of circumstances affecting Online Resellers and we want to thank you for your patronage over the years.

Sincerely,

**Seneca R. Savage**
Chief Executive Officer



# EXHIBIT B6

**Cancellation Email 2**

Outlook

---

Re: Reselling Allergena & Progena Products

---

From Purchasing Manager <mendy@healthdirectny.com>
Date Sun 1/8/2023 6:16 AM

To Seneca R. Savage <srsavage@meditrend.com>

How can we be an authorized seller? Anything we can do?

Dear Mordechai,

The notice below is being delivered to all Online Resellers selling Meditrend Brands (Allergena & Progena) via 3rd Party Marketplaces including, but not limited to Amazon.

Progena is reorganizing due to supply chain issues and other market forces outside our control. Accordingly, sales to online resellers selling via third-party marketplaces, including Amazon, are being halted. Sellers WILL be permitted to sell their remaining stock via these marketplaces, pursuant to the attached MAP policy.

Online Reseller Accounts designated internally as selling via third party marketplace(s) have been closed and will no longer receive discounted pricing. If your account has been closed as a result of this change, yet you intend to sell product through a brick and mortar store or via your own website, please re-apply for a reseller account at Meditrend.com.

We apologize for this sudden, unfortunate change of circumstances affecting Online Resellers and we want to thank you for your patronage over the years.

Sincerely,

Seneca R. Savage

Chief Executive Officer

MEDITRENtm
Best Regards

Mendy - Purchasing Manager

Email:    Mendy@heal.th.diru.t.ny-.qm

Tel: (718)388-9300 Ext. 108

Health Direct

326 Roebling St.

Brooklyn, N.Y. 11211

healthyglee.com