# Comment from Meditrend Inc.
# Published December 7, 2022

**BEFORE THE UNITED STATES FOOD AND DRUG ADMINISTRATION**

*In re* **Citizen Petition from Americans for Homeopathy Choice Foundation**

**Docket No. FDA-2020-P-1510**

## I.    COMMENTS OF MEDITREND, INC.

Meditrend, Inc. ("Meditrend"), by counsel and in response to the Citizen Petition filed by Americans for Homeopathy Choice Foundation ("AHCF") with the U.S. Food and Drug Administration ("FDA"), hereby submits comments in support of the above-listed Citizen Petition, Docket No. FDA-2020-P-1510.

## II.    INTERESTS OF THE COMMENTER

In 1980, Richard D. Savage founded Meditrend in Albuquerque, New Mexico. Mr. Savage has been an entrepreneurial pioneer in the discovery, development and distribution of innovative health solutions, including, but not limited to, over-the-counter ("OTC") products marketed in the U.S. as homeopathic drugs. Meditrend aims to make health solutions available to the public that are medically sound and economically viable. It has successfully distributed OTC homeopathic drugs for more than 40 years without any reported adverse events. Meditrend's business is directly affected by the FDA's regulation of OTC homeopathic products, including through the FDA's Compliance Policy Guides and policies regarding enforcement discretion.

### III.    SUMMARY

For the reasons discussed below, Meditrend supports AHCF's Citizen Petition to the extent that it requests FDA to regulate OTC homeopathic drugs separate from conventional drugs.  For example, Meditrend agrees that the requirement for an approved NDA should not apply to OTC homeopathic drugs that: (1) contain only homeopathic active ingredients that are listed in the HPUS or pending inclusion in the HPUS during an established grace period; (2) are generally recognized, among experts qualified by scientific training and expertise to evaluate the safety and effectiveness of homeopathic drugs in accordance with homeopathic theories, as safe and effective for use in the treatment of the conditions prescribed, recommended, or suggested in the labeling thereof; and (3) are manufactured in compliance with cGMPs and, if applicable, HPUS requirements.  Meditrend supports AHCF's Citizen Petition because the FDA's current regulation of OTC homeopathic drugs is unlawful.

In 2015, the FDA announced an intent to revisit its regulation of homeopathic drug products.  In 2017, the FDA issued a draft guidance entitled, "Drug Products Labeled as Homeopathic," announcing the agency's shift to a "risk-based approach" to homeopathic regulation.  *See* 82 Fed. Reg. 60403 (Dec. 20, 2017) (Notice of availability of Draft Guidance). The FDA revised the draft guidance in 2019, which culminated in the FDA's withdrawal of Section 400.400 of its Compliance Policy Guide (hereinafter "CPG 400.400").  The CPG 400.400 had otherwise governed the marketing and sale of homeopathic drug products since 1988.  The FDA explained that any drug, "including a homeopathic drug, is considered a 'new drug' if it is not generally recognized as safe and effective (GRAS/E) …" *See* 2019 Draft Guidance at 2.  The FDA requires that such "new drugs" be the "subject of an approved application filed pursuant to section 505(b) or 505(j) of the FD&C Act."  *Id.*  The agency explained in clear terms that, "absent a

determination that a homeopathic drug product is not a 'new drug' under section 201(p), all homeopathic drug products are subject to the premarket approval requirements in section 505 of the FD&C Act[.]" *Id.* (noting that there "are currently no homeopathic drug products that are approved by the FDA").

This shift in policy categorically altered the legal status of homeopathic products. By withdrawing the CPG 400.400, and by concluding in the Draft Guidance that **all** homeopathic drugs are subject to premarket drug approval requirements, the FDA foreclosed practical channels to market homeopathics. Homeopathic products are now saleable based entirely on the whim or caprice of the agency under no fixed standard. In other words, FDA operates with unbridled discretion in its regulation of homeopathic products.

The FDA lacks the statutory authority to regulate all homeopathic products as "new drugs" under federal law. Specifically, the FDA's actions now conflict with the plain and intended meaning of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") by imposing premarket approval requirements on OTC homeopathic drug products. Because Congress exempted homeopathic OTC products from conventional drug approval pathways, the FDA violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C), by imposing heightened premarket approval requirements designed for conventional drugs. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, §§ 3851-3856, 134 Stat. 1281 (2020); *see also In re Roman Cath. Church of Archdiocese of Santa Fe*, 615 B.R. 644, 655-56 (Bankr. D.N.M. 2020) (holding that agency interpretation violated CARES Act and thus 5 U.S.C. § 706(2)(C) because the law spoke directly to the question).

By treating OTC homeopathic drugs the same as conventional drugs, the FDA unlawfully merges homeopathy with conventional drug regulation. Congress expressly instructed otherwise

in Section 3853 of the CARES Act. Through that legislative command, Congress compelled the agency to treat OTC homeopathic drug products differently than conventional OTC drugs. The text of that legislation compels the agency to relax, not heighten, standards for OTC homeopathic drug products. That interpretation is supported by the FDA's lengthy history of non-regulation; the legislative history of CARES Act § 3853; and Congressional exemption of homeopathic drugs from other conventional drug standards (*see* 21 U.S.C. § 360eee(13)). The CPG 400.400 was consistent with congressional intent.

## IV.    BACKGROUND

### A. FDA Regulation of Homeopathy

The federal Food, Drug, and Cosmetic Act ("FDCA") defines "drug" to include, *inter alia*, "articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them." 21 U.S.C. § 321(g)(1)(A). A "new drug" requires an approved drug application filed pursuant to section 355(b) or section 355(j) before it can be marketed, i.e., introduced or delivered or introduction into interstate commerce. *See id.* at § 355(a). Unless an exemption applies, a drug, including a homeopathic drug, is a "new drug" if it is "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . ."[1] *Id.* at § 321(p)(1). Accordingly, under the FDCA, any homeopathic drug

---

[1] A "new drug" does not include, however, a drug that is not recognized as GRAS/E if, at any time prior to June 25, 1938, it was subject to the Food and Drug Acts of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning conditions of use. *See* 21 U.S.C. § 321(p)(1). On the other hand, a "new drug" also includes "any drug . . . the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not,

that is a "new drug" is subject to the drug approval requirements contained in section 355. The
FDA has yet to approve a new drug application for a homeopathic drug. Nor, as explained below,

_____

has the FDA evaluated whether any homeopathic drugs are generally recognized as safe and
effective ("GRAS/E"). The FDA has nonetheless not prohibited the sale of OTC homeopathic
drug products on the sole ground that such products are unapproved drugs.

Requiring all homeopathic drugs to secure approval under Section 355 would destroy the
OTC homeopathic market. Individual New Drug Approvals are estimated to cost more than $2.6
billion. *See, e.g.,* DiMasi, J, et al., "Innovation in the pharmaceutical industry: New estimates of
R&D costs," Journal of Health Economics, 2016;47:20-23. Clinical trials required to support FDA
drug approvals have a median cost of $19 million. *See, e.g.,* Moore, T, et al., "Estimated Costs of
Pivotal Trials for Novel Therapeutic Agents Approved by the US Food and Drug Administration,
2015-2016," JAMA Intern Med., 2018 Nov 1;178(11):1451-1457. Multiple such trials are required
to satisfy the FDA's rigorous standards. Unlike many conventional drugs, however, homeopathics
lack market exclusivity provided by patent protections, in part, because those products have been
generally marketed with FDA's blessing for decades. The absence of barriers to market entry,
coupled with widespread use of homeopathic products standardized under the HPUS, eliminated
financial incentives to pursue drug approval over such products.

Homeopathic products are also unsuited for FDA's conventional drug approval pathways,
which were designed by FDA to regulate novel pharmacologically active ingredients (or "APIs").
The art of homeopathy is a distinctive system of medicine that focuses on individualized solutions

_____

otherwise than in such investigations, been used to a material extent or for a material time under
such conditions." *Id.* at § 321(p)(2).

for each patient. *See, e.g.*, Klaus Linde and Dieter Melchart. Randomized Controlled Trials of Individualized Homeopathy: A State-of-the-Art Review. The Journal of Alternative and Complementary Medicine. Dec 1998. 371-388.[2] Homeopathy is a different medical ideology. *See* 2019 Draft Guidance at 1-2 ("Homeopathy is an alternative medical practice that has a historical

---

basis in theory and practice first systemized in the late 1700s. Homeopathy is generally based on two main principles: (1) that a substance that causes symptoms in a healthy person can be used in diluted form to treat symptoms and illnesses (known as 'like-cures-like'); and (2) the more diluted the substance, the more potent it is (known as the 'law of infinitesimals').").

Homeopathic drugs also have different safety profiles from conventional drugs. The FDA lacks a reasonable basis to conclude that homeopathic products present a risk to patient or consumer health or safety. To the extent FDA claims that homeopathic products are ineffective, the agency identifies largely economic concerns that could be rectified through disclosures. But mandating that all such products proceed through the costly drug approval process is otherwise unreasonable given the agency's long prior history of exempting homeopathic drugs from new drug regulation.

Beginning in 1972, the FDA made GRAS/E determinations for several categories of OTC drugs pursuant to its OTC Drug Review. *See* 37 Fed. Reg. 9464 (May 11, 1972); 21 C.F.R. Part 330. As part of its OTC Drug Review, the FDA formed advisory panels for each category of OTC drugs under review. *See* 21 C.F.R. § 330.10. The advisory panels reviewed information concerning drug safety and efficacy, and classified those drugs into one of three categories: Category I –

---

[2] *Available at* https://www.liebertpub.com/doi/full/10.1089/jicm.2021.0193 (last accessed Nov. 9, 2022).

GRAS/E and not misbranded; Category II – Not GRAS/E; and Category III – Lacking sufficient data on safety or efficacy to permit classification. *See* FDA, *Over-the-Counter (OTC) Drug Review, OTC Monograph Reform in the CARES Act, Status of Existing OTC Monograph Products*.[3] After receiving a report from an advisory panel, FDA published an advanced notice of proposed rulemaking ("ANPR") in the Federal Register. *See, e.g.*, 42 Fed. Reg. 35346 (July 8, 1977) (ANPR for internal analgesic drug products). The ANPRs contained proposed monographs

for the OTC drugs at issue and sought comments from interested persons. FDA reviewed comments received in response to an ANPR and then published a tentative final monograph ("TFM") for that category of OTC drug. The FDA published final monographs for the OTC drug categories. A drug manufactured and labeled in compliance with an applicable OTC monograph was deemed GRAS/E and, as a result, did not require an approved drug application to be marketed in the U.S. *See* 21 U.S.C. § 321(p) (the term "new drug" does not include GRAS/E drugs).

As part of this notice-and-comment rulemaking process, the FDA published several final OTC monographs. Some OTC drugs, however, only proceeded to ANPRs or TFMs. *See* FDA, *Over-the-Counter (OTC) Drug Review, OTC Monograph Reform in the CARES Act, Status*.[4] Under an old FDA policy, OTC drugs covered by an ongoing OTC monograph proceeding were generally allowed to remain on the market. *See* FDA, *Guidance for FDA Staff and Industry, Marketed Unapproved Drugs – Compliance Policy Guide*, Sec. 440.100, Marketed New Drugs Without Approved NDAs or ANDAs.[5]

---

[3] *Available at* https://www.fda.gov/drugs/over-counter-otc-nonprescription-drugs/overcounter-otc-drug-review-otc-monograph-reform-cares-act (last accessed Nov. 9, 2022).
[4] *Available at* https://www.fda.gov/drugs/over-counter-otc-nonprescription-drugs/overcounter-otc-drug-review-otc-monograph-reform-cares-act (last accessed Nov. 9, 2022).
[5] *Available at* https://www.fda.gov/files/drugs/published/Marketed-Unapproved-Drugs---Compliance-Policy-Guide.pdf (last accessed Aug. 24, 2022).

The FDA nonetheless excluded homeopathic drug products from this OTC drug review. At the time, the FDA categorized homeopathic drugs as a separate category and deferred its evaluation of those products because of the "uniqueness of homeopathic medicine[.]" *See* 37 Fed. Reg. at 9466 ("Because of the uniqueness of homeopathic medicine, the Commissioner has decided to exclude homeopathic drugs from this OTC drug review and to review them as a separate category at a later time after the present OTC drug review is complete").[6]

_____

Because homeopathic OTC drugs[7] were exempt from the conventional OTC drug review, those products were excluded from certain pathways to market. Therefore, instead of evaluating homeopathic drugs under its OTC Drug review, the FDA issued CPG 400.400—an enforcement discretion policy that established conditions under which homeopathic drugs could "ordinarily" be marketed without an approved drug application, so long as the homeopathic drugs complied with certain requirements for labeling, manufacturing, and registration.

The CPG 400.400 "specified the regulatory duties of manufacturers of homeopathic drugs and thus had legal consequences[.]" *See MediNatura, Inc. v. Food & Drug Admin.*, 496 F. Supp. 3d 416, 437-38 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021). In *MediNatura*, the District Court for the District of Columbia evaluated whether the FDA acted unlawfully by revoking the CPG 400.400 without giving due consideration to industry's reliance interests. The Court

_____

[6] The CARES Act memorialized that language when Congress ratified this clause as part of its OTC drug legislation.
[7] OTC homeopathic drugs are homeopathic drugs that are intended solely for self-limiting disease conditions amenable to self-diagnosis of symptoms and treatment.

explained that, "By its own terms, the [CPG 400.400] thus pertains to the affirmative 'regulation' of homeopathic drugs and not just, as the FDA claims, to the exercise of enforcement discretion." *Id.* (noting that the CPG "represented a compromise between the FDA and the homeopathic drug industry, through which the industry would come into partial compliance with the FFDCA in exchange for the FDA's permission to market their products."). The *MediNatura* court unequivocally held that the CPG "permitted homeopathic drug companies to market their products without premarket approval, in the ordinary course, so long as they complied with the various statutory and regulatory requirements incorporated in the Policy." *Id.* at 440. "That regulatory framework had legal consequences." *Id.* The Court therefore held that FDA's withdrawal of the CPG was "final agency action" for which the FDA could be sued. And while the court mentioned the CARES Act as part of its background summary of FDA regulation (*id.* at 427), the Court was

_____

not tasked with evaluating how the CARES Act's statutory exemption affected the FDA's authority to regulate homeopathic products. Instead, the *MediNatura* decision focused on whether the FDA had properly considered industry reliance interests when the agency withdrew the CPG. In this comment, however, Meditrend specifically addresses the CARES Act exemption and its legal effect on FDA's regulatory authority over OTC homeopathic products.

The FDA withdrew CPG 400.400 in October 2019 and shifted to a risk-based approach to prioritize enforcement and regulatory actions of homeopathic drugs. *See* FDA, *Drug Products Labeled as Homeopathic, Guidance for FDA Staff and Industry, Draft Guidance* (October 2019).[8] As a result of FDA's decision to exclude homeopathic drugs from its OTC Drug Review and instead publish CPG 400.400, the FDA permitted the marketing and sale of homeopathic products

_____

[8] *Available at* https://www.fda.gov/media/131978/download (last accessed Aug. 11, 2022).

for at least thirty years since predicated on compliance with CPG 400.400 alone. The FDA argues that its revised policy permits the sale of homeopathic products through the agency's enforcement discretion. But the absence of affirmative standards like those in CPG 400.400 and the substitution of a vague "risk-based" analysis leaves homeopathic drugs without substantive protections contemplated by Congress.

**B. CARES Act and Changes to OTC Drug Regulation**

After FDA withdrew CPG 400.400 in 2020, Congress revised the OTC Drug Review process through the CARES Act, Pub. L. No. 116-136. Under the CARES Act, a faster administrative process replaced the notice-and-comment rulemaking process for identifying OTC drugs that FDA determined to be GRAS/E, as well as issuing, revising, and amending OTC monographs. *See* 21 U.S.C. §§ 352, 355g. For example, FDA may now initiate expedited administrative orders if it determines that a drug poses an imminent hazard to public health or if a

change in a drug's labeling is reasonably expected to mitigate a significant or unreasonable risk of serious adverse event associated with use of the drug. The FDA may also initiate orders on a nonexpedited basis, and industry can initiate orders as well. Those industry-initiated orders and the FDA-initiated (non-expedited) orders would include public notice, opportunity for comment, dispute resolution, and the opportunity for an administrative hearing and judicial review. In short, the CARES Act overhaul of OTC drugs affords FDA more administrative control over that pathway to market.

The CARES Act affected OTC drugs that were subject to an ongoing, non-final monograph proceeding. It brought all those outstanding proceedings to a close and made FDA's determination in the most recently applicable proposal, whether it was an ANPR or TFM, final. Accordingly,

whether such OTC drugs could be lawfully marketed depended upon the FDA's most recently applicable proposal or determination and the category into which such determination placed the OTC drug. Thus, a category I drug that FDA deemed to be GRAS/E in a TFM can be marketed without drug approval assuming it complies with the TFM and general OTC drug rules. If the category I drug was deemed GRAS/E in an ANPR, it can be marketed unless and until FDA issues a final administrative order determining that it is not GRAS/E and so long as it complies with the ANPR and general OTC drug rules. A Category II (non-GRAS/E) drug was deemed to be a new drug requiring an approved new drug application, and must have been removed from the market within 180 days of the CARES Act's enactment (i.e., by September 23, 2020) unless the FDA took action to permit its continued marketing. A category III drug that had a TFM is allowed to remain on the market, unless and until FDA issues a final order determining it is not GRAS/E, if it complies with the TFM and the general OTC drug rules. A category III drug whose most recently applicable rulemaking was an ANPR must be immediately removed from the market if it lacks an approved new drug application because that article is deemed a new drug subject to the requirement for an approved new drug application, and there is no grace period for market removal as there is for category II drugs.

The CARES Act also defaulted most other OTC drug products into the category of "new drug" requiring premarket approval unless and until the Administrative Order pathway creates new OTC monographs under which they could then be marketed without an approved new drug application. *See* 21 U.S.C. § 355h(b). Congress therefore streamlined the OTC drug pathway but eliminated any question that drugs not already subject to those pathways would be unmarketable new drugs subject to Section 355 approval. *See id.* at § 355h(a)(5)-(6).

12

Significantly, however, Congress elected to exempt OTC homeopathic drug products from this new OTC Drug Review protocol. The CARES Act eliminated FDA discretion to recategorize homeopathic OTC drugs by exempting them from the new OTC approval pathways for conventional drugs. Specifically, Section 3853 of the CARES Act excluded from the OTC Drug Review "any nonprescription drug . . . which was excluded by the Food and Drug Administration from the Over-the-Counter Drug Review in accordance with the paragraph numbered 25 on page 9466 of volume 37 of the Federal Register, published on May 11, 1972." Thus, the new administrative order process for recognizing GRAS/E OTC drugs does not lawfully apply to homeopathic drugs. Section 3853 of the CARES Act directs back to the FDA Commissioner's exclusion of homeopathic drugs in 1972 from the OTC drug review process because of the "uniqueness of homeopathic medicine[.]" 37 Fed. Reg. at 9466. In that same passage, the Commissioner pledged to "review [homeopathics] **as a separate category** at a later time…" *Id.* (emphasis added).

Because the FDA has not created a separate review process for determining whether a homeopathic drug is GRAS/E, it is unclear what such a process would look like or what FDA would require to establish that a homeopathic drug is GRAS/E following the CARES Act. OTC homeopathic drug products therefore fall within a vacuum of regulatory authority. FDA has suggested that the FDCA entitles the agency to require NDAs for all "new drug" products not already subject to an approval, and homeopathic drugs are expressly included in the definition of "drug" under 21 U.S.C. § 321(g). By passing the CARES Act, Congress demonstrated that it did not intend for *all* homeopathic drugs to be "new drugs" subject to premarket approval requirements. The FDA has the authority to find via another process that a homeopathic drug is GRAS/E. The agency cannot, however, compel *all* homeopathic drugs into the NDA process under Section 355. In Section 3853, Congress plainly sought to relax the standards on homeopathy by

preventing FDA from applying conventional GRAS/E standards to homeopathic drugs. We explain this below.

Prior to the CARES Act, the FDA applied conventional GRAS/E standards to homeopathic drugs. In an October 24, 2019 letter that denied a Citizen Petition from Americans for Homeopathy Choice ("Denial Letter"),[9] the FDA stated the following:

> The legal standard for determining whether a drug product is GRAS/E within the meaning of section 201(p) of the FD&C Act [21 U.S.C. §321(p)] is well-established in case law and requires that a drug product satisfy three criteria. First, the particular drug product must have been subjected to adequate and well-controlled clinical investigations establishing that the product is safe and effective. Second, those investigations must have been published in the scientific literature so that they are available to qualified experts. Third, experts must generally agree, based on those published studies, that the product is safe and effective for its intended uses. A product's general recognition as safe and effective must be evidenced by at least the same quality and quantity of data as are necessary to support approval of an NDA.

Denial Letter at 8. Further, the FDA referred to 21 C.F.R. § 314.26, which describes the characteristics it considers when evaluating whether a clinical investigation is adequate and wellcontrolled for purposes of determining the effectiveness of new drugs.[10] It summarized the regulation explaining:

> [P]er the regulation, an adequate and well-controlled clinical investigation has at least one control group, is designed to minimize bias (usually through random assignments of study participants to control and treatment groups and through the blinding of participants and investigators to those assignments), and includes an analysis of the results of the study that is adequate to assess the effects of the drug. One of the purposes of requiring adequate and well-controlled investigations is to

[9] *Available at* https://downloads.regulations.gov/FDA-2018-P-296216596/attachment_1.pdf (last accessed Aug. 31. 2022).

[10] In addition to section 314.26, section 330.1 concerns general conditions for general recognition of OTC drugs as safe, effective, and not misbranded. Also, section 330.10 provides procedures for classifying OTC drugs as GRAS/E and not misbranded, and for establishing OTC monographs. The latter lists data and information that would be reviewed including, but not limited to, animal safety data, human safety and efficacy data (e.g., studies concerning individual active components and combinations of active components).

ensure that the drug products taken by patients have been shown to be effective based on accepted scientific methods. Rigorously controlled clinical investigations help distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation.

*Id.* at 9.  FDA also reiterated in its Denial Letter that controlled clinical studies are required for a drug to be GRAS/E, and that they are the same type required for new drug approval:

> It is also well-established that anecdotal data, such as the clinical experience of practicing physicians or a drug's long history of use, cannot be the basis for finding that the drug is GRAS/E.  Only substantial evidence as defined by the FD&C Act will suffice to establish that a drug is not a new drug.  The requirement that GRAS/E status be based on the same quantity and quality of evidence that would support approval of an NDA is also reflected in FDA's regulations at 21 CFR 314.200(e)(1).

> Finally, because the Supreme Court has held that the word "drug" in the "new drug" definition refers to the entire finished product, including excipients, and not just to the active ingredient, courts generally have not been receptive when firms seek to rely on studies of one drug product to support a claim that a similar or identical drug product is GRAS/E.  The case law is clear that having the same active ingredient as an approved or otherwise safe and effective drug product does not establish that a drug product is GRAS/E; therefore, GRAS/E status cannot be conferred on one drug product because it has the same active ingredient as another drug product that is GRAS/E.  In short, GRAS/E status is not, and cannot be,

---

> established by similarity to another drug product.  Each drug product must independently be shown to be safe and effective in adequate and well-controlled clinical investigations.

*Id.* at 9-10.

As the above indicates, the FDA previously required well-controlled clinical investigations to establish that a drug is GRAS/E regardless of whether the drug was a homeopathic drug or an allopathic drug.  By exempting homeopathic drugs from the new administrative order process for OTC drugs, which included the GRAS/E standards, Congress gave FDA more flexibility in how it determines the safety and effectiveness of homeopathic drugs.  Accordingly, different evidence, such as the results of a proving or compliance with an HPUS monograph, can and should be used to establish that a homeopathic drug is GRAS/E.

15

## C. AHCF's Citizen Petition

In response to the FDA's 2019 Draft Guidance, AHCF filed a Citizen Petition with the FDA on June 5, 2020. In sum, AHCF requested that the FDA: (1) adopt its proposed regulation;[11] (2) recognize as safe and effective homeopathic drugs that are properly manufactured and labeled, and that are listed in, or formally pending approval for listing in, the HPUS and its supplements or

addendums;[12] (3) prohibit any homeopathic drug not listed in, or formally pending approval for listing,[12] in the HPUS or its supplements and addendums from using the term homeopathic in any form that states or implies the product is homeopathic; (4) ensure that any drug listed in, or formally pending approval for listing in, the HPUS its supplements and addendums is manufactured in accordance with the HPUS and current good manufacturing practices ("cGMPs"); (5) if the FDA applies a risk-based policy to drug products labeled as homeopathic, ensure that the risk-based policy is formulated and applied with generally accepted standards and procedures of risk

---

[11] AHCF's proposed regulation: (1) defines terms, such as, but not limited to, "homeopathic drug," "homeopathic drug product," "product properly labeled as homeopathic," and "product improperly labeled as homeopathic"; (2) describes the conditions under which a homeopathic drug is deemed adulterated; (3) describes the conditions under which a homeopathic drug labeled "homoeopathic" is deemed misbranded; and (4) provides standards for homeopathic drugs and homeopathic drug products. Regarding the proposed standards, they are as follows: (1) a homeopathic drug must comply with applicable cGMPs and HPUS requirements; (2) a homeopathic drug, when properly manufactured and labeled and evaluated under an appropriate risk-based policy, is recognized as inherently safe; (3) an appropriate risk-based policy requires that the risk of homeopathic drugs and homeopathic drug products be evaluated in relation to risks presented by other products; and (4) absent a determination that any specific homeopathic drug or any specific homeopathic drug product is a new drug, the FDA will treat all homeopathic drugs as generally recognized as safe and effective for their intended use ("GRAS/E"), subject to compliance with the regulation's provisions addressing adulteration, misbranding, and cGMPs.

[12] The Citizen Petition requested a two (2) year grace period for products, which we assume means homeopathic active ingredients, to be proposed and accepted for review for addition to the HPUS, and an additional four (4) years for the applications to be accepted or rejected by a process certified by a recognized certifying organization such as the International Standards Organization ("ISO") or the American National Standards Institute ("ANSI").

assessment;[13] and (6) hold a public hearing if it denies the Citizen Petition.  In other words, if the

FDA granted AHCF's Citizen Petition, the FDA would cease applying the NDA requirement to all

OTC homeopathic drugs, and would, in most circumstances, recognize them as the low-risk

products that are GRAS/E.

      Meditrend supports the AHCF's Citizen Petition and agrees that FDA cannot require all

OTC homeopathic drugs to seek drug approval under Section 355.  Rather, the FDA should

---

[12] FDA has yet to define "listed" in context with regulation of homeopathic drug products.
*See* 2019 Draft Guidance at 1 (defining, for purposes of the 2019 Draft Guidance, "homeopathic
drug product" as a drug product that is labeled as containing only active ingredients and dilutions
listed for those active ingredients in the HPUS).  To compare, the FDCA, 21 U.S.C. § 321(g)(1)(A),
defines "drug" to include "articles recognized" in the HPUS or its supplements.  The FDA should
broadly interpret the terms "listed," and "recognized," to include homeopathic active ingredients
listed individually or as part of a class described in the HPUS.  For example, all allersodes, which
are homeopathic attenuations of antigens (including toxins, ferments, precipitinogens,
agglutinogens, opsonogens, lysogens, venoms, agglutinins, complements, opsonins, amboceptors,
precipitins, and most native proteins), would be considered to be listed or recognized in the HPUS,
even if not individually listed, because the HPUS recognizes allersodes as a class of homeopathic
active ingredients and provides instructions on how to prepare allersodes. recognize that most, if
not all, OTC homeopathic drugs are GRAS/E under homeopathic principles and regulate them as
such, particularly if they comply with applicable cGMP and HPUS standards.

Meditrend requests that FDA allow marketing and sale of OTC homeopathic drugs without

drug approval if the active homeopathic ingredients are included in or eligible for inclusion in the

HPUS, regardless of whether a manufacturer or distributor pursues listing in the HPUS for

---

[13] The Citizen Petition describes in detail what AHCF considers to be an appropriate
riskbased policy.  In general, the Citizen Petition describes homeopathic drug products as low risk
compared to other products and encourages the FDA to regulate them as such.

individual homeopathic active ingredients,[14] and are manufactured consistent with homeopathic principles and cGMP requirements.[15]

## V.    ANALYSIS

### A. Regulating OTC Homeopathic Drugs Under the Same Standards as Conventional Drugs Contradicts Legislative Intent

Agency action in excess of, or in conflict with, statutory command is unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C).  Courts have applied Section 706(2)(C) to reverse agency action that exceeds the agency's statutory grant, including agency action in violation of the CARES Act. *See, e.g., In re Roman Cath. Church of Archdiocese of Santa Fe*, 615 B.R. 644, 655–56 (Bankr. D.N.M. 2020) (holding that, "The CARES Act directly addresses the PPP eligibility requirements" and "Defendant had no authority under this charge to change the eligibility requirements"). In *In re Roman Cath. Church*, for example, the Court faulted parties for refusing to abide by the plain meaning of the CARES Act. *Id.* at 655-56 ("Defendant's refusal to abide by this simple distinction constitutes a usurpation of Congressional authority to

---

determine which business are eligible for PPP funds."); *see also Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202, 1224 (9th Cir. 2022) (holding that Forest Service violated Section 706 based on a misunderstanding of the Mining Use Act); *Transportation*

---

[14] FDA has previously acknowledged that some homeopathic products are not in the HPUS. For example, in CPG 400.400, FDA stated, "Documentation must be provided to support that those products or ingredients which are not officially recognized in the HPUS, an addendum to it, or its supplements are generally recognized as homeopathic products or ingredients." This indicates that some products could be considered "homeopathic drugs" if they are generally recognized as such. Manufacturing products in accordance with homeopathic principles and cGMP requirements should establish that a product is generally recognized as a homeopathic product.

[15] As discussed in n. 12, *supra*, FDA should also broadly interpret terms like "listed" and "recognized" when they are used in reference to whether a homeopathic drug is in the HPUS.

*Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transportation Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1178, 1184-85 (9th Cir. 2021) (holding that, "the issue is not whether the FRA has the authority to issue a rule that preempts state safety regulations, but whether it has done so in a manner that complies with the APA.").  The exact text of Section 3853 reads as follows:

### SEC. 3853. DRUGS EXCLUDED FROM THE OVER-THE-COUNTER DRUG REVIEW.

(a)  IN GENERAL.—Nothing in this Act (or the amendments made by this Act) shall apply to any nonprescription drug (as defined in section 505G(q) of the Federal Food, Drug, and Cosmetic Act, as added by section 3851 of this subtitle) which was excluded by the Food and Drug Administration from the Over-theCounter Drug Review in accordance with the paragraph numbered 25 on page 9466 of volume 37 of the Federal Register, published on May 11, 1972.

(b)  RULE OF CONSTRUCTION.—Nothing in this section shall be construed to preclude or limit the applicability of any other provision of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.).

*See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (March 27, 2020), 134 Stat 281 ("CARES Act").  Under Section 3853(a), the products "excluded" by FDA in 1972 are exclusively OTC homeopathic products.

When interpreting statutory provisions, a court's goal is to ascertain congressional intent. *See New Mexico*, 854 F.3d at 1221 ("If Congress has spoken *directly* to the issue, that is the end of the matter, the court, as well as the agency, must give effect to Congress's unambiguously expressed intent.") (emphasis original); *Al-Hasani v. Mayorkas*, No. CV 20-8984, 2022 WL 310204, at *3 (D.N.J. Feb. 2, 2022) ("The role of the courts in interpreting a statute is to give effect to Congress's intent."); *id.* ("Where Congress's will has been expressed in language that has a reasonably plain meaning, that language must ordinarily be regarded as conclusive."); *id.* ("In attempting to discern Congress's intent, a court may resort to legislative history as an aid or crosscheck.") (internal citations omitted); *see also Cavazos v. Haaland*, No. CV 20-2942 (CKK),

19

2022 WL 94040, at *6 (D.D.C. Jan. 10, 2022), *appeal dismissed*, No. 22-5061, 2022 WL 1590686 (D.C.

Cir. May 16, 2022); *Teva Pharms. USA, Inc. v. United States Food & Drug Admin.*, 514 F. Supp. 3d 66, 97–98 (D.D.C. 2020).

Here, the CARES Act statutory note is unambiguous. Regardless of whether Section 3853(b) of the CARES Act preserves some of the FDA's statutory authority under the FDCA to regulate homeopathic drugs, Congress intended to relax—not heighten—the premarket burdens on OTC homeopathics and did not intend for all homeopathic drugs to be subject to the NDA requirements in 21 U.C.S. § 355.

Even if a court finds that Section 3853 is ambiguous on this issue, however, it may proceed through the *Chevron* analysis. "In conducting … *Chevron* step-one analysis, [courts] employ traditional tools of statutory construction." *New Mexico*, 854 F.3d at 1223 (quoting *INS v. Cardoz-Fonseca*, 480 U.S. 421, 446 (1987)). "These tools include examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Id.* (quoting *Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016)). Moreover, as discussed above, courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)). "Regardless of how serious the problem an administrative agency seeks to address, … it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Brown*, 529 U.S. at 125.

By exempting OTC homeopathic drugs from all new premarket approval requirements, Congress intended to permit the continued marketing and sale of OTC homeopathic drugs subject

to the same type of conditions under CPG 400.400. That interpretation is based on the following evidence of Congressional intent.

First, Congress expressly adopted and ratified the FDA's language from 1972 wherein the FDA excluded OTC homeopathic drugs from premarket requirements "[b]ecause of the uniqueness of homeopathic medicine…" *See* 37 Fed. Reg. 9466 (¶25). Following that FDA issued exemption in 1972, the FDA then permitted homeopathic products to be marketed without premarket approval for nearly fifty (50) years. By adopting that language in the Federal Register, Congress expressly acknowledged that OTC homeopathics should be regulated *differently* than conventional drugs under a different regulatory scheme. Requiring homeopathics to meet stricter standards as conventional drugs, i.e., by eliminating the marketing pathway permitted under the CPG 400.400, would directly conflict with the spirit of Congress's language.

Second, Congress's language in the CARES Act is consistent with other provisions of the FDCA, including 21 U.S.C. § 360eee(13), which expressly excludes "homeopathic drugs marketed in accordance with applicable guidance under this chapter" from significant obligations imposed on conventional drugs, which are found in Section 360eee-1. Those requirements include, *inter alia*, product identifiers, manufacturing requirements, wholesale distributor requirements, dispenser requirements, repackager requirements, enhanced drug distribution requirements, and guidance documents. *See* 21 U.S.C. § 360eee-1. Those drug requirements were included by Congress in the Drug Quality and Security Act of 2013. *See* Drug Quality and Security Act, Pub. L. 113-54 (Nov. 27, 2013), 127 Stat 587. Thus, here again, Congress chose to relax (not heighten) the requirements on homeopathic drug products. But at the time Congress also directly referenced the FDA's "applicable guidance" under the chapter, which would have referred to CPG 400.400 in existence at that time in 2013.

21

Third, courts may examine the history of regulation, including the age of the statutory regime that FDA purports to invoke. *See West Virginia*, 142 S. Ct. 2587 at 2623. Although the FDA may argue that it has possessed regulatory authority over homeopathic drugs since 1938, its refusal to actually regulate homeopathics for fifty (50) years thereafter undermines the agency's position now that such products should revert to categorical regulation under Section 355. Moreover, even when the agency did regulate homeopathic drugs through the CPG 400.400, it refused to impose premarket requirements on OTC homeopathics. This history of non-regulation supports the argument that Congress would have intended to preserve the status quo—not impose heightened burdens on homeopathics—through the CARES Act.

Finally, members of Congress provided direct evidence of congressional intent through a letter to the FDA in September 2021 signed by twenty-four congresspersons. *See* Congressional Ltr. to FDA (Sep. 3, 2021).[16] The letter encouraged FDA to protect homeopathic drugs consistent with the CARES Act:

> Since 1938 until 2017, the FDA consistently recognized the distinction between conventional and homeopathic drugs, and Congress has repeatedly reaffirmed this distinction as set forth in the Food, Drug, and Cosmetic Act. As discussed above, **most recently in 2020, Congress passed the CARES Act, which exempts homeopathic drugs from review under its provisions regarding pharmaceutical drugs.** In 1938, the FDA supported the decision to recognize the HPUS and its supplements as the official compendium of standards and monographs for homeopathic drug ingredients giving the Agency the tools to regulate homeopathic drugs as a unique and separate category of drugs. On several occasions, the FDA has commented on this distinction as set forth by Congress, and the Agency's policies have been in adherence with the law which, as the FDA stated in 1988, "gives no premarket review of true homeopathic dilutions."

---

[16] *Available at*, https://homeopathychoice.org/wp-content/uploads/2021/09/9.3-Letter-tothe-FDA-regarding-Homeopathic-Guidelines.pdf (last accessed Aug. 30, 2022).

*See id.* (emphasis added). Of the representatives who submitted that letter to the FDA, seventeen (17) cast votes in favor of the final CARES Act legislation.[17] The September 2021 letter therefore represents direct evidence of congressional intent concerning the legislative text of the CARES Act, particularly relevant to what some legislators understood that statutory text, Section 3853, to mean when they voted to enact it into law.

This position is supported by the Supreme Court's decision in *Brown & Williamson Tobacco*. *See Brown*, 529 U.S. 120 (2000). In *Brown*, the FDA asserted jurisdiction to regulate tobacco products by concluding that nicotine is a "drug" under the FDCA and cigarettes are "devices" that deliver nicotine to the body." *Id.* at 1300. The court was asked to evaluate whether the FDA could manipulate its "drug" regulations to reach tobacco products—a category of products that had traditionally not been FDA-regulated. The Court evaluated the FDA as a whole, as well as in conjunction with Congress's subsequent tobacco-specific legislation, and held that Congress had plainly not given the FDA authority to regulate tobacco products. *See id.* at 1300-1316. Similarly, here, FDA is attempting to use the broad "drug" regulations to extend regulatory authority over homeopathics that Congress expressly denied. "In addition, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id.* at 1301. The *Brown* court found significant that Congress "ha[d] foreclosed the removal of tobacco products form the market." *Id.* at 1303. "A ban of tobacco products by the FDA would therefore plainly contradict congressional policy." *Id.* at 1304. Just like homeopathic drugs, the FDA's position on tobacco left those products in an

---

[17] An additional member, Gus Bilirakis, cast a vote for the same statutory language when it was introduced earlier under separate legislation in H.R. 7328 and H.R. 269.

impossible situation. "A fundamental precept of the FDCA is that any product regulated by the FDA—but not banned—must be safe for its intended use." *Id.* at 1306. But tobacco products

could never satisfy those standards because they could not be proven safe and effective for any purpose. *Id.* Thus, "[t]he inescapable conclusion is that there is no room for tobacco products within the FDCA's regulatory scheme. If they cannot be used safely for any therapeutic purpose, and yet they cannot be banned, they simply do not fit." *Id.* Under these and other circumstances, the Court concluded, "[I]t is evidence that Congress's tobacco-specific statutes have effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products." *Id.* at 1307.

      Although homeopathic drugs are fundamentally different from injurious tobacco products, the circumstances surrounding FDA's approach to homeopathic regulation resemble the FDA's attempt to regulate tobacco in *Brown*. As in *Brown*, here Congress's legislative language evidences an intent to "effectively ratif[y] the FDA's long-held position" that OTC homeopathics should be exempt from premarket approval requirements. There are, however, certain distinguishing factors, including the fact that, unlike with tobacco, Congress expressly gave the FDA authority to regulate homeopathic drugs in 21 U.S.C. § 321(g). But those provisions are irrelevant because Meditrend does not contest the FDA's authority to regulate homeopathics generally. Rather, it challenges the FDA's authority to require *premarket approval* for all OTC homeopathic drugs. Consistent with the CPG 400.400, the FDA may elect to impose other requirements (e.g., labeling).

## B. The FDA's Withdrawal of the CPG 400.400 Implicates the Major Questions Doctrine

      As explained above, a court will likely conclude that Section 3853 of the CARES Act clearly and unambiguously demonstrates that Congress intended to exempt OTC homeopathic

drugs from premarket approval requirements contained in 21 U.S.C. § 355. Moreover, in the event that a court concludes that Section 3853 is ambiguous, however, it would reach that same result by applying the *Chevron* analysis. In this context, the "major questions" doctrine also applies and militates against the FDA's claimed authority to require Section 355 drug approval for all OTC homeopathic products.

The "major questions" doctrine is not a rule of construction or legal claim against administrative action. Rather, the doctrine counsels courts to exercise greater scrutiny of administrative action where the consequences of regulation are "extraordinary" (e.g., "cases in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority"). *See W. Va. v. EPA*, 142 S. Ct. 2587, 2608 (2022). The principle is sometimes invoked to deny government regulatory authority unless Congress clearly spoke to the issue. For instance, in *Brown & Williamson* (cited by the Court in *W. Va.*, at 2608), which this comment discussed above, the FDA claimed that its authority of drugs and devices included the power to regulate, and even ban, tobacco products. *Brown*, 529 U.S. at 126-127. More recently, in *W. Va.*, the Supreme Court invalidated an Environmental Protection Agency ("EPA") regulation under the "major questions" doctrine. Under that doctrine, courts will strictly scrutinize agency action based on statutory interpretations that carry extraordinary political, social, or economic consequences.

The *W. Va.* Court was tasked with evaluating whether EPA's novel "general shifting" rule was consonant with the Clean Air Act ("CAA"). The Court considered whether the EPA could jettison its "best system of emission reduction" ("BSER") in favor of a "generation shifting" approach that would have regulated power plants' emissions of greenhouse gases to address climate

change by shifting energy generation mix at the grid level. The court held that the EPA could not rely on relatively unused or obscure provisions of the CAA to establish a sweeping New Source Performance Standards program because Congress had not granted the EPA authority to devise emissions caps in that manner. The *W. Va.* decision rejected the EPA's "'expansive construction of the statute,' concluding that 'Congress could not have intended to delegate' such a sweeping and consequential authority 'in so cryptic a fashion.'" *W. Va.* at 2609 (citing *Brown & Williamson)*; *Brown*, 529 U.S. at 159 ("[O]ur inquiry into whether Congress has directly spoken to the precise question at issue is shaped, at least in some measure, by the nature of the question presented.").

At its core, however, the "major questions" doctrine is merely a guidepost in an otherwise conventional statutory construction analysis. A court must still follow traditional cannons of statutory interpretation. Those cannons are designed to discern legislative intent. Ultimately, if a statute is plain on its face, the "major questions" doctrine would not compel a result inconsistent with that statutory meaning. *See W. Va.*, at 2609 ("both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there"). "Major question" cases focus on the scope of agency authority. *See id.* ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency may add pages and change the plot line.'"). The test under a "major question" case: "a requirement of 'clear congressional authorization,' confirms that the approach under the major questions doctrine is distinct." *Id.*

Here, we address FDA's authority to regulate homeopathic drug products in light of the major questions doctrine and its withdrawal of the CPG 400.400. The FDA's recent change to homeopathic regulation carries extraordinary economic and social consequences. By reclassifying

all homeopathic drugs as "illegal" under the FDCA because none of them have an approved NDA, the FDA created a presumption that homeopathic practitioners are performing illegal acts. Homeopathic practitioners are now being put at risk that their medical specialty could be deemed unlawful. The U.S. homeopathic market has been valued at approximately $6.2 billion in 2020.[18] Absent FDA intervention, the market was forecasted to reach over $19.7 billion by 2030. *Id.* This growth rate was projected, in part, by "the rising inclination of the population toward non-invasive treatment." *Id.* Consumers want alternatives to conventional allopathic medicine. These are personal medical choices toward complementary and alternative medicine. By rending such products technically "unlawful," the FDA has threatened to disconnect an entire multi-billiondollar industry from its consumers. These facts would support invocation of the "major questions" doctrine.

Particularly following *MediNatura*, a court will likely conclude that the FDA profoundly altered industry's legal rights and obligations by replacing the CPG 400.400 with an ad hoc "riskbased" approach, and by otherwise defaulting all OTC homeopathic products to Section 355 premarket requirements. Under that *MediNatura* decision, a court could conclude that the CPG 400.400 was a substantive "rule" entitled to the same consideration as a codified regulation. *See Se. Mins., Inc. v. Harris*, 622 F.2d 758, 766 (5th Cir. 1980) (explaining the difference between substantive rules which are subject to Section 553(b) and general statements of policy which are not). A "rule" is "the whole or part of an agency statement of general or particular applicability and future effect designated to implement, interpret, or prescribe law or policy…" *See Pros. & Patients for Customized Care v. Shalala*, 847 F. Supp. 1359, 1364 (S.D. Tex. 1994), *aff'd,* 56 F.3d

---

[18] *See, e.g.,* Precedence Research, Homeopathic Products Market, Global Industry Analysis, Size, Share, Growth, Trends, Regional Outlook, and Forecast 2021-2030.

592 (5th Cir. 1995). "[T]he label that the particular agency puts upon its given exercise of administrative power is not, for [the court's purposes], conclusive; rather, it is what the agency

does in fact." *Id.* at 596. The *MediNatura* court observed that the FDA "applied CPG 400.400 as a basis for taking enforcement action and treated the policy as a legally operative document." *MediNatura*, 496 F.Supp.3d at 441. This further underscores why Congress would have memorialized the FDA's position governing OTC homeopathic products through the CARES Act exclusions. The *MediNatura* decision supports Meditrend's position, stating: "MediNatura's arguments seem premised on the notion that the agency must leave open some avenue for the legal marketing of homeopathic drugs, but if it is not possible for the industry to comply with the requirements of the FFDCA, that is a problem to take up with Congress." *See MediNatura*, 496 F.Supp.3d at 459. Since that ruling, Congress has now spoken through the CARES Act and expressly exempted homeopathic products from OTC premarket requirements, including new drug approval pathways. That conclusion is at odds with the FDA's rescission of CPG 400.400. The *MediNatura* decision mentioned the CARES Act only as part of its background summary of FDA regulation. The Court did not evaluate how the CARES Act affected the FDA's authority to regulate OTC homeopathic drugs moving forward. Accordingly, the *MediNatura* decision is not dispositive of whether the FDA may regulate OTC homeopathic drug products as it is currently doing under the 2019 Draft Guidance in light of the CARES Act. That issue was never reached.

A court would not be required to reach the "major questions" doctrine here because Congressional intent to exempt OTC homeopathic drugs products is clear from Section 3853 of the CARES Act. However, even if a court chooses to evaluate the agency's interpretation of that

28

statutory provision, the "major questions" doctrine requires FDA to identify "clear congressional authorization for the authority" to regulate OTC homeopathic drugs consistent with as conventional drugs. *See W. Va.*, 142 S. Ct. at 1609. That authority is lacking following the CARES Act. For that reason, the FDA must follow Congressional intent by adopting regulations and standards for the manufacturing and sale of OTC homeopathic drugs. Those standards must be more flexible than those imposed on conventional drugs, and must facility the ongoing marketing and sale of OTC homeopathic products consistent with FDA's history of regulation in that field. The AHCF petition proposes proper standards to meet that goal and, thus, the FDA should grant and implement the requested relief.

## VI.  CONCLUSION

Because the FDA lacks authority to require all OTC homeopathic drug products to have an approved new drug application to be lawfully marketed, Meditrend requests that the FDA partially grant the AHCF Citizen Petition and cease regulating OTC homeopathic drugs as "new drugs" under the FDCA. In particular, the FDA should treat OTC homeopathic drugs as GRAS/E when such products are manufactured in accordance with cGMPs, comply with HPUS requirements, and contain homeopathic active ingredients that are either listed in or pending approval for listing in the HPUS, and/or are manufactured consistent with homeopathic principles outlined in the HPUS. In the alternative, the FDA should promulgate regulations governing the marketing and sale of OTC homeopathic drugs which mirror the conditions for sale stated in the now-rescinded CPG 400.400. Agency action under the AHCF petition is necessary to remedy unlawful administrative action in conflict with Congressional intent.

[Signature Page to Follow]

Respectfully submitted,

MEDITREND, INC.

By:    */s/ Jonathan W. Emord*
        Jonathan W. Emord
        Peter A. Arhangelsky
        Bethany R. Kennedy

        Emord & Associates, P.C.
        11808 Wolf Run Ln.
        Clifton, VA 20124
        Phone:  (202) 466-6937
        Email:  jemord@emord.com

        *Counsel to Meditrend, Inc.*

Dated:  November 30, 2022.