UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Alliance for Natural Health USA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, *et al.*, <br><br> Defendants. | Case No. 24-cv-2989 (CRC) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR
SUMMARY JUDGMENT[1]**

Plaintiffs Alliance for Natural Health USA ("ANH") and Meditrend, Inc. ("Meditrend") hereby submit their memorandum in support of their motion for summary judgment in compliance with this Court's July 15, 2025 Memorandum Opinion and Order ("MO&O")[2] and its July 31, 2025 Order setting deadlines, and in accordance with Federal Rule of Civil Procedure 56 and LCvR 7. In the MO&O, the Court narrowed the universe of actionable claims in this proceeding to Count III of the Plaintiff's Complaint.

---

[1] See Federal Rule of Civil Procedure 56 and LCvR 7(h)(2): "Paragraph (1) shall not apply to cases in which judicial review is based solely on the administrative record. In such cases, motions for summary judgment and oppositions thereto shall include a statement of facts with references to the administrative record." Accordingly, no separate statement of material facts is submitted and the material facts incorporated herein are each referenced to the corresponding AR page.

[2] In the MO&O, the Court concluded that Plaintiff Meditrend had "plausibly alleged standing" but cautioned that the "burden to demonstrate standing increases over the course of litigation . . ." and emphasized that the "Court has a continuing duty to examine its subject matter jurisdiction and must raise the issue *sua sponte* when it comes into doubt," citing *Bonner v. Duggan*, 324 F.R.D. 285, 294 (D.D.C. 2018) (citing *Henderson ex. Rel. Henderson v. Shinseki,* 562 U.S. 428, 434 (2011). Because standing is always in issue (see, e.g., *Young v. Environmental Protection Agency*, 106 F.4th 56, 59 (2024), Meditrend in **Exhibit 1** hereto provides the Court with a second affidavit from its owner and manager Ric Savage, who supplies therein and in the attached documentation detailed proof of increased supply costs to Meditrend directly resulting from the FDA revocation of CPG 400.400, remediable through further agency proceedings following reversal of the agency's CPG 400.400 revocation and remand to the agency in accordance with the anticipated order from this Court.

**INTRODUCTION**

In Count III, Plaintiffs explain that the FDA revoked CPG 400.400 on the basis that homeopathic drugs are intrinsically unsafe. In that count, Plaintiffs challenged FDA's determination as contrary to comments of record without analysis of those comments and as unsupported by, and contradicted by, the Administrative Record, and, therefore, arbitrary and capricious and lacking substantial evidence.

FDA's conclusion is grounded on single, isolated instances of mis-manufacture, or adulteration, and ignores the overwhelming evidence of record that confirms homeopathic drugs when properly manufactured in accordance with GMPs and the HPUS are intrinsically unsafe.

FDA has failed to consider and weigh the relevant data in its administrative record. The data which FDA ignored confirms the intrinsic safety of homeopathic drugs. Moreover, FDA's offered explanations for concluding homeopathic drugs unsafe run contrary to the weight of record evidence, which repeatedly confirms that homeopathic drugs manufactured in accordance with GMPs and the HPUS are intrinsically safe. As explained below with citations to the Administrative Record, FDA has violated the APA arbitrary and capricious and substantial evidence standards of review. See *Motor Vehicle Manufacturers Assoc. of the U.S., Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43, 49, 55-56 (1983)*.

On the record before it, FDA's determination of a lack of safety is, when compared to the record as a whole, a classic fallacy of logic (*a dicto simpliciter ad dictum secundum quid*): the mistake of applying a general statement unqualifiedly to a qualified case. In the Administrative Record, homeopathic drugs that are GMP and HPUS-compliant are overwhelmingly established to be safe for their intended uses.

Consequently, on the sole remaining question of whether FDA acted arbitrarily and capriciously and without substantial evidence when concluding homeopathic drugs intrinsically unsafe, the record evidence overwhelming confirms that it did.

2

## STATEMENT OF FACTS REFERENCING THE ADMINISTRATIVE RECORD

## BACKGROUND

Homeopathic drugs are daily used by millions of people worldwide and are recognized by the World Health Organization as safe for intended uses. (**Administrative Record (AR) p. 318**). Homeopathic drugs have been part of the federal regulatory framework since the passage of the Food, Drug, and Cosmetic Act in 1938, which expressly included them in the statutory definition of "drug" under 21 U.S.C. § 321(g).[3] For nearly eight decades thereafter FDA treated homeopathics as a unique category of drugs distinct from conventional drug products. Unlike conventional drugs, homeopathics were not subjected to the burdensome premarket approval requirements under 21 U.S.C. § 355 but were instead regulated for compliance with labeling and manufacturing requirements and with manufacturing standards governed by the HPUS. *Compliance Policy Guide 7132.15, § 400.400 (1988) ("CPG 400.400")*.

In 1972, when FDA initiated its OTC drug review process and began classifying conventional drugs into monographs, it specifically excluded homeopathic drugs. FDA explained that *"because of the uniqueness of homeopathic medicine, the Commissioner has decided to exclude homeopathic drugs from this OTC drug review and to review them as a separate category at a later time"* (37 Fed. Reg. 9466). For decades, FDA did not regulate homeopathics as conventional "new drugs." In 1983, the agency finalized amendments to good manufacturing practice rules, stating that compliance with GMP standards together with adherence to the HPUS was "sufficient to ensure the quality of homeopathic drug products" (48 Fed. Reg. 14004; **AR pp. 26–27**).

FDA reaffirmed this position in subsequent statements, including in a 1988 article in its <u>FDA Consumer</u> magazine and a related Talk Paper, where it emphasized that homeopathic drugs were

---

[3] 21 U.S.C. § 321(g): "The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, *official Homoeopathic Pharmacopoeia of the United States*, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals…" (Emphasis added).

3

"exempt" from the conventional safety and efficacy requirements imposed on drugs under 21 U.S.C. § 355 (Sept. 15, 1988, FDA Talk Paper); (**AR pp. 5241, 5243, 7165, 7172, 7174**).

The agency formalized that position in 1987 when it adopted Compliance Policy Guide (CPG) 400.400. The CPG required "homeopathic products to be properly labeled and manufactured in accordance with current good manufacturing practices" but acknowledged that "due to the unique nature of these drug products, some requirements of 21 CFR 211 are not applicable'" (**AR p. 27**). For the next three decades, CPG 400.400 provided a regulatory safe harbor under which homeopathic products lawfully entered the market, and industry relied extensively on the guidance to structure its manufacturing, labeling, and distribution practices.

Even in 2004, when FDA withdrew the proposed regulation, it reaffirmed that the primary concern with homeopathy was the *potential* for <u>manufacturing or labeling errors</u>, not the inherent safety of the products. 69 Fed. Reg. 227, 68834 (Nov. 26, 2004); (**AR p. 18**). FDA expressly stated that finished product testing may be appropriate in cases where ingredients, at certain levels, could pose toxicity risks, but otherwise reiterated that GMP requirements and HPUS standards were sufficient to ensure homeopathic drug quality (**AR p. 18- FDA**). That reveals FDA itself recognized that tailored safeguards addressing specific risks—such as targeted product testing and labeling enforcement—were sufficient to protect public health, and that homeopathy was not intrinsically unsafe.

Not until 2017 did FDA abandon this historical position by issuing a draft guidance entitled "Drug Products Labeled as Homeopathic" (82 Fed. Reg. 60403), signaling that homeopathics would henceforth be subject to a "risk-based" enforcement approach. That guidance was finalized in 2022, revoking CPG 400.400 and treating all homeopathic drugs as "unsafe" and unapproved "new drugs."

## RECORD CITATIONS ON SAFETY

### The Administrative Record

The first 100 pages of the Administrative Record include the petition of Americans for Homeopathy Choice Foundation (AHCF) and its appendices (**AR pp. 1–100**). The next 439 pages contain the Flexner Report and articles and books discussing homeopathic safety, remedies, and effectiveness, including the WHO Global Atlas of Traditional, Complementary and Alternative Medicine (2005) (**AR pp. 101–539**). Following that is a comprehensive Homeopathy Research Evidence Base: References Curated by Iris Bell, M.D., Ph.D. and Peter Gold (**AR pp. 540–762**), containing over 5,500 citations to peer-reviewed scientific literature, the overwhelming majority of which affirm homeopathy's safety and effectiveness. Additional materials, including the Homeopathy Research Institute and Homeopathic Pharmacopoeia of the United States' websites, Science Museum publication on Thalidomide, the 2011 Guidance Document, and the 1996 FDA Compliance Policy, appear in **AR pp. 763-1009**. From **AR pp. 1010–7198**, the record consists of public submissions from more than 54,000 citizens overwhelmingly attesting to the safety and benefits of homeopathy in their daily lives. In contrast, a small part of the record (**AR pp. 7309–8962**), contains reports, warning letters, recalls, or complaints, the vast majority of which concern a few products (Hyland's teething tablets, Zicam, and Ameba/Fluke Detox) that were either misbranded, adulterated, or improperly labelled.

Records from the American Association of Poison Control Centers (AAPCC) and the National Poison Data System (NPDS) confirm that exposure reports involving products labeled "homeopathic" account for less than 1% of all calls to poison control centers, and that 98% of those cases involve only minor or no adverse effects, requiring no medical referral (**AR p. 96**).

No serious adverse events, hospitalizations, or deaths are attributed to properly manufactured homeopathic drugs (**AR pp. 54, 96, 98**).

The Swiss government's health technology review concluded that homeopathy is both safe and effective (**AR p. 98**).

**Dr. Iris Bell and Peter Gold Curated Bibliography of Over 5,500 Peer-Reviewed Articles**

The Administrative Record contains a curated bibliography of over 5,500 peer-reviewed articles assembled by Dr. Iris Bell and Peter Gold in 2015, the overwhelming majority of which support the safety and efficacy of homeopathy (**AR pp. 540–762**). Representative studies include Bornhöft et al., (*Effectiveness, safety and cost-effectiveness of homeopathy in general practice,* 2006); English, J. M., (*The Safety of Homoeopathy,* 1996); Jong et al., (*Effectiveness, safety and tolerability of a complex homeopathic medicinal product in the prevention of recurrent acute upper respiratory tract infections in children,* 2016); Steinsbekk et al., (*Homeopathic care for the prevention of upper respiratory tract infections in children: a pragmatic, randomised, controlled trial comparing individualised homeopathic care and waiting-list controls,* 2005); Felippi CC, et al. (*Safety and efficacy of antioxidants-loaded nanoparticles for an anti-aging application*; Adler M., (*Efficacy and safety of a fixed-combination homeopathic therapy for sinusitis,* 1999); Baars et al., (*Safety of homeopathic injectables for subcutaneous administration: a documentation of the experience of prescribing practitioners,* 2005); Fisher, P., et al. (*The safety of homeopathic products,* 2002); Gogtay, N. J., et al. (*The use and safety of non-allopathic Indian medicines,* 2002). Chainani-Wu, N. (*Safety and anti-inflammatory activity of curcumin: a component of tumeric (Curcuma longa),* 2003). (**AR pp. 540–762**).

**Hyland's Baby Natural Relief Teething Tablets**

In January 2017, the Forensic Chemistry Center (FCC) analyzed Hyland's Baby Natural Relief Teething Tablets and found varying amounts of scopolamine in 174 of 474 tablets, with levels ranging from 0.1 to 53.4 nanograms — at least $10^6$ times greater than the label claim of 0.24 femtograms (**AR pp. 7385–86**). The FCC concluded that this reflected inhomogeneity in belladonna incorporation and thus suggests "a poor manufacturing quality control issue." (**AR p. 7388**). The

6

pharmacovigilance team further acknowledged that a causal link between reported adverse events and labeled formulations could not be established, that post-marketing reports lacked sufficient medical evidence, and that it was pharmacologically implausible for the infinitesimal quantities claimed on the labels ($0.2 \times 10^{-12}$ mg) to elicit any effect (**AR pp. 7317–18**).

FDA's Forensic Chemistry Center found that certain lots of Hyland's tablets contained nanogram levels of scopolamine—a million times higher than the labeled femtogram amount—due to poor quality control (**AR pp. 7385–88**). FDA's January 27, 2017, News Release described the risk as a problem of "inconsistent amounts of belladonna" and expressly described the matter as a labeling and quality-control failure (**AR p. 8781**). Likewise, FDA's inspection letter characterized the products as "adulterated" due to "significant violations of Current Good Manufacturing Practice (CGMP) regulations" (**AR p. 8784**).

FDA's news release concerning the Hyland product on January 27, 2017 states: "[I]ts laboratory analysis found inconsistent amounts of belladonna, a toxic substance, in certain homeopathic teething tablets, sometimes far exceeding the amount claimed on the label" (**AR p. 8781**). Likewise, in recalling Hyland's Baby Teething Tablets and Hyland's Baby Nighttime Teething Tablets, FDA expressly cited "significant violations of Current Good Manufacturing Practice (CGMP) regulations" that rendered the products adulterated under § 501(a)(2)(B) of the FDCA (**AR p. 8784**).

In its April 29, 2011 letter to Standard Homeopathic Company concerning the Hyland product, FDA identified GMP violations including failure to establish hold times, failure to conduct in-process testing, and failure to investigate failed batches — all hallmarks of poor manufacturing practice, not intrinsic dangers of homeopathy (**AR pp. 8793–97**).

## Zicam Cold Remedy Nasal Gel

Consumers using Zicam Cold Remedy Nasal Gel as labeled were exposed to 3.6 mg of zinc per day and 12 mg for those using Zicam Cold Remedy Nasal Swabs (**AR p. 8839**). Considering the

7

latter amount equals the maximum exposure for 4- to 8-year-olds, Zicam Cold Remedy Nasal Swabs is a misbranded product (**AR p. 8839**). FDA's letter to Matrixx Initiatives, Inc., on June 16, 2009, identified the products as "misbranded" (**AR pp. 8873–76**). FDA admits that "the Zicam on which these reports were received was misrepresented as a homeopathic drug product and should not have been labeled 'homeopathic.'" (**AR p. 8814; AR p. 8839**).

### Warning Letters, Recalls, and FAERS Reports

Warning letters, recalls, and FAERS reports (FDA Adverse Even Reporting System reports) (**AR pp. 7309–8962**) in the Administrative Record concern a narrow set of products that were defective because they were adulterated, misbranded, or misrepresented as homeopathic.

A January 4, 2013, DHHS letter to Michael D. Grubb faulted a manufacturer for selling products such as "Virus Nosode Drops" and "Herpetic Nosode Formular" containing ingredients that were "not established homeopathic active ingredients in the HPUS or any of the addenda or supplements" (**AR pp. 8879–83**). These products were thus not homeopathic at all.

The FDA admits "FAERS data does have limitations. First, there is no certainty that the reported event… was due to the product… Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population" (**AR p. 64**). FAERS reports lack adequate detail, contain duplicate entries, and sometimes misclassify conventional drugs (such as citalopram) as "homeopathic" (**AR pp. 64–65**). Many entries lack dates, patient histories, or follow-up information, and some are filed nearly a decade after the alleged events (**AR p. 65**).

### The AHCF Petition

In its June 5, 2020 petition, American Homeopathic Consumer Freedom (AHCF) asked FDA to recognize HPUS-listed homeopathic drugs as safe when properly manufactured and labeled, prohibit the misuse of the term "homeopathic" by non-HPUS products, and ensure CGMP compliance for all HPUS-listed drugs (**AR pp. 3–7**).

## ARGUMENT

### I.    FDA's Mis-Attribution of Safety Risks to the Homeopathic Method Constitutes Arbitrary and Capricious Agency Action in Violation of the APA

The FDA's own warning letters, inspection reports, product recalls, and news releases reveal the agency's cited "safety" problems with homeopathic products do not stem from the homeopathic method itself but from isolated instances of mis-manufacture or misbranding. Those isolated instances involve problems unique to each circumstance and not proof of a systemic problem or one endemic to homeopathic drugs properly manufactured in accordance with GMPs and the HPUS. The evidence in the Administrative Record on which FDA relies repeatedly frames adverse events and enforcement actions as traceable to poor quality controls, contamination, adulteration, and misbranding, but not to GMP and HPUS-compliant homeopathy. Nevertheless, FDA concludes that the homeopathic method itself poses systemic danger, the result of a hasty generalization whereby FDA declares without proof of a nexus that isolated, unrepresentative instances of adulteration and misbranding are representative of the universe of properly manufactured and HPUS-compliant homeopathic drugs, a general statement unqualifiedly applied to a qualified case. Because FDA's conclusion of a lack of safety endemic to the homeopathic method is overwhelmingly contradicted by the Administrative Record, it violates the Administrative Procedure Act's requirement of reasoned decision making. 5 U.S.C. § 706(2)(A).

FDA's own record therefore concedes that its cited "homeopathic safety" cases in fact involved products that did not meet the legal definition of homeopathy in the first place: another hallmark of arbitrary and capricious agency action. In each instance — whether Hyland's teething tablets, Zicam's intranasal zinc, or the other cited examples — the Administrative Record reveals the problem to be manufacturing noncompliance, failure to comply with the HPUS, labeling errors, and misbranding, not the homeopathic method itself. Despite the fact of mis-manufacture and misbranding associated with these products, reports tied to injury from "homeopathic" products still account for less than 1% of calls to Poison Control Centers, with 98% of those cases involving only

9

minor or no adverse effects (**AR p. 96**). To attribute systemic risk to the homeopathic method, as FDA has done, in the face of the record data, and to disregard the agency's own prior factual findings which for decades contradicted the notion that homeopathy is intrinsically unsafe, is to act unreasonably and irrationally, to embrace arbitrary and capricious decision-making.

To avoid arbitrary and capricious action, agencies must not ignore relevant data, must not ignore important aspects of the problems they address, and must not offer explanations for agency action that run contrary to the record evidence.  See *Motor Vehicle Manufacturers Ass'n v. State Farm, at 29, 43, 49, 55-56.*  In *Motor Vehicle Manufacturers Ass'n v. State Farm, 463 U.S. 29, 55 (1983)*, the Court held that "while agencies need not consider every alternative device and thought conceivable by the mind of man, they must consider 'technological and policy alternatives within the ambit of the existing standard' when such alternatives could achieve the agency's statutory objectives."  Likewise, in *FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-516 (2009),* the Court requires reasoned analysis that explains in detail a change from prior policy, taking into account commenters' alternatives that are within the ambit of the existing policy.  See also *Dept. of Homeland Sec. v. Regents of Univ. of Cal.,* 591 U.S. 1, 30 (2020) ("*State Farm* teaches that when an agency rescinds a prior policy, its reasoned analysis must consider 'alternatives' that are 'within the ambit of the existing [policy]'").

The Administrative Record contained precisely such alternatives.  AHCF's proposal, if adopted, would have directly addressed the quality issues documented in FDA's own enforcement record while preserving consumer access to properly manufactured homeopathic drugs.  FDA ignored that proposal, offering no reasoned analysis for refusing to accept it.  Instead of adopting less draconian measures, FDA chose to rescind decades of established policy and declare all homeopathic drugs intrinsically unsafe, doing so based on a tiny, unrepresentative fraction of errant products, the faults of which did not logically, reasonably, or scientifically impugn the homeopathic method or any homeopathic drug manufactured consistent with cGMPs and the HPUS.  It did so without

substantively engaging the mountain of record evidence in favor of homeopathic drug safety or by even referencing, let alone evaluating, reasonable alternatives articulated by commenters like the AHCF.

The implicit rejection of the alternatives, *sub silentio*, violates the APA, as the Supreme Court explained in *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816-817 (1983):

> …[T]he Secretary failed to provide any explanation for his implicit rejection of alternatives . . . . Therefore, in light of *Motor Vehicle Manufacturers Association*, we are constrained to hold the Secretary's failure to consider such alternatives . . . arbitrary and capricious, in violation of [the APA]. . . . It is absolutely clear . . . that such an "artificial narrowing of options," *Pillai v. CAB, 485 F.2d 1018, 1027 (DC Cir. 1993),* is antithetical to reasoned decision-making and cannot be upheld.

See also, *Yakima Valley Cablevision, Inc. v. F.C.C.*, 794 F.2d 737, 746 & n.36 (DC Cir. 1986) (the "failure of an agency to consider obvious alternatives has led uniformly to reversal"). The Administrative Record thus revealed that identified risks were remediable through GMP enforcement, labeling correction, and disallowance of non-HPUS products, but FDA ignored the AHCF comment along with the evidence to that effect which predominated in the Administrative Record.

FDA's *secundum quid et simpliciter* approach cannot withstand fair judicial scrutiny under a non-deferential application of 5 U.S.C. § 706(2)(A), a judicial scrutiny mandated in the advent of *Loper Bright Enterprises, Inc. v. Raimondo, 603 U.S. 369 (2024).*

By attributing risks arising from non-GMP and HPUS compliant products to the homeopathic method itself, FDA acted contrary to the record evidence, ignored relevant facts, failed to consider obvious alternatives, and disregarded reliance interests — all in violation of the APA. See *City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 (1993), Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company, 463 U.S., at 49, 55-56.*

II.	FDA's *Volte Face* on Homeopathic Safety Is Arbitrary and Capricious Based on the Historic Regulatory Record

In *FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-516 (2009)*, the Supreme Court reasoned that when an agency adopts a new policy, and its new factual basis contradicts its old one (the precise circumstance here), and the new policy affects reliance interests (as it does here), the agency must give a "more detailed explanation" for its *volte face* and will violate the APA reasoned decision-making requirement if it fails to provide that explanation.  See *FCC v. Fox Television Stations, Inc.*, 556 U.S., at 515-516 (explaining that "'a more detailed explanation' must be provided when . . . [a] new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account (citing *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 742 (1996)").  The Court held a failure to provide that detailed explanation "arbitrary and capricious" agency action in violation of the APA.  *Id*.

The FDA's *volte face* on homeopathic drug safety comes with no substantive reckoning with its nearly eighty years of policy favoring homeopathic drug safety or reliance by industry.  It thus constitutes arbitrary and capricious agency action under *Fox Television Stations, Inc.*  See also *Dept. of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S., at 30 ("When an agency changes course . . . it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account'. . .[and] 'it would be arbitrary and capricious to ignore such matters.'").

Furthermore, the Administrative Record undermines the basis for FDA's determination by revealing that homeopathic drugs have historically generated negligible safety signals compared to conventional pharmaceuticals.

In stark contrast to the agency's determination, the curated bibliography in the Administrative Record of over 5,500 peer-reviewed articles assembled by Dr. Iris Bell and Peter Gold in 2015 overwhelmingly support the safety and efficacy of homeopathy (**AR pp. 540–762**).  By disregarding that extensive data, FDA violated its obligation "to consider the relevant factors and articulate a

rational connection between the facts and the choice made," essential to avoid arbitrary and capricious agency action under the APA. See *Motor Vehicle Manufacturers Assoc. of the U.S., Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S., at 43, 49, 55-56 (1983).*

### III. FDA's Conclusion that Homeopathy Is Unsafe Is Not Supported by "Substantial Evidence"

The Administrative Procedure Act provides that agency action must be set aside where findings are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). Substantial evidence review does not permit an agency to confine itself to evidence that supports its preferred outcome, while ignoring contrary record evidence. Rather, under the controlling *Universal Camera Corp.* standard, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88 (1951); Butte Cnty., Cal. v. Hogen, 613 F.3d 190, 194 (DC Cir. 2010).* As the D.C. Circuit has emphasized, an agency cannot rely "upon portions of studies that supported its position, while ignoring cross sections in those studies that did not." *Genuine Parts Co. v. EPA, 890 F.3d 304, 311 (DC Cir. 2018).* But here nothing of record supports the agency's position (when misbranding and HPUS non-compliant products are removed from the equation); rather, the agency mischaracterized select cases in the record, declaring them representative of all homeopathy, when in fact the cases were only indicative of harms associated with non-GMP and HPUS-compliant products, entirely unrepresentative of the universe of homeopathic drugs.

FDA disregarded the Administrative Record evidence supporting the safety of the homeopathic method, while seizing upon a handful of aberrant cases that involved mis-manufactured or misbranded products, ones not made in accordance with the homeopathic method (ones that were, thus, not "homeopathic" at all). Yet, despite that incongruity, FDA presumed the universe of homeopathic drugs unsafe when the opposite was born out by the vast majority of data in its Administrative Record. The error of logic was also one of science, wholly inconsistent with

generally accepted scientific principles on which Courts depend to avoid errors of justice precisely like this.  See, e.g., *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)*.

The entirety of the record reflects a consistent, international consensus among leading authorities that homeopathic products when properly manufactured and labeled are safe for use.

FDA, however, chose to ignore the mountain of record evidence, not even addressing it, and to base its decision on a proverbial speck in the record, on two isolated and unrepresentative instances—Hyland's teething tablets and Zicam intranasal zinc.  Those two are central to the agency's withdrawal of CPG 400.400 and featured prominently in its determination.  But the Administrative Record confirms that those two products were not unsafe because of homeopathy itself; they were unsafe because they were mis-manufactured and misbranded.

The record evidence concerning the two cases on which FDA principally relied, Hyland's teething tablets and Zicam intranasal zinc, reveal mis-manufacturing and misbranding, not inherent dangers of homeopathy.

Under the APA, FDA cannot lawfully base its action on isolated record instances that constitute selective and unreliable evidence while ignoring overwhelming countervailing data directly on point.  Evidence that appears substantial in isolation "may become insubstantial when contradictory evidence is taken into account." *Genuine Parts Co. v. Env't Prot. Agency, 890 F.3d 304, 313-315 (DC Cir. 2018); Morall v. Drug Enf. Admin., 412 F.3d 165, 178 (DC Cir. 2005)* ("Our lodestar is the question of whether the record *as a whole* provides substantial evidence to support the agency action.  We conclude that it does not . . .").  But FDA did not take it into account, and therein lies another APA violation.  The Supreme Court has ruled that if an agency decision ignores material evidence in the record, the agency fails to base its decision on substantial evidence and, thus, violates the APA. *Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88 (1951); Consolidated Edison Co. v. New York v. N.L.R.B., 305 U.S. 197, 229 (1938)*.  Courts must examine the record *as a whole* to determine whether there exists a rational connection between the facts found and the regulatory

choice made. *Morall,* 412 F.3d at 178. By treating isolated instances involving noncompliant products as proof of systemic homeopathy risk among the universe of compliant products, FDA acted irrationally and unreasonably. It offered "an explanation for its decision that runs counter to the evidence before the agency" and thereby violated the APA arbitrary and capricious standard and the substantial evidence standard. *Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 798 (DC Cir. 1984); Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43, 49, 55-56 (1983)*.

FDA's reliance on FAERS reports further undermines the credibility of its position. The Administrative Record concedes that "FAERS data does have limitations. First, there is no certainty that the reported event… was due to the product… Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population" (**AR p. 64**). FAERS reports lack adequate detail, contain duplicate entries, and sometimes misclassify conventional drugs (such as citalopram) as "homeopathic" (**AR pp. 64–65**). Many entries lack dates, patient histories, or follow-up information, and some are filed nearly a decade after the alleged events (**AR p. 65**). As the D.C. Circuit held, it is "not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data" or data known only to the agency. *Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 237 (DC Cir. 2008).* FDA's heavy reliance on FAERS data, despite its acknowledged unreliability, further confirms the absence of substantial evidence supporting its determination.

The Supreme Court has consistently cautioned that an agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [acted] so implausibly that it could not be ascribed to a difference in view or the product of agency expertise." *Dep't of Com. v. New York, 588 U.S. 752, 802 (2019) (quoting State Farm, 463 U.S., at 43).* That is the case here. FDA disregarded the thousands of peer-reviewed studies in its own record confirming the safety of homeopathy, relied disproportionately on two noncompliant products as supposed proof of systemic

danger among compliant products, and then tried to cover its tracks by leaning heavily on an adverse-event reporting that the agency acknowledges is unreliable.

In light of the statutory requirement that agency findings be supported by substantial evidence, 5 U.S.C. § 706(2)(E), and the judicial mandate that all material facts in the record be considered, FDA's position cannot withstand fair judicial scrutiny, particularly post *Loper Bright,* under applicable standards of review. Its refusal to engage the bulk of the scientific record, coupled with its reliance on unrepresentative data, renders its determination irrational, legally deficient, and scientifically indefensible.

**IV.     The Administrative Record Overwhelming Supports Homeopathic Drug Safety**

In analyzing administrative action, the Court's role is to determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).* The Administrative Record in this case overwhelmingly supports the safety of homeopathic drugs, yet FDA reached a contrary conclusion by ignoring the record evidence that contradicts lack of safety and deeming dispositive isolated, unrepresentative instances involving misbranded or mis-manufactured "homeopathic" products. As explained above, when parsed beyond a superficial reliance on FDA's conclusory statements, the record reveals the principal bases for FDA decision not to involve the homeopathic method, not to involve products manufactured in compliance with GMPs and the HPUS, but to involve either mis-manufactured products or misbranded products that are, in fact, by virtue of those fundamental defects not "homeopathic" at all.

To decide whether an agency's conclusion is supported by substantial evidence, a reviewing court must "identify the conclusion and then examine and weigh the evidence." *Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 389 (1998)*. FDA's conclusion was that homeopathy as a category poses safety risks warranting the withdrawal of CPG 400.400. Yet the weight of the record points decisively to the opposite conclusion. Over 6,000 pages of the 8962 pages of the record

16

contain scientific literature, petitions, and citizen comments corroborating the safety and benefits of homeopathy, while only a fraction of the record cites problems; problems resulting from manufacturing or misbranding, not homeopathy itself.

The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla." *Consolidated Edison Co. v. New York v. N.L.R.B., 305 U.S., at 229*. FDA's decision rests on less than a mere scintilla—extrapolating broad safety concerns from a handful of errant unrepresentative cases while disregarding thousands of pages of evidence concerning relevant products. The Court has made clear that evidence that may appear substantial in isolation "may become insubstantial when contradictory evidence is taken into account." *Genuine Parts Co. v. EPA, 890 F.3d 304, 311 (DC Cir. 2018)*. That is the case here. The contradictory evidence—the scientific literature, the AHCF petition, and the over 54,000 citizen submissions—is not incidental, it is the bulk of the record, while the unrepresentative instances of alleged safety risk plucked out of the record by FDA are false exemplars and miniscule by comparison with the totality of the evidence, constituting a rare exception in the record content.

Our Court of Appeals vacates agency action if the agency "has failed to examine the relevant data or failed to articulate a rational explanation for its actions." *Genuine Parts Co. v. EPA, 890 F.3d 304, 311 (DC Cir. 2018)*. FDA's failure to address the core record evidence of safety, including the scientific bibliographies (**AR pp. 540–762**), and particularly the AHCF petition and the thousands of public comments, constitutes just such a failure. Indeed, the AHCF petition and its supporting submissions (**AR pp. 1–100 and AR pp. 1010–7198**) show near-universal support for continued reasonable regulation of homeopathy as the means to ensure safety, not withdrawal of CPG 400.400. FDA's dismissal of that evidence represents a failure to "consider an important aspect of the problem," rendering its action arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983)*.

17

The Supreme Court has further held that each agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983)*. FDA has not done so.  It ignored the extensive evidence confirming homeopathy's safety and relied instead on a narrow set of recalls and warning letters concerning products that were not established to be homeopathic drugs manufactured in compliance with GMPs and the HPUS.  That failure to rationally connect the evidence in the record with the decision reached is under controlling precedent the very definition of arbitrary and capricious agency action and a lack of substantial evidence.  FDA depended on an isolated, faulty, and unrepresentative sliver of record evidence, and then leapt past without rational comment the great bulk of the record which confirmed homeopathic drug safety, to reach its heavily contradicted determination that homeopathic drugs are intrinsically unsafe.  It did not follow the APA, and it did not satisfy the substantial evidence standard.

Moreover, the law requires agencies changing course from past practice to "show that there are good reasons for the new policy," *Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)*, and to provide a "more detailed explanation" for its *volte face, FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009)*.  FDA's *volte face* after decades of identifying homeopathic drugs as intrinsically safe when compliant with GMPs and the HPUS was not supported by any reasoned, detailed explanation for its *volte face* beyond the mere conclusory assertion of safety risk.  Its references undergirding that conclusion—isolated, noncompliant products and questionable FAERS data—cannot withstand fair judicial scrutiny under applicable precedent when viewed in the light of the record as a whole.

The small portion of the record on which FDA relied (**AR pp. 7309–8962**) concerns a narrow set of products that were defective because they were adulterated, misbranded, or misrepresented as homeopathic.  As such, they were not "homeopathic," not made in accordance with the HPUS and cGMPs, not representative of homeopathic drugs properly manufactured and labeled.  Hyland's

teething tablets were adulterated due to manufacturing inconsistencies; Zicam contained non-homeopathic levels of zinc and was "misrepresented as a homeopathic drug product" (**AR p. 8814**); other cited products were similarly noncompliant.  As such, the examples relied upon by FDA lack substantial evidence that homeopathy is intrinsically unsafe.

The Supreme Court in *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 389 *(1998)* emphasized that courts must weigh the evidence *as a whole* in determining whether substantial evidence supports an agency's conclusion. When the record here is weighed in its entirety--over 6,000 pages of scientific literature, AHCF petitions, and thousands of citizens comments--versus a small collection of recalls tied to noncompliant products, the balance shifts decisively in favor of homeopathic drug safety.

Ultimately, the agency's action is not supported by substantial evidence as required by 5 U.S.C. § 706(2)(E). The overwhelming evidence in the Administrative Record corroborates the safety and benefits of homeopathy, and FDA did not take that evidence into account, preferring instead to rely on isolated and unrepresentative instances of mis-manufacture and misbranding, and presuming without rational explanation those isolated instances to be characteristic of all homeopathy.  FDA's decision thus runs "counter to the evidence before the agency" and cannot withstand fair judicial scrutiny. *Walter O. Boswell Mem'l Hosp. v. Heckler,* 749 F.2d 788, 798 (DC Cir. 1984).

## **CONCLUSION**

For the foregoing reasons, the Administrative Record fails to provide support for FDA's determination that homeopathy is endemically unsafe.   The few exemplars FDA relied upon are not representative, indeed are not "homeopathic," but are isolated examples of mis-manufactured and misbranded products, ones that are not characteristic of homeopathic drugs manufactured in accordance with GMPs and the HPUS.  Accordingly, FDA's determination is a hasty generalization, a classic *secundum quid et simpliciter* error of logic (mistakenly applying a general statement

unqualifiedly to a qualified case). FDA has failed to satisfy the basic requirements of the Administrative Procedure Act by employing reasoned decisionmaking in review of evidence contrary to its position and articulating a rational reason for relying on the evidence it selectively drew from the record. Its determination is not based on substantial evidence and is arbitrary and capricious and not in accordance with law.

For those reasons, this Court should reverse the agency's decision revoking CPG 400.400 and remand this matter to the agency for re-evaluation consistent with the Court's decision.

Sincerely,

/s/ Jonathan Emord

Jonathan W. Emord[4],
D.C. Bar # 407414,
Chimnonso Onyekwelu
Emord & Associates, P.C.,
11808 Wolf Run Lane,
Clifton, VA 20124

Dated: October 8, 2025

---

[4] Counsel of Record